UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| STATE OF TEXAS, STATE OF MISSISSIPPI, STATE OF LOUISIANA,<br><br>    Plaintiffs,<br><br>v.<br><br>JANET YELLEN, in her official capacity as Secretary of the Treasury; RICHARD K. DELMAR, in his official capacity as acting inspector general of the Department of Treasury; U.S. DEPARTMENT OF THE TREASURY; and the UNITED STATES OF AMERICA,<br><br>    Defendants. | Case No. _____ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**I. INTRODUCTION**

1. In exchange for badly needed funds to assist the States of Texas, Mississippi, and Louisiana and their citizens in recovering from the ongoing pandemic, the American Rescue Plan Act attempts to obligate these States to exercise their core sovereign power of taxation in the way the federal government prefers. Specifically, the Act prohibits the Plaintiff States from reducing net tax revenue on pain of forfeiting up to billions of dollars in federal funding. American Rescue Plan Act of 2021, Pub. L. No. 117-2, § 9901(a) (2021) (adding § 602(c)(2)(A) to Title VI of the Social Security Act, codified at 42 U.S.C. § 802(c)(2)(A)).

2. The Act includes $195.3 billion in aid intended to assist States in recovering from the impacts of the pandemic—appropriating funds to be used "to respond to the public health emergency," "to respond to workers performing essential work," "for the provision of government

services to the extent of the reduction in revenue" of each State that receives the funds, and "to make necessary investments in water, sewer, or broadband infrastructure." *Id*. (adding § 602(c)(1) to Title VI of the Social Security Act, codified at 42 U.S.C. § 802(c)(1)).

3. The Act allocates money among the States based on their population and unemployment rates. *Id.* (adding § 602(b)(3) to Title VI of the Social Security Act, codified at 42 U.S.C. § 802(b)(3)). Texas is expected to receive approximately $16.45 billion under the Act. *See* Jared Walczak, State Aid in American Rescue Pan Act is 116 Times States' Revenue Losses, TAX FOUNDATION (Mar. 3, 2021), https://taxfoundation.org/state-and-local-aid-american-rescue-plan/.

4. Yet these funds come with a significant (and unconstitutional) condition—the Tax Mandate in Section 9901 of the Act. The Tax Mandate demands that the States not use funds received through the Act to "directly or indirectly" offset "a reduction in net tax revenue" caused by a change in tax policy. Pub. L. No. 117-2, § 9901(a) (adding § 602(c)(2)(A) to Title VI of the Social Security Act, codified at 42 U.S.C. § 802(c)(2)(A)). This condition applies regardless of the State's current rate of COVID-19 infections, its current unemployment rate, or its views on the best way to alleviate the economic burdens associated with the pandemic.

5. Section 9901 comes with a powerful enforcement mechanism. It empowers the Secretary of the Treasury to recoup any federal funds that a State used to "directly or indirectly" offset revenue loss from a tax reduction. *Id.* (adding §§ 602(c)(2)(A) and 602(e) to Title VI of the Social Security Act, codified at 42 U.S.C. §§ 602(c)(2)(A) and 802(e)).

6. The Act does not delineate how to determine whether funds have been used to directly or indirectly offset a reduction in net tax revenue. Because money is fungible, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 37 (2010), any reduction in the revenue that a State raises through its various tax policies may be determined by the Secretary to have been directly or

indirectly offset by funds received under the Act. Further exasperating the problem, the Tax Mandate demands on pain of forfeiture not only that the States not exercise their sovereign taxing powers to reduce tax *rates*—it demands that the States not enact any policy regarding a tax that, through legislation or otherwise, reduces tax *revenues*.

7. The threat created by the Tax Mandate therefore not only prohibits the Plaintiff States from eliminating taxes, reducing tax rates, or increasing tax credits; it also prohibits the adoption of enforcement policies regarding taxes which would lead to reduced tax revenues. For example, the States' federal funding under the Act would be put at risk by a decision not to enforce a given unemployment or payroll tax against struggling small businesses if nonenforcement led to reduced tax revenue. Similarly, a law reducing property values, and thus indirectly the collection of property taxes, would also put the States' federal funding at risk. By demanding that no new law or policy reduce the net intake of tax revenues, the Tax Mandate invades a broad swath of the States' potential legislative and executive decisions, including those affecting core sovereign functions.

