**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, <br><br>     Plaintiffs, <br><br>   v. <br><br> JANET YELLEN, in her official capacity as Secretary of the Treasury, *et al.*, <br><br>     Defendants. | Civil Action No. 2:21-cv-0079-Z |

**DEFENDANTS' MOTION TO DISMISS**
**<u>PURSUANT TO RULES 12(b)(1) AND 12(b)(6)</u>**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 3

      A.     Statutory and Regulatory Background ................................................. 3

      B.     Factual and Procedural Background ..................................................... 6

LEGAL STANDARDS ......................................................................................... 7

ARGUMENT ........................................................................................................ 7

      I.     PLAINTIFFS LACK ARTICLE III STANDING ................................................. 7

      II.    PLAINTIFFS FAIL TO STATE A CLAIM ON THE MERITS ........................... 12

      A.     Congress validly exercised its Spending Clause authority to restrict the use of Rescue Plan funds .................................................. 13

      B.     The Rescue Plan is not coercive or commandeering ......................... 18

      C.     The Rescue Plan provides clear notice of the funding condition .................................................................................... 21

      D.     The Rescue Plan does not violate the Equal Sovereignty principle ...................................................................................... 25

CONCLUSION .................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner,*
  387 U.S. 136 (1967) ................................................................................. 10

*Alascom Inc. v. FCC,*
  727 F.2d 1212 (D.C. Cir. 1984) ............................................................... 10

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,*
  548 U.S. 291 (2006) ................................................................................. 22

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................................................... 7

*Babbitt v. Farm Workers,*
  442 U.S. 289 (1979) ................................................................................... 8

*Baptist Mem'l Hosp. – Golden Triangle, Inc. v. Azar,*
  956 F.3d 689 (5th Cir. 2020) ................................................................... 24

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................................................... 7

*Bell v. New Jersey,*
  461 U.S. 773 (1983) ................................................................................... 9

*Bennett v. Kentucky Department of Education,*
  470 U.S. 656 (1985) ............................................................... 16, 17, 21, 23

*Benning v. Georgia,*
  391 F.3d 1299 (11th Cir. 2004) ......................................................... 16, 23

*Blum v. Bacon,*
  457 U.S. 132 (1982) ................................................................................. 24

*Bucklew v. Precythe,*
  139 S. Ct. 1112 (2019) ............................................................................. 13

*Caprock Plains Fed. Bank Ass'n v. Farm Credit Admin.,*
    843 F.2d 840 (5th Cir. 1988) ....................................................................... 10, 11

*Charles v. Verhagen,*
    348 F.3d 601 (7th Cir. 2003) ....................................................................... 23, 24

*Children's Hosp. Ass'n of Tex. v. Azar,*
    933 F.3d 764 (D.C. Cir. 2019) .......................................................................... 24

*Citizens Bank of Md. v. Strumpf,*
    516 U.S. 16 (1995) ............................................................................................ 14

*City of Los Angeles v. Barr,*
    929 F.3d 1163 (9th Cir. 2019) ..................................................................... 22, 24

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,*
    527 U.S. 666 (1999) ...................................................................................... 12, 21

*Cutter v. Wilkinson,*
    423 F.3d 579 (6th Cir. 2005) ........................................................................... 22

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ............................................................................................ 7

*Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.,*
    526 U.S. 629 (1999) ...................................................................................... 22, 23

*Elam v. Kan. City S. Ry. Co.,*
    635 F.3d 796 (5th Cir. 2011) .............................................................................. 8

*Fac. Senate of Fla. Int'l Univ. v. Winn,*
    616 F.3d 1206 (11th Cir. 2010) ....................................................................... 12

*Gonzalez v. Raich,*
    545 U.S. 1 (2005) .............................................................................................. 25

*Gruver v. La. Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll.,*
    959 F.3d 178 (5th Cir. 2020) ...................................................................... 19, 20

*In re Complt. of RLB Contracting, Inc. v. Butler,*
    773 F.3d 596 (5th Cir. 2014) ................................................................. 7

*Irving Indep. Sch. Dist. v. Tatro,*
    468 U.S. 883 (1984) ......................................................................... 24

*Jackson v. Birmingham Bd. of Educ.,*
    544 U.S. 167 (2005) ...................................................................... 22, 23

*Kansas v. United States,*
    214 F.3d 1196 (10th Cir. 2000) ...................................................... 16, 17

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ......................................................................... 7, 8

*Machete Prods., LLC v. Page,*
    809 F.3d 281 (5th Cir. 2015) ................................................................. 7

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923) ......................................................................... 9, 10

*Mayhew v. Burwell,*
    772 F.3d 80 (1st Cir. 2014) ................................................................. 17

*Mayweathers v. Newland,*
    314 F.3d 1062 (9th Cir. 2002) ............................................................. 23

*McKinley v. Abbott,*
    643 F.3d 403 (5th Cir. 2011) ............................................................... 13

*Miss. Comm'n on Env't Quality v. EPA,*
    790 F.3d 138 (D.C. Cir. 2015) ......................................................... 19, 20

*Missouri v. Yellen,*
    2021 WL 1889867 (E.D. Mo. May 11, 2021) ........................................ 9, 11

*Munaf v. Geren,*
    553 U.S. 674 (2008) ........................................................................... 7

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) .................................................................................. *passim*

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
    538 U.S. 803 (2003) .................................................................................. 10, 12

*New York v. United States*,
    505 U.S. 144 (1992) .............................................................................. 16, 19, 21

*Nw. Austin Mun. Util. Dist. v. Holder*,
    557 U.S. 193 (2009) .......................................................................................... 25

*Ohio v. Yellen*,
    2021 WL 2712220 (S.D. Ohio July 1, 2021)............................................... 22, 23

*Oklahoma v. U.S. Civ. Serv. Comm'n*,
    330 U.S. 127 (1947) .......................................................................................... 15

*Pennhurst State School & Hospital v. Halderman*,
    451 U.S. 1 (1981) ....................................................................................... 21, 22

*Pub. Serv. Comm'n of Utah v. Wycoff Co.*,
    344 U.S. 237 (1952) .......................................................................................... 12

*Religious Sisters of Mercy v. Azar*,
    2021 WL 191009 (D.N.D. Jan. 19, 2021)......................................................... 19

*Rimini St., Inc. v. Oracle USA, Inc.*,
    139 S. Ct. 873 (2019) ....................................................................................... 14

*Rostker v. Goldberg*,
    453 U.S. 57 (1981) .............................................................................................. 3

*S.C. Dep't of Educ. v. Duncan*,
    714 F.3d 249 (4th Cir. 2013) ............................................................................ 17

*Sabri v. United States*,
    541 U.S. 600 (2004) .......................................................................................... 15

*Shelby Cnty. v. Holder*,
    570 U.S. 529 (2013) .................................................................................................. 25

*South Dakota v. Dole*,
    483 U.S. 203 (1987) ................................................................................... 9, 12, 16, 21

*Steward Mach. Co. v. Davis*,
    301 U.S. 548 (1937) ............................................................................................. 19, 21

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) .................................................................................................... 8

*Tex. Educ. Agency v. U.S. Dep't of Educ.*,
    992 F.3d 350 (5th Cir. 2021) .................................................................................... 24

*Trump v. New York*,
    141 S. Ct. 530 (2020) ................................................................................................ 10