8. The Tax Mandate, with its broad invasion of the States' sovereign prerogatives, seeks to unconstitutionally commandeer the governments of the Plaintiff States into setting their tax policy as the federal government would prefer. By design, Congress lacks the power to assert control over the States as such, let alone issue direct orders to the governments of the States to adopt policies as Congress desires. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1476 (2018); *New York v. United States*, 505 U.S. 144, 162 (1992).

9. If understood as a contract, rather than a command, the Tax Mandate unconstitutionally coerces the States. For example, the Mandate conditions $16.45 billion—more than 13 percent of Texas's 2021 budget—on acceptance of a particular set of policies preferred by

3

Congress. Lesser intrusions have failed the anti-coercion principles required by the Spending Clause and the Tenth Amendment. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580-81 (2012). As should the Tax Mandate.

10. The Plaintiff States seek a declaration that the Tax Mandate is unconstitutional as well as an injunction preventing federal officials from applying the Tax Mandate against Texas, Mississippi, and Louisiana.

## II. PARTIES

11. Plaintiffs are the sovereign States of Texas, Mississippi, and Louisiana.

12. Defendant Janet L. Yellen is the Secretary of the Treasury, named in her official capacity. The Secretary of the Treasury is responsible for administering the coronavirus state and local fiscal recovery fund created by § 9901 of the American Rescue Plan Act of 2021.

13. Defendant Richard K. Delmar is the Acting Inspector General of the Department of Treasury, named in his official capacity. The Inspector General is responsible for monitoring and oversight of existing coronavirus relief funds to the States and is responsible for informing the Secretary of the Treasury about programs administered by the Department and advising on necessary corrective action.

14. Defendant Department of the Treasury is an agency of the United States and is additionally responsible for administering the coronavirus state and local fiscal recovery fund created by § 9901 of the Act.

15. Defendant United States of America includes all government agencies and departments responsible for administering the coronavirus state and local fiscal recovery fund created by § 9901 of the Act.

### III. JURISDICTION AND VENUE

16. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

17. The Court is authorized to award the requested declaratory and injunctive relief under 28 U.S.C. §§ 1361, 2201-02.

18. Venue lies in this district pursuant to 28 U.S.C. § 1391 because Plaintiff the State of Texas is a resident of this judicial district, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

19. The Plaintiff States have standing to challenge the Tax Mandate because the Tax Mandate intrudes on the States' sovereign authority by interfering with their fiscal affairs, and by subjecting the States to the risk that they will be required to return millions or billions of dollars in funding disbursed under the coronavirus state and local recovery fund to the federal government. The Plaintiff States face the present choice of having to decide whether to accept federal funds in exchange for surrendering to an unconstitutional invasion of their sovereignty or rejecting badly needed funds because the invasion of the States' sovereignty is too great.

20. Injunctive or declaratory relief would redress the States' injuries by enabling them to exercise their sovereign powers without federal interference and by permitting them to receive their share of federal relief funding without being subjected to unconstitutional federal demands.

### IV. FACTUAL BACKGROUND

**A. The American Rescue Plan Act**

21. On March 11, President Biden signed the American Rescue Plan Act, a $1.9 trillion stimulus package, into law. Pub. L. No. 117-2, available at https://www.congress.gov/bill/117th-congress/house-bill/1319/text.

22. The Act appropriates $195.3 billion in aid to the States and the District of Columbia. *Id.* § 9901(a) (adding § 602(b)(3) to Title VI of the Social Security Act, codified at 42 U.S.C. § 802(b)(3)).

23. The Act allocates $25.5 billion equally among the States and the District of Columbia. *Id.* (adding § 602(b)(3)(B)(i) to Title VI of the Social Security Act, codified at 42 U.S.C. § 802(b)(3)(B)(i)). Most of the balance is allocated based on each State's average number of unemployed individuals from October through December 2020, with an additional $1.25 billion reserved to the District of Columbia. *Id.* (adding § 602(b)(3)(B) to title VI of the Social Security Act, codified at 42 U.S.C. § 802(b)(3)(B)).