*United States v. Lipscomb*,
    299 F.3d 303 (5th Cir. 2002) .................................................................................... 16

*United States v. Louisiana*,
    363 U.S. 1 (1960) ...................................................................................................... 25

*United States v. Morrison*,
    529 U.S. 598 (2000) .................................................................................................. 13

*United Transp. Union v. Foster*,
    205 F.3d 851 (5th Cir. 2000) .................................................................................... 12

*Van Wyhe v. Reisch*,
    581 F.3d 639 (8th Cir. 2009) .................................................................................... 23

*Voisine v. United States*,
    136 S. Ct. 2272 (2016) .............................................................................................. 14

*W. Va. Dep't of Health & Hum. Res. v. Sebelius*,
    649 F.3d 217 (4th Cir. 2011) .................................................................................... 23

*Wash. State Grange v. Wash. State Republican Party,*
    552 U.S. 442 (2008) .................................................................................................. 13

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) .................................................................................................. 24

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 1 ........................................................................................ 12

**Statutes**

20 U.S.C. § 241e (1970) ............................................................................................. 17

42 U.S.C. § 801 ............................................................................................................. 3

42 U.S.C. § 802 ................................................................................................. *passim*

American Rescue Plan Act. *See* Pub. L. No. 117-2, § 9901(a), 135 Stat. 4 (2021)
    (codified at 42 U.S.C. §§ 802–805) ..................................................................... 1, 3

Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-
    137, § 5001, 134 Stat. 281, 501 (2020) (codified at 42 U.S.C. § 801) ................................... 3

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ............................................................... 7

Federal Rule of Civil Procedure 12(b)(6) ............................................................... 7

**Regulations**

86 Fed. Reg. 26,786 (May 17, 2021) ............................................................... 5, 6, 15

## INTRODUCTION

As part of the American Rescue Plan Act, Pub. L. No. 117-2, 135 Stat. 4 (2021) ("Rescue Plan" or "Act"), Congress appropriated nearly $200 billion in new funding for state governments. 42 U.S.C. § 802. Congress made these new federal funds available for State efforts to respond to the public health emergency created by the COVID-19 pandemic and to its economic effects and gave States considerable flexibility to use these new federal funds, including by funding state-level government services and by providing assistance to households, small businesses, and industries. *Id*. § 802(c). To ensure that States would use these new funds for the broad categories of state expenditures it identified, Congress specified that States cannot use the federal funds to offset a reduction in net tax revenue resulting from changes in state law. *Id*. § 802(c)(2)(A) (the "offset provision"). That is a straightforward exercise of Congress's well-settled Spending Clause authority to attach conditions that "preserve its control over the use of federal funds." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 579 (2012) [hereinafter "*NFIB*"] (plurality opinion).

In their Complaint, the three Plaintiff States argue that this provision violates the "anti-coercion principle[]" and "unconstitutionally commandeer[s] the governments of the Plaintiff States" by limiting the States' ability to exercise their "sovereign taxing powers." Compl. ¶¶ 6, 8–9, ECF No. 1. Plaintiffs' Complaint, however, suffers from multiple jurisdictional defects and rests on a fundamental misunderstanding of both the challenged statute and the governing law.

First, the challenged statute. Because the offset provision's plain text addresses only a reduction in a State's "*net* tax revenues," 42 U.S.C. § 802(c)(2)(A) (emphasis added), a State is free to cut some taxes and increase others and may change its tax law as it believes appropriate. And even if a State chooses to make changes that result in a reduction in net tax revenue, the Act bars a State only from using Rescue Plan funds—as opposed to other means—to offset that reduction. *Id*. The Act also makes clear that if a State chooses to use Rescue Plan funds to offset a reduction in net tax revenue resulting from

1

changes in state law, the only consequence would be a loss of monies commensurate with the amount of federal funding misused for that offset. *See id.* § 802(e).

Second, the law. As an initial matter, Plaintiffs lack Article III standing because the States have not enacted *any* tax cut, let alone alleged that any hypothetical tax cut under consideration will decrease net tax revenue or that they plan to use Rescue Plan funds to offset that theoretical reduction. Because Plaintiffs have not alleged any intention to use the federal funds in a way not permitted under the Act, they lack standing to challenge the offset provision. Relatedly, the States' challenge is not ripe because Plaintiffs have not alleged conduct that could result in recoupment, and the Treasury Department has not indicated any imminent plans to recoup from the Plaintiff States. Particularly given the extraordinary nature of Plaintiffs' request for pre-enforcement injunctive relief based on the purported unconstitutionality of a federal statute, it is critical to ensure that they have satisfied the jurisdictional prerequisites for this suit. They have not.

Plaintiffs' Complaint also fails to state a claim on the merits. Federal statutes that place conditions on how a State can use federal funds are commonplace and present no constitutional concern. Such provisions reflect the common-sense proposition that when Congress gives money to States for a particular purpose, it may place conditions on a State's acceptance of the funds to ensure that the funds are in fact used for the intended purpose. The Rescue Plan allows States to deploy the considerable funds provided for a broad array of purposes related to the COVID-19 pandemic and its effects. Congress acted well within constitutional bounds by conditioning the receipt of Rescue Plan funds on the State's agreement to use funds for those purposes and not to offset a reduction in net tax revenue resulting from changes in state law.

Plaintiffs' Complaint seeks to invalidate portions of the Rescue Plan based on the States' speculative concerns about possible future disputes. Because declaring an Act of Congress unconstitutional is "the gravest and most delicate duty that" federal courts are

"called on to perform," *Rostker v. Goldberg*, 453 U.S. 57, 64 (1981) (quotation marks omitted), this Court should dismiss the Complaint.

BACKGROUND

### A.      Statutory and Regulatory Background

In March 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). *See* Pub. L. No. 116-137, § 5001, 134 Stat. 281, 501 (2020) (codified at 42 U.S.C. § 801). The CARES Act established a $150 billion "Coronavirus Relief Fund" for States, tribal governments, and localities for 2020. *See* 42 U.S.C. § 801(a). That fund covers costs that are "necessary expenditures incurred due to the public health emergency" that "were not accounted for in the budget[s]" of those governments. *Id.* § 801(d). If recipients do not use the funds for the permitted purposes, the Act permits the Treasury Department to recoup the amount of any misused funds. *Id.* § 801(e).

On March 11, 2021, Congress enacted the American Rescue Plan Act. *See* Pub. L. No. 117-2, § 9901(a) (codified at 42 U.S.C. §§ 802–805). The Rescue Plan establishes an additional "Coronavirus State Fiscal Recovery Fund," allocating another $220 billion to broadly "mitigate the fiscal effects" of the pandemic on States, territories, and Tribal governments through 2024. 42 U.S.C. § 802(a)(1); *see id.* § 803(a) (additional $130 billion for localities). Nearly $200 billion is allocated for the States and the District of Columbia. *Id.* § 802(b)(2)(A).