24. Texas is expected to receive $16.45 billion under the Act. *See* Jared Walczak, State Aid in American Rescue Pan Act is 116 Times States' Revenue Losses, TAX FOUNDATION (Mar. 3, 2021), https://taxfoundation.org/state-and-local-aid-american-rescue-plan/.

25. The Act's funds are available to the States "through December 31, 2024." Pub. L. No. 117-2, § 9901(a) (adding § 602(a)(1) to Title VI of the Social Security Act, codified at 42 U.S.C. § 802(a)(1)).

26. The Act's Tax Mandate provides that the Plaintiff States—and other States—may not use the funds provided by the Act to offset a reduction in net tax revenue, either directly or indirectly:

> A State or territory shall not use the funds provided under this section or transferred pursuant to section 603(c)(4) to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

*Id.* (adding § 602(c)(2)(A) to Title VI of the Social Security Act, codified at 42 U.S.C. § 802(c)(2)(A)).

6

27. If a State violates the Tax Mandate, the Secretary of the Treasury shall recoup the lesser of: (1) the amount of the applicable reduction to net tax revenue; or (2) the amount of funds the State received from the federal government. *Id.* (adding § 602(e) to Title VI of the Social Security Act, codified at 42 U.S.C. § 802(e)).

28. For purposes of recouping funds, the Act states that the "covered period" "begins on March 3, 2021" and "ends on the last day of the fiscal year of such State . . . in which all funds received by the State . . . from a payment made under this section . . . have been expended or returned to, or recovered by, the Secretary." *Id.* (adding § 602(g)(1) to Title VI of the Social Security Act, codified at 42 U.S.C. § 802(g)(1)). This period may prove to last years.

29. On its face, the Act provides no process for the Plaintiff States, or any other State, to dispute an alleged violation of the Tax Mandate, nor does it provide a process for a State to demonstrate that a tax policy reducing taxes may nonetheless prove consistent with recovering from the pandemic.

30. The Act gives the Secretary of the Treasury broad authority to issue regulations "necessary and appropriate to carry out" the program. *Id.* (adding § 602(f) to Title VI of the Social Security Act, codified at 42 U.S.C. § 802(f)).

**B. Texas's Budget**

31. As discussed above, Texas is expected to receive $16.45 billion from the Act to help it and its citizens recover from the pandemic.

32. Texas is required to maintain a balanced budget. *See* Tex. Const. art. III, § 49(a). The State Legislature budgets on a two-year cycle.

33. The economic slowdown caused by the pandemic has significantly decreased the amount of funds available to Texas to fund state government and important programs.

34. Due to the pandemic, revenue collection fell short of what was expected, and "the ending 2020-2021 balance will be close to *negative* $1 billion." Texas Comptroller Glenn Hegar Releases Biennial Revenue Estimate, https://comptroller.texas.gov/about/media-center/news/2021/210111-bre.php.

35. "The projected negative ending balance in 2020-21 is a direct result of the COVID-19 pandemic, which caused revenue collections to fall well short of what was expected when the 86th Legislature approved the 2020-21 budget." Texas Comptroller Biennial Revenue Estimate, available at https://comptroller.texas.gov/transparency/reports/biennial-revenue-estimate/2022-23/docs/96-402-BRE-2022-2023.pdf, Cover Letter, at 1.

36. In order to address this shortfall, most Texas state agencies have already been asked to identify five percent savings from their current budget. Letter from Governor Greg Abbott, Lieutenant Governor Dan Patrick, and Speaker Dennis Bonnen, available at https://gov.texas.gov/uploads/files/press/O-AgencyHeads202005200703.pdf.

37. For the 2022-23 budget cycle, the Texas Comptroller expects a .4 percent reduction in funds available for general purpose spending when compared to the 2020-21 cycle. Texas Comptroller Glenn Hegar Releases Biennial Revenue Estimate, available at https://comptroller.texas.gov/about/media-center/news/2021/210111-bre.php.

38. "For 2022-23, the state can expect to have $112.5 billion in funds available for general-purpose spending." Texas Comptroller Biennial Revenue Estimate, available at https://comptroller.texas.gov/transparency/reports/biennial-revenue-estimate/2022-23/docs/96-402-BRE-2022-2023.pdf, Cover Letter, at 1. "[R]evenue collection from all sources and for all purposes," including dedicated revenue, is expected to "total $270.5 billion." *Id.* at 2.