The Rescue Plan provides States with considerable latitude, in scope and duration, to use the funds for pandemic-related purposes. Through 2024, a State may use the funds "to cover costs incurred":

> (A) to respond to the public health emergency with respect to the Coronavirus Disease 2019 (COVID–19) or its negative economic impacts, including assistance to households, small businesses, and nonprofits, or aid to impacted industries such as tourism, travel, and hospitality;
>
> (B) to respond to workers performing essential work during the COVID–19 public health emergency by providing premium pay to eligible workers of the State, territory, or Tribal government that are performing such essential

3

work, or by providing grants to eligible employers that have eligible workers who perform essential work;

(C) for the provision of government services to the extent of the reduction in revenue of such State, territory, or Tribal government due to the COVID–19 public health emergency relative to revenues collected in the most recent full fiscal year of the State, territory, or Tribal government prior to the emergency; or

(D) to make necessary investments in water, sewer, or broadband infrastructure.

*Id.* § 802(c)(1). While CARES Act funds were limited to covering previously unbudgeted costs of necessary expenditures incurred due to the public health emergency, the Rescue Plan allows States to use the funds for "government services" to the extent the pandemic has resulted in a "reduction in revenue." *Id.* § 802(c)(1)(C). The Rescue Plan also permits recipients to use the funds to respond broadly to the public-health emergency and its negative economic effects, to support essential workers during the pandemic, and to invest in certain infrastructure areas. *Id.* § 802(c)(1)(A), (B), (D).

The Rescue Plan includes two "further restrictions" to ensure that the broad outlay of funds is used for the identified purposes while funds are available. 42 U.S.C. § 802(c)(2). One limitation (not challenged here) provides that a State may not "deposit" Rescue Plan funds "into any pension fund." *Id.* § 802(c)(2)(B). The other limitation (at issue here) provides in relevant part that a State:

shall not use the funds provided under [§ 802] . . . to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

*Id.* § 802(c)(2)(A).[1]

---

[1] The "covered period" began on March 3, 2021 and "ends on the last day of the fiscal year of such State . . . in which all funds received by the State . . . have been expended or returned to, or recovered by, the Secretary." 42 U.S.C. § 802(g)(1).

By its terms, this funding condition applies only to reductions in "net" tax revenue. *Id.* This limitation on the use of federal funds is not implicated at all by a State's choice to modify its tax code—including by cutting taxes—if the changes, taken together, do not result in a reduction of *net* tax revenue. If a State chooses to reduce its net tax revenue, it may not use the Rescue Plan funds to "offset" that reduction. If a State chooses to do so, the State will be required to repay only the amount of funds used to offset the "reduction to net tax revenue" or "the amount of funds received," whichever is less. 42 U.S.C. § 802(e).

The Rescue Plan also authorizes the Secretary of the Treasury "to issue such regulations as may be necessary or appropriate to carry out" the applicable statutory provisions. *Id.* § 802(f). On May 10, 2021, Treasury posted an Interim Final Rule implementing the Rescue Plan, which was published in the Federal Register the following week. *See* 86 Fed. Reg. 26,786 (May 17, 2021) ("the Rule"). The Rule sets forth a framework for determining when a State has used Fiscal Recovery Funds to "directly or indirectly offset" a reduction in net tax revenue:

1.      For each year during the covered period, a State will generally use its ordinary budget-scoring process to evaluate whether changes in law, regulation, or interpretation will result in a reduction in tax revenue. If so, the amount of the reduction is the amount a State needs to "pay for" with sources other than Fiscal Recovery Funds.

2.      A State need not show how reductions are paid for if the reductions are de minimis, defined as less than 1% of the State's inflation-adjusted 2019 tax revenue. Under those circumstances, a State will not be subject to recoupment.

3.      A State will consider the amount of actual tax revenue recorded in the reporting year. If the State's actual tax revenue is greater than its inflation-adjusted 2019 tax revenue, the State did not violate the offset provision (regardless of what changes it made to its tax laws) because it experienced no reduction in net tax revenue.

4.      If a State's actual tax revenue in the reporting year is less than the State's inflation-adjusted 2019 tax revenue, the State will identify any sources of funds that have been used to permissibly offset the total value of covered tax changes. These include any tax changes that increase tax revenue and any spending cuts in areas where the State is not spending Fiscal Recovery Funds. The State then subtracts those permissible offsets from the total value of revenue-reducing changes calculated in Step 1 to determine what portion of the revenue-reducing changes has not been paid for. The State is then potentially subject to recoupment for that amount or the difference between the State's actual tax revenue and its inflation-adjusted 2019 tax revenue, whichever is greater.

5.      If there are any amounts that could be subject to recoupment, Treasury will provide notice to the State and the State will have an opportunity to respond.

*See* 86 Fed. Reg. at 26,806–10.

### B.      Factual and Procedural Background

On May 3, 2021, Texas, Louisiana, and Mississippi brought this suit alleging that the offset provision of § 802(c)(2)(A) is unconstitutional. Compl. ¶ 10. On May 10, 2021, Mississippi certified to the Department of the Treasury its intent to use Rescue Plan funds for permissible purposes under 42 U.S.C. § 802(d)(1), and the Department of the Treasury subsequently issued Mississippi its first tranche payment of $903,186,672.95. Louisiana certified on June 1, 2021, and received payment of $3,011,136,886.60. Texas has not yet certified but alleges that it will do so and that it expects to receive $16.45 billion. *Id.* at ¶ 47. Plaintiffs nowhere allege that they have enacted changes in state law during the covered period that would reduce net tax revenue, or that they intend to use Rescue Plan funds to offset any hypothetical reduction in net tax revenue. *See generally id.* ¶¶ 1–79. Plaintiffs nonetheless request injunctive and declaratory relief against enforcement of the offset provision. *See id.* (Prayer for Relief).

6

## LEGAL STANDARDS

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), a plaintiff bears the burden to establish a court's jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). It is "presume[d] that federal courts lack jurisdiction unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) (citation omitted).

Under both Rule 12(b)(1) and Rule 12(b)(6), to survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "plausibility" standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). While the Court accepts well-pleaded factual allegations as true, "mere conclusory statements" and "legal conclusion[s] couched as . . . factual allegation[s]" are "disentitle[d] . . . to th[is] presumption of truth." *Id.* at 678, 681 (citation omitted).

While courts apply the plausibility standard under both rules, "in examining a Rule 12(b)(1) motion, a district court is empowered to find facts as necessary to determine whether it has jurisdiction." *Machete Prods., LLC v. Page*, 809 F.3d 281, 287 (5th Cir. 2015). Accordingly, "the district court may consider evidence outside the pleadings and resolve factual disputes." *In re Compl. of RLB Contracting, Inc. v. Butler*, 773 F.3d 596, 601 (5th Cir. 2014).

## ARGUMENT

## I.   PLAINTIFFS LACK ARTICLE III STANDING.

In assessing the Plaintiff States' Complaint, this Court must determine whether they have established jurisdiction, including Article III standing. *Munaf v. Geren*, 553 U.S. 674, 691 (2008). To satisfy the "irreducible constitutional minimum" of standing, the

7

States must first demonstrate "a concrete and particularized" injury in fact that is "actual or imminent." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). When a plaintiff seeks to enjoin the future enforcement of a statute, "the injury-in-fact requirement" demands that the plaintiff "allege[] 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of [enforcement] thereunder.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)); *see id.* at 161–67 (analyzing the three elements separately). In other words, the prospect of enforcement must be "sufficiently imminent" to create a concrete injury. *Id.* at 159.