39. The pandemic caused a "severe contraction of the Texas economy over the first and second quarters of calendar year 2020." *Id.* Though economic growth has subsequently rebounded, "gross state product . . . and employment remain well below their pre-pandemic levels." *Id.*

40. In March 2020, Texas lost nearly 90,000 jobs. *Id.*, Texas Economic Outlook, at 3. In April 2020, Texas lost over 1.3 million jobs. *Id.*

41. Texas's gross state production fell an estimated 1 percent in 2020 and is expected to decline by 1.3 percent in 2021 before growing again in 2022 and 2023. *Id.* at 1.

42. Moreover, due to the pandemic, "uncertainty remains high." *Id.*, Cover Letter, at 3.

43. While Texas has suffered from economic contraction and budget shortfalls, demand for state services has in many areas increased. For example, in February 2020, before the beginning of the pandemic, 3.86 million Texans were on Medicaid. Medicaid and CHIP Monthly Enrollment by Risk Group, https://hhs.texas.gov/about-hhs/records-statistics/data-statistics/healthcare-statistics. In February 2021, the last month for which statistics are available, that number had increased to just over 4.6 million. *Id.*

44. For the 2020-21 budget cycle, the last one completed, the legislature budgeted just over $125 billion for the year ending August 2020 and $123.2 billion for the year ending August 2021. General Appropriations Act for the 2020-2021 Biennium, https://www.lbb.state.tx.us/Documents/GAA/General_Appropriations_Act_2020_2021.pdf, at xi.

45. The Act requires the Secretary to make payment to the State of at least fifty percent of the allocated funds within sixty days of the State providing a certification and the remainder within twelve months. Pub. L. No. 117-2, § 9901(a) (adding § 602(b)(6)(A) to Title VI of the Social Security Act, codified at 42 U.S.C. § 802(b)(6)(A)).

46. The $16.45 billion Texas is expected to receive under the Act is more than thirteen percent of the State's total expenditures for either the year 2020 or 2021. It is also more than six percent of the State's total projected available funds for *both* 2022 and 2023 combined.

47. The $16.45 billion that Texas is expected to receive under the Act provides funds necessary for the State to fill budget gaps created by the pandemic and to assist its citizens and economy in recovering from the pandemic. Texas has no practical choice but to accept the funds provided by the Act and plans to do so. Mississippi and Louisiana are in the same position.

**C. Louisiana's Budget**

48. Louisiana is expected to receive $3.1 billion under the Act to help it and its citizens recover from the pandemic.

49. Like Texas, Louisiana is generally required to maintain a balanced budget. La. Const. art. VII, Section 10(E).

50. In the first half of 2020, the total number of jobs in Louisiana dropped by 11 percent due to COVID-19, a mark that is nearly double the 6 percent drop after Hurricane Katrina in 2005. In the first quarter of 2020, Louisiana's economy contracted at an annualized rate of 6.6 percent; Louisiana's contraction was one of the sharpest drops in the nation, with only Michigan, New York, Nevada, and Hawaii experiencing larger downturns in economic activity. *See* https://www.theadvocate.com/acadiana/news/business/article_8b80af5c-e228-11ea-9cec-23e47d98596f.html.

51. In February 2021, Louisiana Governor John Bel Edwards proposed a $36.6 billion budget for the fiscal year beginning July 1, 2021. That proposal is still under review by the State Legislature.

52. Louisiana suffered significant adverse budgetary impacts from COVID-19 and has relied on federal aid to prevent cuts to services. Louisiana anticipates further large losses of

revenue based on the Biden Administration's Executive Order 14008, which imposes a moratorium on all oil and natural gas leasing activities on public lands and offshore waters.

## V. CLAIMS FOR RELIEF

### COUNT I

**Violation of the U.S. Constitution, Article I; Violation of the Spending Clause, U.S. Const., Art. I, § 8.**

53. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

54. Article I of the Constitution enumerates Congress's legislative powers, including those under the Spending Clause. "Congress shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ." U.S. Const. art. I, § 8, cl. 1.

55. Congress lacks by design the power to "require the States to govern according to Congress' instructions." *New York v. United States*, 505 U.S. 144, 162 (1992).