Plaintiffs cannot meet that standard because their asserted injuries are hypothetical and speculative. The Complaint is silent as to how the States intend to use Rescue Plan funds, nowhere even suggesting that they plan to use them in a manner inconsistent with the offset provision. Under that provision, a State may not use the new federal funds to offset a reduction in net tax revenue that results from certain changes in state law. 42 U.S.C. § 802(c)(2)(A). But the Plaintiffs do not allege that any State has enacted any tax cuts—or even that they are *considering* tax cuts—let alone tax cuts that would (taken together with any tax increases) reduce net tax revenue. And there is no allegation that any State intends to use Rescue Plan funds to offset any reductions in its net tax revenue that might result from any changes a State ultimately chooses to adopt. Merely proposing or adopting a tax cut is not itself the "course of conduct arguably affected with a constitutional interest" and "proscribed by a statute" required for pre-enforcement standing. *Driehaus*, 573 U.S. at 159 (quoting *Babbitt*, 442 U.S. at 298). The offset provision restricts only a State's using Rescue Plan funds to offset a reduction in net tax revenue resulting from a change in state law; it does not prohibit the proposal or adoption of any tax change on its own. The States are the proverbial "master of [their] complaint" and must take responsibility for the allegations included—or not included—therein. *Elam v. Kan. City S. Ry. Co.*, 635 F.3d 796, 803 (5th Cir. 2011).

Unable to demonstrate that the Rescue Plan restricts any conduct that the Plaintiff States intend to undertake, let alone that any recoupment is imminent, the States assert a general intrusion on their "sovereign authority." Compl. ¶ 19. In doing so, Plaintiffs fundamentally misunderstand the Rescue Plan. "The [Rescue Plan] does not prohibit States from proposing, enacting, or implementing legislation that cuts taxes for its citizens and businesses." *Missouri v. Yellen*, 2021 WL 1889867, at *4 (E.D. Mo. May 11, 2021), *appeal filed*, No. 21-2118 (8th Cir. May 18, 2021). To ensure that the new federal funds are used for the purposes Congress permitted and not others that it chose not to support, the Act requires a State to agree that it will not use the federal funds to offset a reduction in net tax revenue resulting from changes in state law. The Rescue Plan does not prohibit a State from cutting taxes; it merely restricts a State's ability to use *federal funds* distributed under the Rescue Plan to offset a reduction in net tax revenue. No State has a sovereign interest in using federal funds for that purpose, so the States' "sovereign power to set its own tax policy is not implicated by the [Rescue Plan]." *Id.* Quite the opposite: The Supreme Court has repeatedly made clear that *Congress* has a sovereign interest in conditioning the receipt of federal funds "on the States' complying with restrictions on the use of those funds, because that is the means by which Congress ensures that the funds are spent according to its view of the 'general Welfare.'" *NFIB*, 567 U.S. at 580; *see South Dakota v. Dole*, 483 U.S. 203, 207 (1987) ("In considering whether a particular expenditure is intended to serve general public purposes, courts should defer substantially to the judgement of Congress"). Put simply, "[r]equiring States to honor the obligations voluntarily assumed as a condition of federal funding before recognizing their ownership of funds simply does not intrude on their sovereignty." *Bell v. New Jersey*, 461 U.S. 773, 790 (1983).

Plaintiffs' reliance on their sovereign taxation authority also cannot be reconciled with the Supreme Court's decision in *Massachusetts v. Mellon*, which made clear that Article III jurisdiction is not satisfied by raising "abstract questions . . . of sovereignty." 262

U.S. 447, 485 (1923). There, Congress had enacted through the Spending Clause a maternity program that permitted States to accept funding to protect the health of mothers and infants and provided that violating the program's conditions could result in the withholding of funds. *Id.* at 478–79, 484-85. Massachusetts brought suit, alleging that the statute "imposed upon the [S]tates an illegal and unconstitutional option either to yield to the federal government a part of their reserved rights or lose their share of the moneys appropriated." *Id.* at 482. The Supreme Court held that the State's "naked contention that Congress has usurped the reserved powers of the several [S]tates by the mere enactment of the statute" was insufficient to establish an Article III case or controversy. *Id.* at 483. Instead, the Court held that Massachusetts was required to allege that a sovereign interest was "actually invaded or threatened" by "the actual or threatened operation of the statute," *id.* at 485—precisely what Plaintiffs have failed to demonstrate here. Plaintiffs have not alleged any plan to use Rescue Plan funds to offset a reduction in net tax revenue resulting from a change in state law, and even then, only federal money—not state power—would be at stake.

For similar reasons, even if the Plaintiff States had Article III standing, their challenge to the offset provision would not be ripe. "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies,' and "also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–149 (1967)). Plaintiffs' claimed harm here rests on the potential recoupment of some Rescue Plan funds from the States. *See* Compl. ¶¶ 5, 27. "[T]he mere *potential* for future injury, however, is insufficient to render an issue ripe for review." *Caprock Plains Fed. Bank Ass'n v. Farm Credit Admin.*, 843 F.2d 840, 845 (5th Cir. 1988) (quoting *Alascom Inc. v. FCC*, 727 F.2d 1212, 1217 (D.C. Cir. 1984)); *see also Trump v. New York*, 141

S. Ct. 530, 535 (2020) (per curiam); *Caprock Plains Fed. Bank*, 843 F.2d at 845 ("[A] party's allegation of hardship will be found wanting if there are too many 'ifs' in the asserted causal chain . . . ." (citation omitted)). Recoupment would be possible only if, at some point, the Plaintiff States enact tax-law changes, and only if their net tax revenues fall as a result, and only if the States then decide to use Rescue Plan funds to offset that reduction. With potential recoupment nowhere in sight, the States' challenge is premature. *See Missouri*, 2021 WL 1889867, at *3–5.

Because the jurisdictional prerequisites are lacking, this Court should follow the lead of the *Missouri* court and dismiss the Complaint. *See Missouri*, 2021 WL 1889867, at *5. The *Missouri* court explained, in a case similar to this one, that the State lacked pre-enforcement standing because "State tax cuts are not proscribed by the ARPA" and "Missouri's sovereign power to set its own tax policy is not implicated by the ARPA." *Id.* at *4. Rather, Congress simply "both appropriated recovery funds and placed a condition on a State's receipt of the funds." *Id.* Therefore, the State "does not face a credible threat of prosecution if it decides to pass tax cutting measures" because "the ARPA does not prohibit a State from implementing its own tax policy." *Id.* In other words, "recoupment is not triggered by a reduction in State tax revenue, it is triggered by a State's use of federal recovery funds to offset a reduction in its net tax revenue." *Id.*

The *Missouri* court also found that the case was not ripe because "Missouri ask[ed] the Court to determine the scope of the [offset provision] well in advance of any adverse effect and in a wholly, non-actionable hypothetical context," and because further factual development would aid the court's determination. *Id.* at *5. The court further explained that the offset provision "does not require Missouri to engage in, or refrain from, any conduct, including legislative conduct regarding tax policy," and "Missouri's purported injuries to legislative proceedings and the prospect of recoupment of federal recovery funds are too abstract and remote to constitute significant hardship." *Id.* This Court should conclude the same.