56. Using its spending power, Congress may "grant federal funds to the States, and may condition such a grant upon the States' 'taking certain actions that Congress could not require them to take.'" *Sebelius*, 567 U.S. at 576 (2012) (quoting *College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 686 (1999)).

57. "Congress may use its spending power to create incentives for States to act in accordance with federal policies," but when the pressure created by the incentives is so great that the "pressure turns into compulsion," Congress exceeds its authority under the Constitution. *Id.* at 577-78; *Steward Mach. Co. v. Davis*, 301 U.S. 548, 590 (1937).

58. That has happened here. By conditioning billions of dollars of pandemic-recovery funding—which in the case of Texas is more than thirteen percent of its annual budget—on

maintaining Congress's favored tax policies, the Tax Mandate is an "economic dragooning that leaves the States with no real option but to acquiesce." *Sebelius*, 567 U.S. at 581.

59. As a result of the Tax Mandate, the Plaintiff States must decline billions of dollars of funding necessary to assist the States and their citizens recover from the pandemic or cede their sovereign authority to set tax policy to the federal government.

## COUNT II

**Violation of the U.S. Constitution, Article I; Violation of the Spending Clause, U.S. Const., Art. I, § 8.**

60. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

61. Congress's spending power carries other restrictions as well. *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). For example, if Congress wishes to impose conditions on the receipt of federal funds, those conditions must be both unambiguous and reasonably related to the purpose of the federal grant. *Id.* at 207-08; *see also New York*, 505 U.S. at 171-72. The Tax Mandate is ambiguous as to its scope and not reasonably related to encouraging the States' economic recovery following the COVID-19 pandemic.

62. The Tax Mandate's broad prohibition on using funds to "directly or indirectly offset a reduction in the net tax revenue" collected by the States provides no clear limiting principle—specifically, no principle explaining how attenuated an "indirect offset" must be to violate the mandate.

63. The Tax Mandate is also far too overinclusive *and* underinclusive to bear any reasonable relationship to any legitimate purpose underlying the Act's funding provisions. While the Tax Mandate arrogates to federal policy numerous fiscal decisions constitutionally left to the sovereign States, it imposes no similar restriction on cities, local governments, or tribal

12

governments. Pub. L. No. 117-2, § 9901(a) (adding § 602(c)(2) to Title VI of the Social Security Act, codified at 42 U.S.C. § 802(c)(2)).

64. Indeed, whatever interest the federal government could claim in preventing the reduction of state tax revenues through the Act's funding provisions is belied by the Act's reduction in certain *federal* taxes. *See* Pub. L. No. 117-2 § 9621-9626 (expanding earned income tax credit); *id.* § 9673 (restaurant revitalization grants not included in gross income).

65. Both the Tax Mandate's ambiguity and its overinclusive and underinclusive scope render the Tax Mandate's conditions unconstitutional as an exercise of Congress's Spending Clause powers. The Tax Mandate's conditions therefore cannot be enforced against Texas, Mississippi, and Louisiana.

## COUNT III

### Violation of the Tenth Amendment to the U.S. Constitution; Violation of Anticommandeering Principle

66. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

67. The Constitution "established a system of 'dual sovereignty.'" *Printz v. United States*, 521 U.S. 898, 918 (1997) (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991)).

68. Certain legislative powers were granted to Congress, "but they are not unlimited." *Murphy*, 138 S. Ct. at 1476. "The Constitution confers on Congress not plenary legislative power but only certain enumerated powers," and the Tenth Amendment confirms that "all other legislative power is reserved for the States." *Id.*; *see* U.S. Const. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.").

69. "[T]he Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress's instructions." *New York*, 505 U.S. at 162.

"[C]onspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States." *Murphy*, 138 S. Ct. at 1476. "The anticommandeering doctrine simply represents the recognition of this limit on congressional authority." *Id.*

70. Although the Act does not directly command the Plaintiff States to implement Congress's preferred tax policy, the threat of denying the States billions of dollars in badly needed funding if they do not agree to the Tax Mandate has the same effect. *See Sebelius*, 567 U.S. at 578-79.

71. The effect of the Tax Mandate is to put the tax policy of the Plaintiff States' legislatures "under the direct control of Congress," at least insofar as it comes to any act that might directly or indirectly lower the States' net tax revenue. *See Murphy*, 138 S. Ct. 1478.