11

There must be some "concrete action applying [Treasury's] regulation to [a State's] situation in a fashion that harms or threatens to harm [it]" before adjudicating its challenge. *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808; *see Fac. Senate of Fla. Int'l Univ. v. Winn*, 616 F.3d 1206, 1209 n.8 (11th Cir. 2010) ("[A] final conclusion on that issue can await a post-enforcement, as-applied challenge on a less speculative record than exists here."); *United Transp. Union v. Foster*, 205 F.3d 851, 858–59 (5th Cir. 2000). Given the nature of the Plaintiffs' pre-enforcement facial challenged to a federal statute, it is especially critical to ensure that the jurisdictional prerequisites for this suit are satisfied. *See Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237 (1952).

## II.    PLAINTIFFS FAIL TO STATE A CLAIM ON THE MERITS.

On the merits, Plaintiffs have not come close to demonstrating that Congress exceeded the bounds of its Spending Clause authority. The Constitution empowers Congress to raise and spend revenue to "provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Congress "may, in the exercise of its spending power, condition its grant of funds to the States upon their taking certain actions that Congress could not require them to take, and that acceptance of the funds entails an agreement to the actions." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 686–87 (1999); *NFIB*, 567 U.S. at 576; *Dole*, 483 U.S. at 207.

Congress's Spending Clause authority is subject to certain limitations. Congress must use this power in pursuit of "the general welfare" and ensure that its "conditions on the receipt of federal funds" are related to the federal interest. *Dole*, 483 U.S. at 207. Spending Clause conditions also must not violate "other constitutional provisions" or be "coercive." *Id.* at 208, 211. Finally, Congress's "desire[] to condition the States' receipt of federal funds" must be unambiguous. *Id.* at 207.

In this case, Plaintiffs contend that the offset provision exceeds these limitations and therefore is not a valid exercise of Congress's Spending Clause authority and violates the Tenth Amendment. Compl. ¶¶ 53–72. As noted above, Plaintiffs do not claim that any

particular state enactment will lead to recoupment; Plaintiffs instead challenge the condition as a facial matter. The States therefore bear a significant burden to demonstrate that the offset provision is "unconstitutional in all its applications": they "must show that there is no set of circumstances under which the law would be valid." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019); *McKinley v. Abbott*, 643 F.3d 403, 408–09 (5th Cir. 2011) (citation omitted); *see also Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 450 (2008). And in evaluating the Act's facial constitutionality, "[d]ue respect for the decisions of a coordinate branch of Government demands that [courts] invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." *United States v. Morrison*, 529 U.S. 598, 607 (2000). Here, Congress has validly exercised its Spending Clause authority, and Plaintiffs' contentions have no merit.

> ### A.   Congress validly exercised its Spending Clause authority to restrict the use of Rescue Plan funds.

The Rescue Plan is a lawful exercise of Congress's Spending Clause authority. Designed to assist in the Nation's economic recovery during and following a pandemic, the Rescue Plan appropriates nearly $200 billion in new federal funding for States and the District of Columbia. 42 U.S.C. § 802(b)(2)(A), (c)(1). With that funding, States have considerable flexibility to "mitigate the fiscal effects" of the COVID-19 pandemic as they see fit within the broad parameters specified by Congress. *Id.* § 802(a)(1), (c)(1). Unsurprisingly, Congress sought to ensure that its monetary outlay would be used as intended. To that end, it included a guardrail that prohibits States that choose to accept the federal money from using those funds to "directly or indirectly offset a reduction" in "net tax revenue" resulting from changes in state law. *Id.* § 802(c)(2)(A).

The offset provision is a modest restriction on an otherwise generous outlay of federal funds. By its plain terms, the offset provision applies only when a State uses Rescue Plan funds to "offset" a reduction in "net" tax revenue resulting from changes in state law. *Id.* That restriction is not implicated if reductions in some taxes are balanced with

13

increases in others because no "net" tax revenue reduction would then occur. A State also does not transgress the limitation if it does not "use" Rescue Plan funds to "offset" a reduction in net tax revenue. *Id.* The term "use" connotes "volitional" "active employment" of federal funds. *Voisine v. United States*, 136 S. Ct. 2272, 2278–79 (2016). And the term "offset" means "[t]o balance" or "compensate for." Offset, Black's Law Dictionary (11th ed. 2019). The Act's reference to States' "directly or indirectly" offsetting a reduction in net tax revenue does not alter the statutory meaning. Both "directly" and "indirectly" are adverbs that cannot "alter the meaning of the word" that they modify (here, "offset"). *Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 878 (2019). It remains the case that the statute restricts only the use of Rescue Plan funds to offset reductions in net tax revenue resulting from changes in state law, not every tax reduction. If Congress had sought to prohibit *every* reduction in taxes, Compl. ¶ 6, it could have said so explicitly.

Taken together, the offset provision's language simply ensures that States are not employing federal funds to finance state tax cuts that decrease net tax revenue. *See Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 19 (1995) (describing "offset" as balancing out a specific loss with another specific gain). For example, assuming no other changes, a State could not receive $2 billion in Rescue Plan funds, cut its income tax by an amount equal to $2 billion, and use the Rescue Plan funds to offset the revenue loss. That would be using Rescue Plan Funds to "directly" offset a reduction in net tax revenue. 42 U.S.C. § 802(c)(2)(A). Similarly, again assuming no other changes, a State could not use Rescue Plan funds to replace $2 billion in planned state expenditures on COVID-19 testing and then use the $2 billion it had originally budgeted for that purpose to offset a $2 billion reduction in state income tax. That would be using Rescue Plan Funds to "indirectly" offset a reduction in net tax revenue. *Id.* But States routinely offset reductions in net tax revenue by other means. And even if a State impermissibly uses Rescue Plan funds to offset a reduction in net tax revenue, the consequence is proportional to the misuse: the State would be required to repay only the portion of the federal money it used to offset

14

the reduction in net tax revenue (not to exceed the amount of the federal grant). *Id.* § 802(e).

The Rule confirms this straightforward interpretation. The Rule requires that States demonstrate how they covered the costs of any tax cuts from sources other than Rescue Plan funds, such as by raising other sources of revenue, cutting spending in certain areas, or using revenue derived from increased economic growth. 86 Fed. Reg. at 26,807. Only if a State cannot demonstrate how it paid for its tax cuts without using Rescue Plan funds will Treasury consider that amount to have been directly or indirectly offset with the federal funds, and thus potentially subject to recoupment. *Id.; see also id.* at 26,810 (explaining, for example, that "prevent[ing] recipient governments from using Fiscal Recovery Funds to supplant State or territory funding in the eligible use areas, and then us[ing] those State or territory funds to offset tax cuts," "ensure[s] that Fiscal Recovery Funds are not used to 'indirectly' offset revenue reductions due to covered changes").

Congress has broad leeway in establishing permissible uses of federal funds. And Congress has an overriding interest in ensuring that the new Rescue Plan funds will be used for the broad categories of state expenditures it identified and not others Congress chose not to support. *See Sabri v. United States*, 541 U.S. 600, 608 (2004) ("The power to keep a watchful eye on expenditures . . . is bound up with congressional authority to spend in the first place."); *Oklahoma v. U.S. Civ. Serv. Comm'n*, 330 U.S. 127, 143 (1947) (explaining that Congress has the "power to fix the terms upon which its money allotments to [S]tates shall be disbursed"). The offset provision itself, which is titled "[f]urther restriction on *use of funds*" and only applies to a State's "*use [of] the funds* provided under this section," 42 U.S.C. § 802(c)(2) (emphasis added), makes clear that it is an exercise of that broad congressional authority.