72. By using the Tax Mandate to commandeer the States' sovereign authority over their own tax policy, Congress acted beyond the scope of its enumerated powers in violation of the Tenth Amendment.

## COUNT IV

**Violation of the Tenth Amendment to the U.S. Constitution; Violation of Equal Sovereignty Principle**

73. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

74. The "historic tradition" of the United States is "that all States enjoy equal sovereignty." *Nw. Austin Mun. Util. Dist. v. Holder*, 557 U.S. 193, 203 (2009) (Citing *United States v. Louisiana*, 363 U.S. 1, 16 (1960)). A statute that "differentiates between the States, despite our historic tradition," may only be upheld upon "a showing that [the] statute's disparate geographic coverage is sufficiently related to the problems that it targets." *Id.*

75. While on its face the American Rescue Plan Act may appear neutral, and equally applicable to all States, in purpose and effect, the Tax Mandate intrudes upon a sensitive area of state policymaking in only a targeted subset of the States.

76. State legislatures have broad authority to exercise their sovereign taxing authority as they see fit, and they may reasonably choose to exercise that authority in a variety of ways to aid their States in recovering from the pandemic. Historically, and as a matter of present fact, some States are much more likely to exercise their sovereign authority to decrease taxes and other government revenues than others.

77. The Tax Mandate violates the principle of equal sovereignty by targeting and invading the sovereignty only of those States that, as a matter of history and present fact, are likely to decrease taxes and other government revenues.

78. The Tax Mandate is not "sufficiently related to the problem it targets" to justify such an intrusion. *Id.* For example, it imposes no similar restriction on cities, local governments, or tribal governments. Pub. L. No. 117-2, § 9901(a) (adding § 602(c)(2) to Title VI of the Social Security Act, codified at 42 U.S.C. § 802(c)(2)).

79. By only invading the sovereign authority of those States likely to seek to decrease taxes as a matter of history and fact, the Tax Mandate violates the Tenth Amendment and the principle of equal sovereignty.

## VI. PRAYER FOR RELIEF

Wherefore, Plaintiffs pray the Court:

a. Declare that the Tax Mandate in § 9901 of the American Rescue Plan Act of 2021, Pub. L. No. 117-2, is in excess of Congress's Article I power and thus unenforceable;

b. Declare that the Tax Mandate violated the Tenth Amendment to the Constitution and is thus unenforceable;

c. Enjoin the defendants, and any other agency or employee of the United States, from recouping funds pursuant to § 9901 based on a violation of the Tax Mandate;

d. Enjoin the defendants, and any other agency or employee of the United States, from otherwise enforcing the Tax Mandate against Texas, Mississippi, and Louisiana;

e. Award the Plaintiff States the costs of this action and reasonable attorney's fees; and

f. Award such other and further relief as the Court deems equitable and just.

Respectfully submitted this the 3rd day of May, 2021,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JUDD E. STONE II
Solicitor General

PATRICK K. SWEETEN
Deputy Attorney General for Special Litigation
State Bar No. 00798537
patrick.sweeten@oag.texas.gov

WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
State Bar No. 24088531
will.thompson@oag.texas.gov

/s/ *Jeffrey M. White*
JEFFREY M. WHITE
Special Counsel
State Bar No. 24064380
jeff.white@oag.texas.gov

Office of the Attorney General
P.O. Box 12548 (MC 009)
Austin, Texas 78711-2548
Tel.: (512) 936-0677
Fax: (512) 457-4410

**Counsel for the State of Texas**

LYNN FITCH
Attorney General of Mississippi

/s/ *Justin L. Matheny*
JUSTIN L. MATHENY*
Assistant Solicitor General
State of Mississippi
Office of the Attorney General
P.O. Box 220
Jackson, MS 39205
Tel: (601) 359-3680
justin.matheny@ago.ms.gov
**Pro hac vice* application forthcoming

**Counsel for the State of Mississippi**

17

JEFF LANDRY
Attorney General

/s/ *Elizabeth B. Murrill*
ELIZABETH B. MURRILL*
Solicitor General
Office of the Attorney General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (205) 326-6085
murrille@ag.louisiana.gov
**Pro hac vice* application forthcoming

**Counsel for the State of Louisiana**