Plaintiffs contend that the Rescue Plan's conditions on the use of funds are not related to the funding program. Compl. ¶ 63. But it is difficult to imagine how they could be *more* related to the funding program because they specify the uses to which a State

15

may and may not devote the federal funds. That sort of statutory condition is by definition "germane[]" because it ensures that federal funds are used for the public-health and economic-recovery "federal purposes" of the spending program. *Dole*, 483 U.S. at 207. Congress acted well within its Spending Clause authority by both describing broad categories of permissible uses and proscribing certain narrow uses. This more than satisfies the "minimum rationality" required of Spending Clause legislation. *United States v. Lipscomb*, 299 F.3d 303, 322 (5th Cir. 2002) (quoting *Kansas v. United States*, 214 F.3d 1196, 1199 (10th Cir. 2000)); *see New York v. United States*, 505 U.S. 144, 172 (1992) (finding funding conditions sufficiently related where "both the conditions and the payments embody Congress' efforts to address the pressing problem of radioactive waste disposal"); *Dole*, 483 U.S. at 208–09 (finding that the federal interest in a uniform drinking age was sufficiently germane to States' receipt of highway funds); *see also Benning v. Georgia*, 391 F.3d 1299, 1308 (11th Cir. 2004). The offset provision simply ensures that Rescue Plan funds "are spent according to [Congress's] view of the 'general Welfare.'" *NFIB*, 567 U.S. at 580. Other Spending Clause case law illustrates that the Rescue Plan and its offset provision advance a valid federal purpose: provisions that require States to maintain their existing fiscal efforts as a condition of receiving federal funds are an uncontroversial and familiar exercise of Congress's spending power. In *Bennett v. Kentucky Department of Education*, 470 U.S. 656 (1985), for example, the Supreme Court explained that, "[i]n order to assure that federal funds would be used to support additional services that would not otherwise be available," the regulations implementing Title I of the Elementary and Secondary Education Act of 1965 "from the outset prohibited the use of federal grants merely to replace state and local expenditures." *Id.* at 659. After receiving complaints that Title I funds were nonetheless being used to replace state and local funds that otherwise would have been spent for participating children, Congress amended Title I in 1970 to require that Title I funds be used "to supplement and, to the extent practical, increase the level of funds that would, in the absence of such federal funds, be made available from non-Federal sources

for the education of pupils participating in programs and projects assisted under this subchapter," and "in no case, as to supplant such funds from non-Federal sources." *Id.* at 660 (quoting 20 U.S.C. § 241e(a)(3)(B) (1970)). Federal auditors later found that certain Kentucky programs had violated that provision, and the Secretary of Education required Kentucky to repay the federal funds that had been misused. *Id.* at 661. The Supreme Court upheld that determination, explaining that the State "gave certain assurances as a condition for receiving the federal funds, and if those assurances were not complied with, the Federal Government is entitled to recover amounts spent contrary to the terms of the grant agreement." *Id.* at 663, 673–74.

In accord with the Supreme Court's decision, courts of appeals have applied and upheld similar provisions in an array of Spending Clause statutes. For example, in *Mayhew v. Burwell*, 772 F.3d 80, 82 (1st Cir. 2014), the First Circuit upheld the Affordable Care Act's requirement that States accepting Medicaid funds maintain their state-level Medicaid eligibility standards for children for a specified period. The *Mayhew* court held that this requirement "is constitutional, fitting easily within congressional spending power to condition federal Medicaid grants." *Id.*; *see also, e.g., S.C. Dep't of Educ. v. Duncan*, 714 F.3d 249, 252 (4th Cir. 2013) (describing provision in the Individuals with Disabilities Education Act, which generally requires the Secretary to reduce a State's grant by the amount the State has failed to maintain spending for special education for children with disabilities); *Kansas v. United States*, 214 F.3d 1196, 1197 (10th Cir. 2000) (noting similar requirement in the Temporary Assistance to Needy Families program).

As these cases reflect, statutory provisions that prevent federal funds from being used to displace state efforts are both common and undoubtedly within Congress's authority. In the cases discussed above, States were required to maintain a certain level of spending; the federal funds could not be used to displace existing State funding. Here, the Rescue Plan's offset provision is even less proscriptive: it does not mandate any particular spending or taxation level but instead merely prevents States from using federal

17

funds to offset a reduction in net tax revenue. Although federal funding conditions are often specific to the particular state program at issue, Rescue Plan funding is not confined to any particular state program or activity—it broadly covers "government services" and "negative economic impacts," among other potential uses. 42 U.S.C. § 802(c)(1). Congress gave States the additional flexibility to determine which of the broadly defined permissible uses of the new funds are most appropriate to their circumstances. And consistent with that generous, four-year outlay of flexible funding, Congress simply sought the assurance that States would not displace their own tax-revenue sources with the federal funds that Congress had appropriated for other purposes.

### B.   The Rescue Plan is not coercive or commandeering.

Plaintiffs do not dispute that Congress generally can prohibit States from using federal grants to fund state tax cuts, and they do not argue that they have a constitutional right to use federal funds to make up for a shortfall caused by a State's decision to decrease net revenues through tax cuts. But they nevertheless urge that the offset provision is coercive and an intrusion on their sovereign taxing authority. Compl. ¶¶ 7–9.

As an initial matter, Plaintiffs' coercion argument rests on a mischaracterization of the offset provision. As explained above, this provision simply limits a State's ability to "use" Rescue Plan funds to "offset" a reduction in "net tax revenue" resulting from changes in state law. *See* Section II.A., *supra*. Plaintiffs are thus wrong to insist that the offset provision "prohibits the Plaintiff States from eliminating taxes, reducing tax rates, . . . increasing tax credits[,] . . . [or] adopt[ing] enforcement policies regarding taxes which would lead to reduced tax revenues." Compl. ¶ 7.

Plaintiffs' coercion argument is also based on a fundamental misunderstanding of governing law. The Supreme Court has made clear that "Congress may attach appropriate conditions to federal taxing and spending programs to preserve its control over the use of federal funds." *NFIB*, 567 U.S. at 579; *Steward Mach. Co. v. Davis*, 301 U.S. 548, 590–

91 (1937); *see also New York*, 505 U.S. at 171 (not undertaking a "coercion" inquiry where "Congress has placed conditions—the achievement of the milestones—on the receipt of federal funds"). So the coercion inquiry is not implicated where, as here, Congress merely restricts how States use newly appropriated federal money because that "is the means by which Congress ensures that the funds are spent according to its view of the 'general Welfare.'" *NFIB*, 567 U.S. at 580; *see, e.g., Miss. Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 179 (D.C. Cir. 2015); *Religious Sisters of Mercy v. Azar*, 2021 WL 191009, at *25 (D.N.D. Jan. 19, 2021), *appeal pending on other grounds*, No. 21-1890 (8th Cir.). Binding Fifth Circuit law says as much. *Gruver v. La. Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll.*, 959 F.3d 178, 183–84 (5th Cir. 2020) (holding that there are "two types of spending conditions that are subject to different scrutiny" and that "determining that a condition does not 'govern the use of the funds'" is what "triggers the coercion question" (citing *NFIB*, 567 U.S. at 580)). And that is exactly what Congress has done here: the offset provision is titled "[f]urther restriction on *use of funds*" and only applies to a State's "*use [of] the funds* provided under this section" to offset a reduction in net tax revenue. 42 U.S.C. § 802(c)(2) (emphases added). The States are free to do anything they want with their own money or tax schemes, including cutting taxes, providing rebates, increasing spending, or cutting expenditures. They must simply refrain from using the *federal* money to "directly or indirectly offset a reduction in net tax revenue" resulting from state tax-law changes. 42 U.S.C. § 802(c)(2).

Even if coercion analysis did apply, Plaintiffs would lose under *NFIB*. *See* Compl. ¶ 9. Unlike the statute challenged here, the Affordable Care Act provision at issue in *NFIB* threatened States with the loss of their *preexisting* Medicaid funding if they declined to take part in the ACA's expansion of Medicaid coverage. *NFIB*, 567 U.S. at 576. In the controlling opinion, the Chief Justice explained that the statute's primary constitutional flaw was the threat to cut off all *existing* Medicaid funding if a State did not agree

to the Medicaid expansion.[2] *Id.* at 579–80. As the opinion summarized, "Congress is not free" to "penalize States that choose *not to participate* in that new program by taking away their *existing* Medicaid funding." *Id.* at 585 (emphases added).

By contrast, the only funds regulated by the offset provision are the funds that Congress appropriated as part of the Rescue Plan itself. *See* 42 U.S.C. § 802(a)–(c). Unlike in *NFIB*, States do not suffer the "penalty" of losing *preexisting* funds if they decline Rescue Plan funds. *See NFIB*, 567 U.S. at 585. Indeed, *all* Justices in *NFIB* agreed that "Congress could have made just the *new* funding provided under the ACA contingent on acceptance of the terms of the Medicaid Expansion." *NFIB*, 567 U.S. at 687–88 (joint dissent); *id.* at 576, 585 (plurality) (same); *id.* at 625 (Ginsburg, J., concurring in part and dissenting in part) (same). That is exactly what Congress has done here. In fact, the Rescue Plan is notably more modest than the prospective funding condition that *NFIB* indicated was permissible because it is not an all-or-nothing proposition: even if a State were to use Rescue Plan funds to offset a reduction in net tax revenue, it could lose no more than those funds used for the offset. *Compare* 42 U.S.C. § 802(e)(1), *with NFIB*, 567 U.S. at 576, 585 (explaining that Congress could make the *entirety* of the new federal funds provided—totaling $100 billion per year—contingent on a State's adoption of that new program), *and id.* at 687–88 (joint dissent). So the requirement in the Rescue Plan that States use federal funds for specified purposes and not for others—including to offset a reduction in net tax revenue—is no more "coercive" than any type of restriction on the receipt of federal funds that the Supreme Court has held to be a valid exercise of Congress's Spending Clause authority. *See, e.g., New York*, 505 U.S. at 171; *Dole*, 483 U.S. at 211; *Bennett*, 470 U.S. at 663; *Steward Mach.*, 301 U.S. at 590–91.

---

[2] Because Chief Justice Roberts, writing for a plurality, "struck down Medicaid expansion on narrower grounds than the joint dissent, the plurality opinion is binding." *Gruver*, 959 F.3d at 183 n.5; *Miss. Comm'n on Env't Quality*, 790 F.3d at 176 & n.22.

Finally, Plaintiffs' effort to characterize the offset provision as impermissible commandeering under the Tenth Amendment should also be rejected. Compl. ¶¶ 8, 67–72. The Supreme Court has repeatedly affirmed that "Congress can use [its Spending Clause] power to implement federal policy it could not impose directly under its enumerated powers." *NFIB*, 567 U.S. at 578; *Coll. Sav. Bank*, 527 U.S. at 686 (same); *Dole*, 483 U.S. at 207 (same). The inquiry under both the Spending Clause and the Tenth Amendment is whether the challenged "provision is inconsistent with the federal structure of our Government established by the Constitution." *New York*, 505 U.S. at 177; *NFIB*, 567 U.S. at 578–79. And because nothing in the Act "force[s] the States to implement a federal program," *NFIB*, 567 U.S. at 578–79, Plaintiffs' commandeering argument fails.

In cases like this one — where "a State has a legitimate choice whether to accept the federal conditions in exchange for federal funds" — the "state officials can fairly be held politically accountable for choosing to accept or refuse the federal offer." *Id.* at 578; *New York*, 505 U.S. at 168 ("Where Congress encourages state regulation rather than compelling it . . . state officials remain accountable to the people."). If the Plaintiff States dislike the funding condition, or any other provision of the Act, they are free to decline the generous federal aid in whole or in part. Their voters know where to turn if they like, or dislike, the States' choice.

### C.    The Rescue Plan provides clear notice of the funding condition.

Plaintiffs fare no better in urging that the offset provision is unconstitutionally ambiguous. Compl. ¶¶ 61, 65. In *Pennhurst State School & Hospital v. Halderman*, the Supreme Court declared that "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." 451 U.S. 1, 17, 24 (1981). But that is not an onerous requirement: a State's obligations under a funding condition may be "largely indeterminate," so long as Congress gives "clear notice to the States that they, by accepting funds under the Act, would indeed be obligated to comply with" certain conditions. *Id.* at 25. The idea is simply to keep Congress from "surprising participating States with

post-acceptance or retroactive conditions." *NFIB*, 567 U.S. at 584 (quoting *Pennhurst*, 451 U.S. at 25); *see City of Los Angeles v. Barr*, 929 F.3d 1163, 1174–75 (9th Cir. 2019).

Here, "a state official who is engaged in the process of deciding whether the State should accept [Rescue Plan] funds and the obligations that go with those funds" would "clearly understand that one of the obligations of the Act is the obligation" not to use Rescue Plan funds to offset a net-tax-revenue reduction. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). The Act establishes conditions on the use of funds (§ 802(c)), requires States to certify that they will use the funds for the intended purposes and to report those uses (§ 802(d)), and informs States that the potential consequence of non-compliance is the recoupment of no more than the portion of the funds used to offset a net tax revenue reduction (§ 802(e)). The Act further permits the Secretary to implement its provisions by regulation. *Id.* § 802(f).

These provisions give a state official deciding whether to accept Rescue Plan funds clear notice that those funds are conditioned on the State's agreement not to use the funds to offset a reduction in net tax revenue resulting from changes in state law. "Nothing more is required under *Pennhurst*, which held that Congress need provide no more than 'clear notice' to the [S]tates that funding is conditioned upon compliance with certain standards." *Cutter v. Wilkinson*, 423 F.3d 579, 586 (6th Cir. 2005) (citing *Pennhurst*, 451 U.S. at 25); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005) (noting that the Supreme Court has held "there was sufficient notice under *Pennhurst* where a statute made clear that some conditions were placed on the receipt of federal funds"); *Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999) (same).

The district court in *Ohio v. Yellen* misread governing case law to require that Congress itself must specify such minute details as how to "score" tax-law changes. 2021 WL 2712220, at *14 (S.D. Ohio July 1, 2021). But "it is simply impossible" for Congress to "delineate every instance in which a State may or may not comply with" a funding condition. *Charles v. Verhagen*, 348 F.3d 601, 607 (7th Cir. 2003); *see Mayweathers v. Newland*, 314 F.3d

22

1062, 1067 (9th Cir. 2002); *Van Wyhe v. Reisch*, 581 F.3d 639, 650 (8th Cir. 2009) ("[S]etting forth every conceivable variation in the statute is neither feasible nor required."); *see Bennett*, 470 U.S. at 666 (explaining that "every improper expenditure" need not be "specifically identified and proscribed" in the statute); *Jackson*, 544 U.S. 167 at 183 (same); *Davis*, 526 U.S. at 650 (same). "There are far too many circumstances affecting the States in different ways for Congress to have envisioned all aspects of compliance and noncompliance." *Charles*, 348 F.3d at 608; *W. Va. Dep't of Health & Hum. Res. v. Sebelius*, 649 F.3d 217, 223 (4th Cir. 2011) ("Congress need not spell out every condition with flawless precision for a provision to be enforceable."). Instead, Congress must simply "make the existence of the condition itself—in exchange for the receipt of federal funds—explicitly obvious." *Mayweathers*, 314 F.3d at 1067; *Charles*, 348 F.3d at 607 ("[T]he exact nature of the conditions may be 'largely indeterminate,' provided that the *existence of the conditions* is clear, such that States have notice that compliance with the conditions is required." (emphasis added)); *Benning v. Georgia*, 391 F.3d 1299, 1307 (11th Cir. 2004) ("The federal law in *Pennhurst* was unclear as to whether the [S]tates incurred any obligations *at all* by accepting federal funds, but [the statute at issue] is clear that states incur an obligation when they accept federal funds, even if the method for compliance is left to the [S]tates." (emphasis added)).

When properly applied, *Pennhurst* and its progeny instruct that Congress must simply make clear that acceptance of federal funds obligates the State to comply with a condition; any particularized questions can be addressed by agency regulations and by other formal or informal guidance. *See Bennett*, 470 U.S. at 669 (explaining that "grant recipients ha[ve] an opportunity to seek clarification of the program requirements" from the agency if they are "uncertain" about their obligations). *Contra Ohio*, 2021 WL 2712220, at *16. Courts thus have routinely accorded *Chevron* deference to regulations that implement federal spending programs (such as Medicaid and education statutes), an impossibility if any ambiguity in a funding condition rendered the statute unconstitutional. *See,*

*e.g.*, *Irving Indep. Sch. Dist. v. Tatro*, 468 U.S. 883, 891–92 (1984); *Blum v. Bacon*, 457 U.S. 132, 141 (1982); *Baptist Mem'l Hosp. – Golden Triangle, Inc. v. Azar*, 956 F.3d 689, 692–93 (5th Cir. 2020);[3] *Children's Hosp. Ass'n of Tex. v. Azar*, 933 F.3d 764, 770 (D.C. Cir. 2019); *see also City of Los Angeles*, 929 F.3d at 1174–81 (affirming constitutionality under the Spending Clause while also applying *Chevron* deference). And that is exactly what Congress envisioned here by expressly authorizing Treasury "to issue such regulations as may be necessary or appropriate to carry out" the provision of funds and the associated conditions. 42 U.S.C. § 802(f).

But agency regulations should have no bearing on the Spending Clause analysis. If a statutory funding condition exists, the implementing agency can regulate the details of the condition subject to the Administrative Procedure Act and the other typical constraints; if not, any agency regulation imposing funding conditions would be unauthorized by the statute. The offset provision easily clears that bar, especially because "Congress permissibly conditioned the receipt of federal money in such a way that each State is made aware of the condition and is simultaneously given the freedom to tailor compliance according to its particular . . . circumstances." *Charles*, 348 F.3d at 607. But even if the bar were higher, it would make no difference. The Rescue Plan provides in direct terms that States cannot use the federal funds to offset a reduction in net tax revenue resulting from changes in state law. *See* Section II.A., *supra*. A more onerous standard would conflict with *Pennhurst*, numerous other Spending Clause precedents, and the well-settled rule that Congress may confer decisionmaking authority on agencies if it "lay[s] down by legislative act an intelligible principle." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001).

---

[3] In the context of a condition that a State waive its sovereign immunity in order to receive federal funds, the Fifth Circuit recently held that the statute itself must clearly require a waiver. *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 361–62 (5th Cir. 2021). This case, however, does not involve a condition that a State waive sovereign immunity.

**D.      The Rescue Plan does not violate the Equal Sovereignty principle.**

Finally, Plaintiffs' claim that the offset provision violates the Equal Sovereignty principle is plainly wrong. Compl. ¶¶ 74–79. As the Complaint notes, the "historic tradition" of the United States is "that all States enjoy equal sovereignty," and a statute that "differentiates between the States" may only be upheld upon "a showing that [the] statute's disparate geographic coverage is sufficiently related to the problems that it targets." *Id.* ¶ 74 (quoting *Nw. Austin Mun. Util. Dist. v. Holder*, 557 U.S. 193, 203 (2009)); *see also Shelby Cnty. v. Holder*, 570 U.S. 529, 540 (2013); *United States v. Louisiana*, 363 U.S. 1, 16 (1960). But the offset provision does not on its face "differentiate[] between the States," *see generally* 42 U.S.C. § 802(c) (referring only to "a State"), and Plaintiffs do not contend otherwise. That should be the end of this claim. *See Mayhew v. Burwell*, 772 F.3d 80, 94 (1st Cir. 2014).

Plaintiffs nonetheless assert a violation of this principle because some States are more likely than others to want to cut taxes. Compl. ¶¶ 75–77. But there is no support for Plaintiffs' novel contention that Congress cannot enact legislation that some States may disfavor more than others. Indeed, if this theory were correct, federal statutes could almost never preempt state law because States will always have differing policy preferences. For example, under Plaintiffs' theory, the federal government would be unable to prohibit marijuana sales if some States wanted to legalize marijuana and others did not. *Contra Gonzalez v. Raich*, 545 U.S. 1, 15, 33 (2005) (upholding federal marijuana law). The offset provision does not "single[] out" any state; it applies to all states equally, so it does not implicate Equal Sovereignty. *Shelby Cnty.*, 570 U.S. at 540.

## CONCLUSION

For the reasons explained above, the Court should dismiss the Complaint.

DATED: July 12, 2021                    Respectfully submitted,

                                        BRIAN M. BOYNTON
                                        Acting Assistant Attorney General

                                        BRIAN D. NETTER
                                        Deputy Assistant Attorney General

                                        ALEXANDER K. HAAS
                                        Director, Federal Programs Branch

                                        BRIGHAM J. BOWEN
                                        Assistant Director, Federal Programs Branch

                                        */s/ Michael P. Clendenen*
                                        MICHAEL P. CLENDENEN
                                        STEPHEN EHRLICH
                                        CHARLES E.T. ROBERTS
                                        Trial Attorneys
                                        Civil Division, Federal Programs Branch
                                        U.S. Department of Justice
                                        1100 L Street, NW
                                        Washington, DC 20005
                                        Phone: (202) 305-9803
                                        Email: stephen.ehrlich@usdoj.gov

                                        *Counsel for Defendants*

**<u>Certificate of Service</u>**

On July 12, 2021, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ *Michael P. Clendenen*