## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, STATE OF MISSISSIPPI, STATE OF LOUISIANA, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Case No. 2:21-cv-00079-Z |
| JANET YELLEN, in her official capacity as Secretary of the Treasury, et al., | § § § | |
| Defendants. | § § § | |

## PLAINTIFFS' BRIEF IN SUPPORT OF THEIR COMBINED RESPONSE TO DEFENDANTS' MOTION TO DISMISS AND MOTION FOR PARTIAL SUMMARY JUDGMENT

TABLE OF CONTENTS

Table of Contents ................................................................................................... i

Tables of Authorities ............................................................................................ ii

Introduction ........................................................................................................... 1

Statement of Facts ................................................................................................. 2

Argument ............................................................................................................... 6

    I.      Defendants Motion to Dismiss Should Be Denied. ................................. 6

          A.    Plaintiffs have standing to challenge the Tax Mandate. ............................ 6

          B.    Plaintiffs' claims are ripe for review. ....................................... 15

          C.    The Complaint sufficiently states a claim for violation of Plaintiffs' equal sovereignty. ............................................................................................... 16

    II.     Plaintiffs are entitled to summary judgment that the Tax Mandate is unconstitutional. ........................................................................................ 19

          A.    Congress's offer of ARPA funds in exchange for acceptance of the Tax Mandate is unconstitutionally coercive. ................................................... 19

          B.    Congress presented the States with an unconstitutionally ambiguous condition that the Secretary cannot cure. ................................................... 22

          C.    The Tax Mandate is unrelated to ARPA's purpose. ................................ 29

    III.    Plaintiffs are entitled to a permanent injunction. ................................. 32

Conclusion ........................................................................................................... 33

Certificate of Service ...................................................................................... 336

TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
    458 U.S. 592 (1982)............................................................................12

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
    576 U.S. 787 (2015)..........................................................................8, 13

*Arizona v. Yellen*,
    No. 2:21-cv-514 (D. Ariz. filed Mar. 25, 2021) .......................................4

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
    548 U.S. 291 (2006)..........................................................................22, 23

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................16

*Awad v. Ziriax*,
    670 F.3d 1111 (10th Cir. 2012) ............................................................32

*Babbitt v. United Farm Workers Nat'l Union*,
    442 U.S. 289 (1979)............................................................................14

*Barnes v. E-Systems, Inc.*,
    501 U.S. 1301 (1991) (Scalia, J.)..........................................................10

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..........................................................................16, 18

*Bennett v. Ky. Dep't of Educ.*,
    470 U.S. 656 (1985)............................................................................31

*Cicalese v. Univ. of Tex. Med. Branch*,
    924 F.3d 762 (5th Cir. 2019) ...............................................................16

*City of San Antonio v. Hotels.com*,
    876 F.3d 717 (5th Cir. 2017) ...............................................................23

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)...........................................................................6, 7

*Clinton v. City of N.Y.*,
    524 U.S. 417 n.22 (1998)......................................................................8

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*,
    527 U.S. 666 (1999)................................................................20

*Conn. Nat'l Bank v. Germain*,
    503 U.S. 249 (1992)................................................................23

*Daves v. Dallas Cnty.*,
    984 F.3d 381 (5th Cir. 2020) ...................................................7

*Davis v. Monroe Cnty. Bd. of Educ.*,
    526 U.S. 629 (1999) (Kennedy, J., dissenting)........................21

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019).........................................................8, 14

*Dep't of Revenue of Or. v. ACF Indus. Inc.*,
    510 U.S. 332 (1994)...........................................................10, 18

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006)................................................................32

*Entergy Corp. v. Riverkeeper, Inc.*,
    556 U.S. 208 (2009)................................................................26

*F.D.I.C. v. Meyer*,
    510 U.S. 471 (1994)................................................................32

*G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*,
    23 F.3d 1071 (6th Cir. 1994) ..................................................32

*Gibbons v. Ogden*,
    22 U.S. (9 Wheat.) 1 (1824)....................................................32

*Gonzales v. Raich*,
    545 U.S. 1 (2005).....................................................................19

*Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*,
    545 U.S. 409 (2005)................................................................23

*Kansas v. United States*,
    214 F.3d 1196 (10th Cir. 2000) ..............................................31

*Kentucky v. Yellen*,
    No. 3:21-cv-17 (E.D. Ky. filed Apr. 6, 2021)...........................5

*Koontz v. St. Johns River Water Mgmt. Dist.*,
    570 U.S. 595 (2013)..................................................................8

*Lane Cnty. v. Oregon*,
   74 U.S. (7 Wall.) 71 (1868) ................................................................10

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992).........................................................................7

*Mayhew v. Burwell*,
   772 F.3d 80 (1st Cir. 2014)........................................................18, 31

*McCulloch v. Maryland*,
   17 U.S. (4 Wheat.) 316 (1819)........................................................10

*Miller v. Tex. Tech Univ. Health Scis. Ctr.*,
   421 F.3d 342 (5th Cir. 2005) ..........................................................29

*Missouri v. Yellen*,
   No. 4:21-cv-376 (E.D. Mo. filed Mar. 29, 2021)....................................4

*Murphy v. NCAA*,
   138 S. Ct. 1461 (2018) ...................................................................19

*NCAA v. Governor of N.J.*,
   730 F.3d 208 (3d Cir. 2013)............................................................19

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*,
   508 U.S. 656 (1993)........................................................................8

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*,
   833 F.2d 583 (5th Cir. 1987) ..........................................................15

*New York v. United States*,
   505 U.S. 144 (1992)...........................................................14, 19, 31

*NFIB v. Sebelius*,
   567 U.S. 519 (2012)...........................................14, 19, 20, 21, 22

*Nw. Austin Mun. Util. Dist. v. Holder*,
   557 U.S. 193 (2009)...........................................................16, 17, 18

*Ohio v. Yellen*,
   No. 1:21-cv-181, 2021 WL 1903908 (S.D. Ohio May 12, 2021) (Cole, J.)...................8, 9, 24

*Ohio v. Yellen*,
   No. 1:21-cv-181, 2021 WL 2712220 (S.D. Ohio July 1, 2021) (Cole, J.)..9, 10, 11, 15, 23, 24, 26, 27, 28, 32

*Ohio v. Yellen*,
   No. 1:21-cv-181 (S.D. Ohio filed Mar. 17, 2021) ........................................4, 8, 29

*Otto v. City of Boca Raton,*
    981 F.3d 854 (11th Cir. 2020) ................................................................32

*Pennhurst State Sch. & Hosp. v. Halderman,*
    45 U.S. 1 (1981).....................................................................................20, 22

*Rimini St., Inc. v. Oracle USA, Inc.*
    139 S. Ct. 873 (2019).................................................................................26

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.,*
    547 U.S. 47 (2006).......................................................................................7

*S.C. Dep't of Educ. v. Duncan,*
    714 F.3d 249 (4th Cir. 2013) ....................................................................31

*Shelby Cnty. v. Holder,*
    570 U.S. 529 (2013).......................................................................16, 17, 19

*Soc'y of Separationists, Inc. v. Herman,*
    959 F.2d 1283 (5th Cir. 1992) (en banc) ...................................................7

*South Dakota v. Dole,*
    483 U.S. 203 (1987)...........................................................14, 20, 21, 29

*Steffel v. Thompson,*
    415 U.S. 452 (1974)...................................................................................14

*Steward Mach. Co. v. Davis,*
    301 U.S. 548 (1937)...................................................................................20

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014)......................................................................7, 14, 16

*Tex. Educ. Agency v. U.S. Dep't of Educ.,*
    908 F.3d 127 (5th Cir. 2018) ...............................................................23, 28

*Tex. Office of Pub. Util. Counsel v. FCC,*
    183 F.3d 393 (5th Cir. 1999) ....................................................................12

*Texas Educ. Agency v. U.S. Dep't of Educ.,*
    992 F.3d 350 (5th Cir. 2021) .................................................................6, 28

*Texas v. Rettig,*
    987 F.3d 518 (5th Cir. 2021) ......................................................................7

*Texas v. United States,*
    787 F.3d 733 (5th Cir. 2015) ....................................................................13

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided court* ........................6, 12

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021).................................................................................10

*Tully v. Griffin, Inc.*,
  429 U.S. 68 (1976).....................................................................................18

*Union Pac. R.R. Co. v. Peniston*,
  85 U.S. (18 Wall.) 5 (1873) .........................................................................18

*United States v. Davis*,
  226 F.3d 346 (5th Cir. 2000) ........................................................................24

*United States v. Kaluza*,
  780 F.3d 647 (5th Cir. 2015) ........................................................................23

*United States v. Louisiana*,
  363 U.S. 1 (1960).......................................................................................16

*Va. Dep't of Educ. v. Riley*,
  106 F.3d 559 (4th Cir. 1997) (en banc) (per curiam)...........................................28

*Va. Uranium, Inc. v. Warren*,
  139 S. Ct. 1894 (2019)................................................................................25

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*,
  454 U.S. 464 (1982)...................................................................................13

*Valley v. Rapides Parish Sch. Bd.*,
  118 F.3d 1047 (5th Cir. 1997) ......................................................................32

*Voisine v. United States*,
  136 S. Ct. 2272 (2016)................................................................................25

*West Virginia v. U.S. Dep't of Treasury*,
  No. 7:21-cv-465 (N.D. Ala. filed Mar. 31, 2021).......................................5, 14, 15

*West Virginia v. U.S. Department of Treasury*,
  No. 7:21-cv-465, 2021 WL 2952863, at *6—7 (N.D. Ala. July 14, 2021) .............9

*White v. U.S. Corr., L.L.C.*,
  996 F.3d 302 (5th Cir. 2021) ........................................................................16

*Williams v. Taylor*,
  529 U.S. 362 (2000)....................................................................................26

**Constitutional Provisions, Statutes, and Rules:**

U.S. Const. amend. X....................................................................................1, 9, 14, 16, 19

42 U.S.C.:
    § 802(a)(1) ..................................................................................................2, 29
    § 802(b)(3)(A)–(C) .............................................................................................2
    § 802(c)(1) ...................................................................................................29, 31
    § 802(c)(1)(A) ...................................................................................................30
    § 802(c)(1)(A)–(D) ........................................................................................3, 21
    § 802(c)(1)(C) ...................................................................................................27
    § 802(c)(2) ........................................................................................................22
    § 802(c)(2)(A) ...........................................1, 3, 11, 12, 21, 23, 25, 27, 29
    § 802(c)(2)(A), (g)(1).......................................................................................10
    § 802(c)(2)(B) .....................................................................................................3
    § 803(a)...............................................................................................................4
    § 803(c)........................................................................................................4, 30
    § 803(c)(4) ..........................................................................................................3

La. Const. art. VII, § 10 ...................................................................................24

Tex. Const.:
    art. III ....................................................................................................6, 7, 9, 12
    art. III, § 49a ....................................................................................................24

American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4 .............................2

Miss. Code Ann. § 27-103-125 ...........................................................................24

Pub. L. No. 117-2:
    § 9621...........................................................................................................4, 30
    § 9673...........................................................................................................4, 30

Tex. Gov't Code § 2003.101 ...............................................................................12

Tex. Tax Code:
    § 111.002(a) .....................................................................................................12
    § 111.00455(a) .................................................................................................12

**Other Authorities:**

Coronavirus State and Local Fiscal Recovery Funds, 86 Fed. Reg. 26,786 (May
    17, 2021) (codified at 31 C.F.R. pt. 35)............................................5, 6, 14, 27

Hearing, The Quarterly CARES Act Report to Cong., Sen. Comm. on Banking,
    Hous., & Urban Affairs at 1:10:00–1:13:36 (Mar. 24, 2021),
    https://tinyurl.com/thornyQs ..................................................................24, 25

Webster's New World College Dictionary 20 (5th ed. 2016) (App.271).......................................26

## INTRODUCTION

One year after the onset of the COVID-19 pandemic, the President signed the American Rescue Plan Act ("ARPA") into law. ARPA was intended to spur economic recovery from the pandemic, and to that end, Congress made almost $220 billion available to States, territories, and Tribal governments. The funds made available to the States were massive in both dollar amount and in relation to their budgets. Texas is entitled to nearly $16 billion (13% of its yearly budget), while Mississippi is entitled to nearly $2 billion (31% of its yearly budget), and Louisiana is entitled to over $3 billion (7% of its yearly budget). But to accept these funds, States must accept conditions that come with them.

This case concerns one of ARPA's conditions—labeled the "Tax Mandate" because of its effect on state tax policy. The Tax Mandate prohibits States accepting ARPA funds from using them "to either directly or indirectly offset a reduction in [their] net tax revenue" resulting from tax cuts. 42 U.S.C. § 802(c)(2)(A). But ARPA neither defines an indirect offset nor the baseline for determining whether a tax cut reduced net tax revenue. The resulting ambiguity, along with the fungibility of money, renders the Tax Mandate's potential scope so broad that it effectively prohibits state tax cuts. While States can theoretically choose between accepting the funds and retaining their sovereignty, that choice is illusory. The economic need for, and size of, the funds are so great that Plaintiffs have no choice but to accept them, conditions and all.

Congress's coercive offer, which commandeers the States into following Congress's preferred policy of government spending over tax cuts, exceeds the limits of Congress's Spending Clause authority and violates the Tenth Amendment. And the constitutional issues do not stop there. Though the Constitution permits Congress to use the Spending Clause to achieve ends beyond its enumerated powers by attaching conditions to its appropriations of federal funds, those

conditions must be related to the statute's purposes, and Congress must present them in a manner that ensures a State's choice to accept the conditions is both voluntary and knowing. Because of the Tax Mandate's ambiguity and lack of any relationship to ARPA's purpose, it violates these constitutional requirements as well.

In passing ARPA, Congress violated well-established constitutional limits on its Spending Clause authority in an attempt to micromanage state tax policy decisions that the Constitution grants Congress no authority to control. A declaration that the Tax Mandate is unconstitutional, and an injunction forbidding its enforcement, are necessary to avoid the irreparable harm effectuated by this unprecedented intrusion into a core aspect of state sovereignty.

## STATEMENT OF FACTS

The COVID-19 pandemic had a drastic negative impact on the United States economy and that of its constituent States. Like other States, the impact on Texas, Mississippi, and Louisiana was severe. *See generally* App.007–022 (detailing the pandemic's impact on the Texas economy); *see also* App.026–030 (same); App.051–057 (same). In an effort to help state economies recover, Congress passed ARPA, and President Biden signed it into law on March 11, 2021. American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4. ARPA created the Coronavirus State Fiscal Recovery Fund, through which Congress made nearly $220 billion available "to States, territories, and Tribal governments to mitigate the fiscal effects stemming" from the COVID-19 pandemic. 42 U.S.C. § 802(a)(1). ARPA includes a formula for determining the amount of funds available to each State, *id.* § 802(b)(3)(A)–(C), and Treasury has published its calculations of those amounts, App.150. The funds available to Texas, Louisiana, and Mississippi are approximately $15.8 billion, $3 billion, and $1.8 billion, respectively. *Id.* In relation to their respective budgets, these amounts are substantial. The Texas Legislature budgeted approximately $126 billion for the

year ending in August 2022, and $122 billion for the year ending in August 2023. App.162. The ARPA funds available to Texas are over 12.5% of its 2022 budget, and nearly 13% of its 2023 budget. The amounts available to Louisiana and Mississippi are similarly substantial.[1]

Congress specified that States accepting ARPA funds must use them for one of four permissible purposes: (1) providing "assistance to households, small businesses, and nonprofits, or aid to impacted industries such as tourism, travel, and hospitality"; (2) "respond[ing] to workers performing essential work during the COVID-19 public health emergency by providing premium pay to eligible workers"; (3) supplementing reduced government revenues resulting from the pandemic; and (4) investing "in water, sewer, or broadband infrastructure." 42 U.S.C. § 802(c)(1)(A)–(D). Separately, Congress prohibited States accepting ARPA funds from using them "for deposit into any pension fund." *Id.* § 802(c)(2)(B).

Congress included the Tax Mandate as another restriction on States accepting ARPA funds. The Tax Mandate provides:

> A State or territory shall not use the funds provided under this section or transferred pursuant to section 803(c)(4) of this title to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

*Id.* § 802(c)(2)(A). ARPA neither defines "directly or indirectly offset" nor how to determine whether a tax cut results in "a reduction in the net tax revenue" of the tax-cutting State.

---

[1] Louisiana total budget for fiscal year 2022 is approximately $42 billion. App.168. The $3 billion in ARPA funds available to Louisiana are 7% the size of its 2022 budget. Mississippi's budget for fiscal year 2022 includes general fund appropriations totaling $5.819 billion. App.277. The $1.8 billion in ARPA funds available to Mississippi are 31% of its 2022 general fund appropriations.

In addition to the state recovery fund, Congress also created a comparable recovery fund for "metropolitan cities, nonentitlement units of local government, and counties." *Id.* § 803(a). These funds may be used for the same purposes as States may use funds under ARPA, but Congress did not impose a Tax Mandate on local governments. *Id.* § 803(c). And as part of ARPA, Congress itself enacted federal tax relief. *E.g.*, Pub. L. No. 117-2, § 9621 (expanding earned income tax credit), § 9673 (exempting revitalization funds).

Shortly after ARPA was signed into law, the Attorneys General for Plaintiffs and eighteen other States wrote Secretary Yellen requesting clarification of the Tax Mandate and asking that she "confirm that [ARPA] does not prohibit States from generally providing tax relief" unrelated to the State's use of ARPA relief funds. App.176. The States expressed their concern, given that "money is fungible[] and States must balance their budgets," that "*any* tax relief enacted by a state legislature after the State has received relief funds could be viewed as 'using' those funds as an 'offset' that allows the State to provide that tax relief" due to ARPA's ambiguous prohibition of indirect offsets. App.172. In response, the Secretary said that "the Act does not 'deny States the ability to cut taxes in any manner whatsoever,'" but she failed to clarify the meaning of the Tax Mandate's prohibition of using ARPA funds "to either directly or indirectly offset a reduction in the net tax revenue" due to tax cuts. App.179–180. She ignored the key phrase—"directly or indirectly offset"—altogether. Instead, the Secretary stated that States that "lower certain taxes" could avoid implicating the Tax Mandate "by replacing the lost revenue through other means," suggesting that the Tax Mandate in fact prohibits any tax relief reducing state revenues. App.179.

After receiving the Secretary's response, several States filed lawsuits challenging the Tax Mandate. *Ohio v. Yellen*, No. 1:21-cv-181 (S.D. Ohio filed Mar. 17, 2021); *Arizona v. Yellen*, No. 2:21-cv-514 (D. Ariz. filed Mar. 25, 2021); *Missouri v. Yellen*, No. 4:21-cv-376 (E.D. Mo. filed

Mar. 29, 2021); *West Virginia v. U.S. Dep't of Treasury*, No. 7:21-cv-465 (N.D. Ala. filed Mar. 31, 2021); *Kentucky v. Yellen*, No. 3:21-cv-17 (E.D. Ky. filed Apr. 6, 2021).

After the filing of this and the other lawsuits, Treasury published an Interim Rule interpreting the Tax Mandate. Coronavirus State and Local Fiscal Recovery Funds, 86 Fed. Reg. 26,786 (May 17, 2021) (codified at 31 C.F.R. pt. 35) (the "Interim Rule"). The Interim Rule does not define "indirectly offsets," but does attempt to provide a method for determining whether a tax cut results in "a reduction in the net tax revenue" of a State. State's accepting ARPA funds must calculate the value of any changes in state law that might reduce the State's tax revenues. 31 C.F.R. §§ 35.3, 35.8(b)(1). If the aggregate amount of revenue loss is greater than one percent of the State's baseline—the State's tax revenue for its fiscal year ending in 2019 adjusted for inflation—and the State reports a reduction in net tax revenue ("measured as the difference between actual tax revenue and the State's . . . baseline"), the State must show that it has increased other tax revenues or reduced spending to offset the revenue loss from the tax cuts to avoid violating the Tax Mandate. *Id.* §§ 35.3, 35.8(b)(2)–(4).

The Interim Rule's methodology is complicated, and it appears designed to identify as many tax cuts as possible as reducing net tax revenues. States must decipher whether spending cuts are in the same "[d]epartments, agencies, or authorities in which the State" is (or is not) using ARPA funds, and they may not "incorporate the effects of macroeconomic growth to reduce . . . the projected impact" of a tax cut. *Id.* §§ 35.3, 35.8(b)(1), 35.8(b)(4). Moreover, by defining the "baseline" as tax revenue for 2019, before the onset of the pandemic, *id.* § 35.3, revenue growth following the economic contraction associated with the pandemic may nevertheless be a reduction

in revenue if the growth does not result in revenues surpassing pre-pandemic levels.[2]

This lawsuit is not about the Interim Rule. Plaintiffs challenge the unconstitutional statute passed by Congress, and no rule issued by the executive branch can rectify ARPA's constitutional deficiencies. *Texas Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 361–62 (5th Cir. 2021).

Since filing suit, Plaintiffs have signed certifications and received ARPA funds,[3] as they said they would when the Complaint was filed. *See* ECF 1 ¶ 47. The acceptance of these funds along with the Tax Mandate was the inevitable result of Congress's coercive offer. As they were at the time they filed suit, Plaintiffs continue to be harmed by the Tax Mandate and Congress's unprecedented attempt to intrude upon their sovereign authority to set state tax policy.

ARGUMENT

I.      **Defendants Motion to Dismiss Should Be Denied.**

A.  **Plaintiffs have standing to challenge the Tax Mandate.**

To establish Article III standing, a plaintiff "must show an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Texas v. United States*, 809 F.3d 134, 150 (5th Cir. 2015), *aff'd by an equally divided court* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). "An

---

[2] Treasury justified this baseline as "consistent with the approach directed by the ARPA in sections 602(c)(1)(C) and 603(c)(1)(C)." Interim Rule at 26808 & n.164. However, those sections concern the permissible use of ARPA funds to address revenue losses due to the pandemic, not the Tax Mandate. While it may make sense to use this baseline to measure revenue losses from the pandemic, it does not make sense to use the same baseline to determine if tax changes following the economic impacts of the pandemic result in revenue losses or increases.

[3] As noted in Defendants' motion, Mississippi filed its certification in May 2021, Louisiana filed its certification in June 2021, and both have received ARPA funds. ECF 19 at 6; *see also* App.274, App.280–281, App.283, App.285–289, App.291. Texas filed its certification in August 2021 and has received its allotment of ARPA funds as well.

allegation of future injury may suffice if the threatened injury is certainly impending, or if there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (cleaned up) (quoting *Clapper*, 568 U.S. at 409). "To obtain equitable relief for past wrongs, a plaintiff must demonstrate either continuing harm or a real and immediate threat of repeated injury in the future." *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1285 (5th Cir. 1992) (en banc). Standing is "assessed under the facts existing when the complaint is filed." *Daves v. Dallas Cnty.*, 984 F.3d 381, 392 (5th Cir. 2020) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 569 n.4 (1992)). "If one plaintiff has standing for a claim, then Article III is satisfied as to all plaintiffs." *Texas v. Rettig*, 987 F.3d 518, 528 (5th Cir. 2021) (citing *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)).

Plaintiffs assert four claims. Standing exists for each claim because Plaintiffs have already been injured by the Tax Mandate, and because it will continue to injure them if its enforcement is not enjoined. Plaintiffs' injuries began as soon as ARPA was enacted into law and they were presented with an unconstitutionally coercive and ambiguous condition, which is unrelated to ARPA's purpose, targets a subset of States, and forces them to make the Hobson's choice of forgoing much needed funding or surrendering state sovereignty. As Plaintiffs stated in their Complaint, economic conditions and the size of the funding available under ARPA rendered the choice between these two options illusory; they had no practical choice but to accept the funds and the Tax Mandate that comes with them. ECF 1 ¶ 47. Plaintiffs have now accepted ARPA funds. Now subject to the Tax Mandate, Plaintiffs continue to be harmed by its intrusion upon their sovereign authority to set tax policy and will be for years to come.

### 1. Plaintiffs were harmed when presented with ARPA and the unconstitutional Tax Mandate.

Plaintiffs can only accept ARPA funds by subjecting themselves to the unconstitutional

Tax Mandate. That is an injury in fact. In comparable circumstances, the Supreme Court has held that a party facing unconstitutional conditions has a "constitutionally cognizable injury" even though they may "refuse[] to cede a constitutional right in the face of coercive pressure." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 607 (2013); *see also Clinton v. City of N.Y.*, 524 U.S. 417, 433 n.22 (1998) (explaining that the injury in fact in *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993), was "harm . . . in the negotiation process"). Plaintiffs must choose between being injured by the "loss of federal funds" made available by ARPA, *see Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019), or the invasion of their constitutional authority, *see Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 800–04 (2015). Plaintiffs are injured whatever choice they make, and putting them to that choice is an injury itself. That Congress was not obligated to make ARPA funds available to the States does not affect the conclusion that doing so with unconstitutional conditions injures Plaintiffs. *See Koontz*, 570 U.S. at 608 (rejecting the argument that the fact that "the government need not confer a benefit at all" changes the analysis).

Other courts considering the Tax Mandate's injury have explained it well. "[W]hether an injury in fact exists turns on the nature of the right that is protected." *Ohio v. Yellen*, No. 1:21-cv-181, 2021 WL 1903908, at *7 (S.D. Ohio May 12, 2021) (Cole, J.). In *Ohio v. Yellen*, the court addressed the ambiguity of the Tax Mandate, and explained that "Supreme Court precedent suggests that the constitutional violation occurs when the federal government offers money on ambiguous terms." *Id.* "It is Congress *passing* the Act, not the State *accepting* the money, that violates the Constitution." *Id.* As soon as the deal of accepting ARPA funds along with the Tax Mandate was presented to Ohio, it was "suffering harm . . . in the form of being forced to ponder whether to accept an unconstitutionally ambiguous deal." *Id.* "[F]orcing Ohio to determine how to

respond to the offer of funding under the cloud of an ambiguous term acts as the injury in fact." *Id.* "The Spending Clause *prohibits* Congress from offering an ambiguous deal, precisely because the States, as sovereigns, are entitled to clarity." *Id.* "[I]ntruding on Ohio's sovereign right to receive a clear offer [is] a sufficient injury in fact to support Article III standing." *Id.* at *8; *see also Ohio v. Yellen*, No. 1:21-cv-181, 2021 WL 2712220, at *6–7, 9 (S.D. Ohio July 1, 2021) (Cole, J.) ("*Ohio II*") (reaffirming Ohio's standing).

Similarly, in *West Virginia v. U.S. Department of Treasury*, the court held that the plaintiffs had standing to bring their ambiguity and anti-commandeering claims because of harm suffered at the time of ARPA's presentment. No. 7:21-cv-465, 2021 WL 2952863, at *6–7 (N.D. Ala. July 14, 2021). The court explained that "recoupment [is not] the only injury that the Plaintiff States have, or will, suffer." *Id.* at *6. It held that "the Plaintiff States suffered an injury in fact when Congress passed the ARPA because they were presented with an unconstitutionally ambiguous deal." *Id.* As to the anti-commandeering claim, the court held that the plaintiffs' "injury in fact is having to choose between forgoing a benefit (federal funds) or accepting that benefit on unconstitutional terms." *Id.* at *7.

Each of Plaintiffs' claims here is based on similar injuries. Congress cannot coerce or commandeer States via Spending Clause legislation. Rather it must provide unambiguous terms that are related to the purpose of the statute, and it cannot violate the equal sovereignty of the States. ARPA violates each of these constitutional requirements, and those violations injured Plaintiffs as soon as ARPA was enacted into law—when they had to choose between forgoing federal funds or accepting them subject to the unconstitutional Tax Mandate. Congress's violation of Spending Clause requirements and the Tenth Amendment is harm "specified by the Constitution itself," which the Supreme Court has described as sufficiently concrete to support standing.

9

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021).

  **2.**  **Plaintiffs face present and future injury to their sovereign authority to set tax policy.**

  A State's authority to set its tax policy is "central to state sovereignty." *Dep't of Revenue of Or. v. ACF Indus. Inc.*, 510 U.S. 332, 345 (1994); *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 428 (1819) ("[T]he power of taxing the people and their property[] is essential to the very existence of government."). "[T]he power of taxation is indispensable." *Lane Cnty. v. Oregon*, 74 U.S. (7 Wall.) 71, 76 (1868). "It is an essential function of government," and "nothing in the Constitution . . . contemplates or authorizes any direct abridgment of this power by national legislation." *Id.* at 76–77. Any "unlawful interference with state tax collection" irreparably harms a State by interfering "with the State's orderly management of its fiscal affairs." *Barnes v. E-Systems, Inc.*, 501 U.S. 1301, 1304 (1991) (Scalia, J.).

  Plaintiffs have already suffered harm to their sovereign taxing authority. At the time of suit, Plaintiffs had not accepted ARPA funds and the Tax Mandate. But as they alleged, the need for the money and the amount of money available made that choice illusory. ECF 1 ¶ 47. Since filing, Plaintiffs have accepted ARPA funds. Plaintiffs' failure to request ARPA funds before filing suit does not mean that they were not already harmed, because the Tax Mandate is retroactive. *See* 42 U.S.C. § 802(c)(2)(A), (g)(1) (defining the "covered period" of the Tax Mandate as beginning March 3, 2021). The Tax Mandate's temporal scope creates present and future harm.

  The Tax Mandate's unconstitutional ambiguity illustrates this harm. Before and after acceptance of the Tax Mandate, Plaintiffs "face[] an unlawfully-imposed quandary in determining how to exercise [their] sovereign taxing power." *Ohio II*, 2021 WL 2712220, at *7. "[L]egislators considering tax changes will have unconstitutionally insufficient information . . . to determine the impact that such changes will have on [their] ability to retain the federal grant money." *Id.* The

ambiguity "cast[s] a pall over legislators' abilities to contemplate such tax changes." *Id.* "[I]ssues regarding taxation are never completely removed from legislative consideration," and the uncertainty created by the Tax Mandate's ambiguity "exert[s] pressure on state legislators not to consider any tax change, or set of tax changes, as to which the Tax Mandate implications cannot be assessed." *Id.* at *8. "That type of thumb on the legislative scale is a current and ongoing injury to [Plaintiffs] in [their] sovereign capacity[ies]." *Id.* at *9. The Tax Mandate affects not only the Plaintiff States' legislators, but their administrative bodies as well. *See* 42 U.S.C. § 802(c)(2)(A) (specifying that the Tax Mandate applies to an "administrative interpretation" as well).

The injury inflicted by the Tax Mandate is concrete, not hypothetical. During their most recent regular session, the Texas Legislature passed several tax cuts that may implicate the Tax Mandate. App.182–185 (HB1195 amends Texas's franchise tax.); App.187 (estimating revenue loss from HB1195); App.190–191 (SB313 creates a sales and use tax exemption); App.193 (estimating revenue loss from SB313); App.196–204 (SB609 provides tax rebates to certain music venues and promoters); App.206 (estimating revenue loss from SB609); App.209–214 (SB938 creates a franchise tax exemption); App.216 (estimating revenue loss from SB938); App.219–224 (SB1524 creates a sales tax and use refund); App.226 (estimating revenue loss from SB1524). Additional tax cuts have been on recent special-session agendas. App.231 (considering revenue appropriations for property-tax relief); App.235 (same). And during this year's second special session, the Texas Legislature passed additional tax cuts. App.238–249 (SB12 reduces ad valorem taxes); App.251 (estimating revenue loss from SB12). Because the Tax Mandate's "covered period" only ends when a State finishes spending ARPA funds, future tax-cut decisions will be affected as well. *See Ohio II*, 2021 WL 2712220, at *8–9 (explaining that the Tax Mandate "will continue to exert pressure on state legislators not to consider any tax change").

Mississippi's Governor recently proposed eliminating the state income tax, and during the last legislative session, the Speaker of the House introduced House Bill 1439, which proposed state income tax changes. App.277; App.379–391; App.393–395. Though the bill died in committee, tax legislation is expected to be on the agenda for the Mississippi Legislature's 2022 Regular Session. App.277; App.397–400; App.402–414. Mississippi's Joint Legislative Budget Committee is currently studying tax proposals, and a Tax Study Committee held hearings on the subject in August 2021. App.278; App.416; App.418–424. Louisianans will vote in October on a constitutional amendment that would lower the maximum rate of Louisiana's income tax. *See* App.254–255 (Act No. 134); App.265–267 (vote adopting Senate Bill No. 159, which became Act No. 134).

Because the Tax Mandate applies to regulations and administrative interpretations, 42 U.S.C. § 802(c)(2)(A), it impacts more than legislative decisionmaking. It also impacts state agencies, such as the Texas Comptroller who administers the Tax Code, *e.g.*, Tex. Tax Code § 111.002(a), and the State Office of Administrative Hearings, which conducts contested tax hearings, *id.* § 111.00455(a); Tex. Gov't Code § 2003.101.

The Tax Mandate's intrusion upon Plaintiffs' lawmaking authority is an Article III injury. The Fifth Circuit and Supreme Court recognize that "states have a sovereign interest in 'the power to create and enforce a legal code.'" *Tex. Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 449 (5th Cir. 1999) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982)). "Pursuant to that interest, states may have standing based on . . . federal assertions of authority to regulate matters [states] believe they control . . . ." *Texas*, 809 F.3d at 153 (citing *FCC*, 183 F.3d at 449). The Tax Mandate is an attempt by Congress to force States to institute Congress's preferred tax policy in place of their own. "[B]eing pressured to change state law constitutes an

injury." *Texas v. United States*, 787 F.3d 733, 749 (5th Cir. 2015).

The Supreme Court's decision in *Arizona State Legislature v. Arizona Independent Redistricting Commission* also shows that Plaintiffs' injuries are sufficient to establish standing. In that case, the Arizona Legislature maintained that the Constitution's Elections Clause vested it with primary responsibility for redistricting and that a state proposition "strip[ped] the Legislature of its alleged prerogative to initiate redistricting." 576 U.S. at 800. The Supreme Court held that the Arizona Legislature—"an institutional plaintiff asserting an institutional injury"—had standing to sue. *Id.* at 801–04. And it held that the Legislature did not need to violate the law to establish standing. *Id.* at 801. The institutional injury was enough to ensure that the dispute would be "resolved in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Id.* at 804 (cleaned up) (quoting *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982)).

The same is true here. Plaintiffs are sovereign States that challenge the Tax Mandate as an attempt by Congress to interfere with their sovereign right to set state tax policy contrary to the Constitution. Like the Arizona Legislature, they do not need to first violate the Tax Mandate to establish standing. The injury to their sovereign interests in creating and enforcing their own legal codes and tax policies is enough to establish standing and ensure that "the legal questions presented . . . will be resolved . . . in a concrete factual context conducive to a realistic appreciation of the consequences." *Valley Forge*, 454 U.S. at 472.

### 3.    Pre-enforcement caselaw support this Court's jurisdiction.

Even if Plaintiffs were not already harmed, they would satisfy the requirements to challenge the Tax Mandate before its enforcement. Plaintiffs have standing to bring a pre-enforcement challenge if: (1) they intend to engage "in a course of conduct arguably affected with a constitutional interest"; (2) the "conduct is 'arguably proscribed by the statute they wish to

challenge"; and (3) there is a substantial threat of future enforcement. *Driehaus*, 573 U.S. at 161–62, 164 (cleaned up) (citing *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

Plaintiffs have and will continue to set their own tax policies, including cutting taxes, which is their right under the federalism principles enshrined in the Constitution, including the Tenth Amendment. Plaintiffs have, in fact, already considered and enacted changes to their tax laws during the covered period of the Tax Mandate. *Supra* § I(A)(2). The Tax Mandate arguably interferes with this process and proscribes these policies, and there is a substantial threat of future enforcement by the Secretary. The Secretary has not "disavowed enforcement." *See Driehaus*, 573 U.S. at 165. To the contrary, the Interim Rule confirms the Secretary's intention to seek recoupment when she deems a State to have violated her understanding of the Tax Mandate. 31 C.F.R. § 35.10. The district court considering West Virginia's Tax Mandate challenge recognized that the plaintiffs had pre-enforcement standing. *West Virginia*, 2021 WL 2952863, at *7.

Defendants complain that Plaintiffs have not alleged that they have already violated the Tax Mandate, but "[n]othing in th[e] [Supreme] Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law." *Driehaus*, 573 U.S. at 163. When a plaintiff is subject to a threat of enforcement, "an actual . . . enforcement action is not a prerequisite to challenging the law." *Id.* at 158 (citing *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)). Pre-enforcement standing in Spending Clause cases is not unusual. *NFIB*, *New York*, and *Dole* were each pre-enforcement challenges to Spending Clause legislation. *NFIB v. Sebelius*, 567 U.S. 519, 542 (2012); *New York v. United States*, 505 U.S. 144, 171–72 (1992); *South Dakota v. Dole*, 483 U.S. 203, 205–06 (1987).

*         *         *

14

Plaintiffs' injuries are fairly traceable to the Tax Mandate, and each can be redressed by a court order declaring it unconstitutional and enjoining its enforcement. *See Ohio II*, 2021 WL 2712220, at *9 (holding Ohio's injuries traceable to the Tax Mandate and redressable by declaratory and injunctive relief); *West Virginia*, 2021 WL 2952863, at *7 ("[T]here is no question that the injuries . . . are fairly traceable to the Federal Tax mandate, and they can be redressed by a court order invalidating the mandate."). Defendants do not contend otherwise, focusing instead on the injury-in-fact issue. *See* ECF 19 at 7–10. Plaintiffs therefore have standing to raise each of their claims.

**B.  Plaintiffs' claims are ripe for review.**

As Defendants have acknowledged, "this case presents issues that are purely legal, which are amenable to resolution without the need for discovery." ECF 21 at 1. That admission establishes the fitness of the issues for judicial decision, as does the harm to Plaintiffs from delaying resolution of this dispute.

> A court should dismiss a case for lack of "ripeness" when the case is abstract or hypothetical. The key considerations are "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required.

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 833 F.2d 583, 586–87 (5th Cir. 1987) (citations omitted). Defendants assert that "Plaintiffs' claimed harm here rests on the potential recoupment" and, "[w]ith potential recoupment nowhere in sight, the State's challenge is premature." ECF 19 at 10–11. But, as explained above, Plaintiffs were harmed when they were presented with the choice to accept ARPA funds along with the unconstitutional Tax Mandate. Their harm does not begin when the Secretary initiates a recoupment proceeding. *See Ohio II*, 2021 WL 2712220, at *8–9 (explaining that "it is not merely the recoupment that harms Ohio"); *West Virginia*, 2021 WL 2952863, at *7 (explaining that "Defendants mischaracterize the harm

suffered by the Plaintiff States" and "easily conclud[ing] that the Plaintiff States' constitutional claims are ripe"). "[D]enying prompt judicial review would impose a substantial hardship on [Plaintiffs], forcing them to choose between [the unfettered exercise of the sovereign taxing powers] on the one hand or [exercising those powers] and risking costly [recoupment] proceedings . . . on the other." *Driehaus*, 573 U.S. at 167–68.

### C. The Complaint sufficiently states a claim for violation of Plaintiffs' equal sovereignty.

The question raised by Defendants' motion to dismiss Plaintiffs' equal-sovereignty claim is not whether Plaintiffs will ultimately prevail, but whether Plaintiffs have pled sufficient facts—when accepted as true and viewed in the light most favorable to Plaintiffs—to state a claim for relief that is plausible on its face. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *White v. U.S. Corr., L.L.C.*, 996 F.3d 302, 306–07 (5th Cir. 2021). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "A complaint 'does not need detailed factual allegations,' but the facts alleged 'must be enough to raise a right to relief above the speculative level.'" *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 765–66 (5th Cir. 2019) (quoting *Twombly*, 554 U.S. at 555). Plaintiffs have met this standard.

The Supreme Court has recognized that "all the States enjoy 'equal sovereignty.'" *Nw. Austin Mun. Util. Dist. v. Holder*, 557 U.S. 193, 203 (2009) (citing *United States v. Louisiana*, 363 U.S. 1, 16 (1960)). "Outside the strictures of the Supremacy Clause, States retain broad autonomy in structuring their governments and pursuing legislative objectives." *Shelby Cnty. v. Holder*, 570 U.S. 529, 543 (2013). "Indeed, the Constitution provides that all powers not specifically granted to the Federal Government are reserved to the States or citizens." *Id.* (citing U.S. Const. amend.

16

X). "Not only do States retain sovereignty under the Constitution, there is also a 'fundamental principle of equal sovereignty' among the States." *Id.* at 544 (quoting *Nw. Austin*, 557 U.S. at 203). In *Northwest Austin*, the challenged statute "differentiat[ed] between the States," *Nw. Austin*, 557 U.S. at 203, and the Court "concluded that 'a departure from the fundamental principle of equal sovereignty requires a showing that a statute's disparate geographic coverage is sufficiently related to the problem that it targets.'" *Shelby Cnty.*, 570 U.S. at 542 (quoting *Nw. Austin*, 557 U.S. at 203). In *Shelby County*, the Court held that failure to satisfy this test was "fatal." *Id.* at 550–52. These cases establish that a State may assert a claim for violation of its equal sovereignty when a statute differentiates between the States without sufficient justification.

Accepting Plaintiffs' allegations as true and in the light most favorable to Plaintiffs, Plaintiffs' have pled a facially plausible equal-sovereignty claim. The Tax Mandate "may appear neutral," but, "in purpose and effect, [it] intrudes upon a sensitive area of state policymaking in only a targeted subset of the States." ECF 1 ¶ 75. Specifically, it targets States such as Texas, Mississippi, and Louisiana, which "[h]istorically, and as a matter of present fact, . . . are much more likely to exercise their sovereign authority to decrease taxes and other government revenues" than other States. *Id.* ¶¶ 76–77, 79.

Moreover, the Tax Mandate's disparate treatment of Plaintiffs cannot be justified by the problem ARPA targets. ARPA is "intended to assist States in recovering from the impacts of the [COVID-19] pandemic." *Id.* ¶ 2. States may reasonably believe that cutting taxes will spur their economic recovery, but the Tax Mandate forbids this approach. *See, e.g.*, *id.* ¶¶ 1, 4, 7, 29, 62, 76. The Tax Mandate's tax-cut prohibition is not sufficiently related to promoting recovery from the pandemic to justify the departure from "the fundamental principle of equal sovereignty." *Nw. Austin*, 557 U.S. at 203. It applies without consideration of present conditions, and it does not

permit States "to demonstrate that a tax policy reducing taxes may nonetheless prove consistent with recovering from the pandemic." ECF 1 ¶¶ 4, 29. At the same time, ARPA permits tax cuts by localities and tribal governments, and it includes federal tax cuts. *Id.* ¶¶ 63–64, 78. These allegations "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Defendants contend that a facially neutral statute cannot violate the equal-sovereignty doctrine, but statutes that are "facially neutral" may be "easily manipulated." *Nw. Austin*, 557 U.S. at 198. Defendants cite *Mayhew v. Burwell*, 772 F.3d 80 (1st Cir. 2014), for the proposition that a facially neutral statute cannot give rise to an equal-sovereignty claim, but the circumstances in *Mayhew* were different from those here. Considering the question de novo, the *Mayhew* court found that "Congress came up with the criteria without regard to which states would be covered by their application." *Id*. at 94. Here, Plaintiffs allege that ARPA's facial neutrality is a ruse. ECF 1 ¶¶ 75–79. In *Mayhew*, the court found that the "provision at issue . . . does not intrude on an area of traditional state concern." 772 F.3d at 94–96. Here, the Tax Mandate intrudes on Plaintiffs' "core sovereign power of taxation," which is "a sensitive area of state policymaking." ECF 1 ¶¶ 1, 59, 72, 75–76; *see, e.g.*, *ACF Indus.*, 510 U.S. at 345 ("[T]he taxation authority of state government" is "an authority we have recognized as central to state sovereignty." (citing *Tully v. Griffin, Inc.*, 429 U.S. 68, 73 (1976); *Union Pac. R.R. Co. v. Peniston*, 85 U.S. (18 Wall.) 5 (1873))). Finally, in *Mayhew*, the court found that the statute directly served a legitimate purpose, 772 F.3d at 96–97, but here, Plaintiffs allege that the Tax Mandate does not promote pandemic recovery. *See* ECF 1 ¶¶ 4, 29, 63–64, 78.

Defendants also assert that Plaintiffs' equal-sovereignty theory would somehow prevent the federal government from "prohibit[ing] marijuana sales if some States wanted to legalize marijuana and others did not." ECF 19 at 25. Defendants' concern is misplaced. Defendants cite a

case concerning the scope of Congress's power under the Commerce Clause. *Gonzales v. Raich*, 545 U.S. 1, 5 (2005). The scope of Congress's power to regulate the sovereign taxing authority of the States via conditions attached to Spending Clause legislation is not informed by a decision concerning the scope of Congress's authority to regulate interstate commerce pursuant to one of its enumerated powers.[4]

Based on the cases cited, and the facts pled, the Court can draw the reasonable inference that "the Tax Mandate violates the Tenth Amendment and principle of equal sovereignty," ECF 1 ¶ 79, and Defendants' motion to dismiss should be denied.

## II.   Plaintiffs are entitled to summary judgment that the Tax Mandate is unconstitutional.

### A.   Congress's offer of ARPA funds in exchange for acceptance of the Tax Mandate is unconstitutionally coercive.

Congress may not order the States to refrain from cutting taxes. *See Murphy v. NCAA*, 138 S. Ct. 1461, 1476 (2018) ("[C]onspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States."); *New York*, 505 U.S. at 162 ("[T]he Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress's instructions."). And Congress may not achieve the same result by making the States an offer they cannot refuse. While "Congress may use its spending power to create incentives for States to act in accordance with federal policies[,] . . . when 'pressure turns into compulsion,' . . . the legislation runs contrary to our system of federalism." *NFIB*, 567

---

[4] The Third Circuit also rejected an equal sovereignty claim on the basis that the Commerce Clause did not "guarantee . . . uniformity in treatment amongst the states" and because it read *Shelby County* not to "indicate that the equal sovereignty principle is meant to apply with the same force outside the context of 'sensitive areas of state and local policymaking.'" *NCAA v. Governor of N.J.*, 730 F.3d 208, 238–39 (3d Cir. 2013). This case does not involve the Commerce Clause, but does concern a sensitive area of state sovereignty.

U.S. at 577–78 (Roberts, J.) (quoting *Steward Mach. Co. v. Davis*, 301 U.S. 548, 590 (1937)). ARPA's offer of billions of dollars—totaling a large percentage of Plaintiffs' budgets—in exchange for agreeing to the Tax Mandate, and thereby surrendering sovereignty over state tax policy, is such an offer. No State can realistically turn the money down, particularly while recovering from a once-in-a-century pandemic.

Congress's offer crosses the line between persuasion and coercion, *id.* at 577–78, 581–82, 585, and "is a blatant violation of the constitutional structure," *id.* at 648 (Scalia, J., dissenting). The Supreme Court has "recognized that Congress may use [its spending power] to grant federal funds to the States, and may condition such a grant upon the States' 'taking certain actions that Congress could not require them to take.'" *Id.* at 576 (quoting *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 686 (1999)). But such legislation is contractual in nature, and "[t]he legitimacy of Congress's exercise of the spending power thus rest on whether the State voluntarily and knowingly accepts the terms of the contract." *Id.* at 576–77 (quotation marks omitted) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 45 U.S. 1, 17 (1981)). Because Congress can use the Spending Clause "to implement federal policy it could not impose directly under its enumerated powers," the threat to "the political accountability key to our federal system" is "heightened," and courts must "scrutinize Spending Clause legislation to ensure that Congress is not using financial inducements to exert a 'power akin to undue influence.'" *Id.* at 577–78 (quoting *Steward Mach.*, 301 U.S. at 590).

In *NFIB*, the line between permissible persuasion and unconstitutional coercion was crossed where Congress conditioned Medicaid funding on a State's agreement to expand Medicaid coverage—a "threatened loss of over 10 percent of a State's overall budget." *Id.* at 581–82. The Supreme Court distinguished this condition from that in *South Dakota v. Dole*, *id.* at 580–82, where

"the threat of losing five percent of highway funds" if the State did not raise its drinking age "was not impermissibly coercive, because Congress was offering only 'relatively mild encouragement to the States.'" *Id.* at 580 (quoting *Dole*, 483 U.S. at 211). The "threatened loss of over 10 percent of a State's overall budget" in *NFIB* was different; it was "a gun to the head" and an "economic dragooning that leaves the States with no real option but to acquiesce." *Id.* at 581–82.

A conditional offer of billions of dollars in COVID-19 relief funds as Plaintiffs recover from a devastating pandemic is another gun to the head. While the choice to preserve state sovereignty by rejecting ARPA funds may be a choice in theory, it is not one in fact. *See id.* at 581. And obviating a State's power to tax presents particular concerns for our federal system. A State's power to tax is one of "the most sensitive areas of traditional state concern, . . . which would otherwise lie outside [Congress's] reach." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 654–55 (1999) (Kennedy, J., dissenting). Thus, condoning Congress's use of its spending power to dictate state tax policy, as it has attempted with the Tax Mandate, "would present a grave threat to the system of federalism created by our Constitution." *See NFIB*, 567 U.S. at 675–76 (Scalia, J. dissenting).

Despite Defendants' contention that the Tax Mandate is a standard condition intended to preserve congressional control over the use of ARPA funds, it is nothing of the sort. *See id.* at 579 ("Congress may attach appropriate conditions to federal taxing and spending programs to preserve its control over the use of federal funds."). Congress told the States how they may spend ARPA funds by defining four categories of permissible uses. 42 U.S.C. § 802(c)(1)(A)–(D). Although Congress styled the Tax Mandate as a "[f]urther restriction on use of funds," *id.* § 802(c)(2)(A), in reality, the Tax Mandate creates an independent obligation on States accepting ARPA funds to not reduce their own tax revenues—because money is fungible and Treasury may deem ARPA funds

to have "either directly or indirectly offset" such a reduction. *See id.* § 802(c)(2). In *NFIB*, the Supreme Court emphasized that reality trumps how "Congress may have styled" a condition when assessing its constitutionality. *See NFIB*, 567 U.S. at 582–85 (explaining that "Congress's decision to so title it is irrelevant"). The reality here is that the Tax Mandate "accomplishes a shift in kind" as to congressional control over state taxing authority. *See id.* at 583.

Moreover, that the federal government may not seek recoupment of all allocated ARPA funds for an alleged violation of the Tax Mandate does not change the coercion analysis. Coercion is judged at the time the State much choose whether to surrender its sovereignty or lose out on billions of dollars in critical federal funds. *See id.* at 582 & n.12. The offer is the gun, and States hand over their sovereignty when they agree to accept the funds, not when the Secretary comes back later to take some of them back.

### B. Congress presented the States with an unconstitutionally ambiguous condition that the Secretary cannot cure.

The constitutional problems with Congress's coercive offer are compounded by the Tax Mandate's ambiguity. "The legitimacy of Congress's exercise of the spending power . . . rests on whether the State voluntarily and knowingly accepts the terms of the contract." *Id.* at 577. (quotation marks omitted) (quoting *Pennhurst*, 451 U.S. at 17). "[W]hen Congress attaches conditions to a State's acceptance of federal funds, the conditions must be set out 'unambiguously,'" because "States cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst*, 451 U.S. at 17). Insisting that "Congress speak with a clear voice . . . enable[s] the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Pennhurst*, 451 U.S. at 17.

The Court must view the statute "from the perspective of a state official who is engaged in

the process of deciding whether the State should accept [the] funds and the obligations that go with those funds." *Arlington Cent.*, 548 U.S. at 296. "The Court then 'ask[s] whether such a state official would clearly understand' the [statute's] requirements." *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 908 F.3d 127, 136 (5th Cir. 2018) (quoting *Arlington Cent.*, 548 U.S. at 296). The Court must "begin with the text" and "presume that a legislature says in a statute what it means and means in a statute what it says there." *Arlington Cent.*, 548 U.S. at 296 (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992)).

In other contexts, a statute is "ambiguous [when] its text, literally read, admits of two plausible interpretations." *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 419 n.2 (2005); *City of San Antonio v. Hotels.com*, 876 F.3d 717, 723 (5th Cir. 2017); *United States v. Kaluza*, 780 F.3d 647, 658–59 (5th Cir. 2015). In the specific context of the Tax Mandate, another district court has applied "a standard akin to 'unable to ascertain,'" finding it "consistent with the analogy to contract law that drives much of Spending Clause jurisprudence." *Ohio II*, 2021 WL 2712220, at *12.

Two ambiguities in ARPA's Tax Mandate make it impossible for Plaintiffs to knowingly accept its terms. First, it is unclear what it means to "indirectly offset a reduction in . . . net tax revenue," and second, it is unclear how to determine if there has been "a reduction  in . . . net tax revenue." 42 U.S.C. § 802(c)(2)(A). ARPA's structure and text provide no explanation of what these phrases mean, and the Secretary cannot cure the constitutional deficiency via regulation.

### 1.   What is the line between an indirect offset and no offset?

The Tax Mandate prohibits States from using ARPA funds to "directly or indirectly offset" a reduction in their net tax revenue. *Id.* § 802(c)(2)(A). The concept of a direct offset is straightforward. States may not lower taxes while leaving their budget otherwise unchanged and use ARPA funds to make up the budget shortfall. However, Plaintiffs have "no idea what an

'indirect offset' to net tax revenues may be." *Ohio*, 2021 WL 1903908, at *12; *Ohio II*, 2021 WL 2712220, at *14. ARPA does not define "indirectly offset" or explain the breadth of this provision. Plaintiffs must balance their budgets. Tex. Const. art. III, § 49a; Miss. Code Ann. § 27-103-125; La. Const. art. VII, § 10. Because "money is fungible," *United States v. Davis*, 226 F.3d 346, 357 (5th Cir. 2000), any reduction in revenue due to a tax cut might be deemed by the Secretary to have been "indirectly offset" by another source of revenue in a State's budget, including the receipt of ARPA funds. Perhaps understanding the federalism concerns implicated by a congressional prohibition of state tax cuts, the Secretary argues that Congress did not prohibit all tax cuts: "If Congress had sought to prohibit *every* reduction in taxes, it could have said so explicitly." ECF 19 at 14 (citation omitted). If the Tax Mandate does not prohibit all tax cuts, then there must be some dividing line between an indirect offset and no offset, but ARPA does not tell the States when this line is crossed.

The Secretary has repeatedly failed to define what "indirectly offset" means and has all but conceded the Tax Mandate's ambiguity. In response to a letter seeking clarification of the Tax Mandate's "unclear, but potentially breathtaking" scope, App.172, the Secretary answered that the Tax Mandate "simply provides that funding received under the Act may not be used to offset a reduction in net tax revenue resulting from certain changes in state law," App.179. Adding the word "simply" and omitting the troublesome "directly or indirectly" language does not clarify what that language means (or how to determine if there has been a reduction in net tax revenue). And in testimony to Congress, the Secretary conceded that the meaning of "directly or indirectly offset" is a "thorny question[]" and "given the fungibility of money, it's a hard question to answer." Hearing, The Quarterly CARES Act Report to Cong., Sen. Comm. on Banking, Hous., & Urban Affairs at 1:10:00–1:13:36 (Mar. 24, 2021), https://tinyurl.com/thornyQs.

Even now, the Secretary cannot define what "indirectly offset" means. Instead, she reads "directly or indirectly" out of the Tax Mandate. First, she argues that, if a tax cut reduces net tax revenue, the Tax Mandate "bars a State only from using Rescue Plan funds – as opposed to other means – to offset that reduction." ECF 19 at 1; *see also id.* at 5, 9, 13. But this does not explain how to determine what "means" are used "to offset that reduction" where money is fungible.

Next, the Secretary argues that the Tax Mandate's inclusion of "[t]he term 'use' connotes 'volitional' 'active employment' of federal funds," and that "the term 'offset' means '[t]o balance' or 'compensate for.'" *Id.* at 14 (citing *Voisine v. United States*, 136 S. Ct. 2272, 2278–79 (2016)). This argument is as unclear as the Tax Mandate. A State legislature that spends ARPA funds necessarily uses, or employs, those funds. The relevant question is if it used them "to either directly or indirectly offset a reduction in . . . net tax revenue." 42 U.S.C. § 802(c)(2)(A). The fungibility of money makes it uncertain whether an indirect offset has occurred. Indeed, it means that in some sense an offset has always occurred. The Secretary's argument leaves this question unresolved.

To the extent the Secretary implies that the intent of the legislature is determinative, that raises still more issues. Incorporation of an intent element into the Tax Mandate via the term "use" is contrary to the Supreme Court's explanation in *Voisine* that the word "use" is "indifferent as to whether the actor has the mental state of intention, knowledge, or recklessness with respect to the . . . consequences of his volitional conduct." 136 S. Ct. at 2279. Moreover, because money is fungible, legislators know that any new funding in some sense "offsets," or compensates for, lost revenue. Beyond that, "trying to peer inside legislators' skulls" to decipher the intent of multi-member state legislatures will likely prove "too fraught an enterprise." *See Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1906–07 (2019).

Finally, the Secretary expressly argues that Congress's use of "directly or indirectly

25

offsets" in the Tax Mandate is meaningless because these "are adverbs that cannot 'alter the meaning of the word' that they modify (here, 'offset')." ECF 19 at 14. While an adverb, like an adjective, may not give the word it modifies a completely different meaning, *see Rimini St., Inc. v. Oracle USA, Inc.* 139 S. Ct. 873, 878–79 (2019) ("A 'full moon' means the moon, not Mars."), by definition, the purpose of an adverb is "to modify a verb . . . by expressing time, place, manner, degree, cause, etc." Webster's New World College Dictionary 20 (5th ed. 2016) (App.271); *see Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218–19 (2009) (explaining that "minimize" is used in the statute as "a term that admits of degree," as demonstrated by "the modifier 'drastic,'" which would be superfluous if it were not).

The Secretary's final attempt at explaining the difference between direct and indirect offsets comes by way of an example, not a definition. ECF 19 at 14. But "[t]he problem is that the example the Secretary offers for a 'direct offset' is substantively identical to the one the Secretary provides for an 'indirect offset,' if stated slightly differently." *Ohio II*, 2021 WL 2712220, at *14. "In both the 'direct' and 'indirect' examples . . ., the State uses the conditional grant to replace . . . state funding for certain current state expenditures," which "frees up existing state funds, which the State then uses for a tax refund." *Id.* "The only difference between the two examples, . . . is that, in the 'indirect offset' scenario, the Secretary identified *where* the federal-for-state dollar swap occurred." *Id.* But, "the Secretary offers no explanation as to why those non-substantive differences would change the 'directness' of the offset." *Id.* Once again, "it appears that even now the Secretary lacks a coherent theory as to what an 'indirect offset' may be." *Id.*

At bottom, each of the Secretary's attempts at clarification ignores the "cardinal principle of statutory construction that [courts] must give effect, if possible, to every clause and word of a statute." *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (cleaned up). Instead of explaining what

"indirectly offset means," the Secretary either avoids it altogether or tries to explain it through failed examples.

### 2.   How do you know if there is a reduction in net tax revenue?

Even if the States could understand what an indirect offset is, that would still leave the question of how to determine if "a change in law, regulation, or administrative interpretation" causes "a reduction in . . . net tax revenue." 42 U.S.C. § 802(c)(2)(A). "[T]he notion of 'reducing net tax revenue' necessarily assumes some baseline," but "the statutory language itself provides no mechanism for determining whether a State's net tax revenues are 'reduced' or not." *Ohio II*, 2021 WL 2712220, at *13. This "raises a host of interpretive problems." *Id.* For example, if a State reduces its gas tax rate, but drivers buy more gas and more taxes are collected, did the tax cut reduce net tax revenues, which may have been higher without the tax cut? *See id.* Is application of the Tax Mandate based on expected revenues or actual revenues? Legislators may lower tax rates believing that it will encourage economic growth and result in greater revenue, but their expectations may differ from reality for reasons beyond their control. The Tax Mandate does not explain if this would result in a violation or not. *See id.* A State might project that tax revenues will increase by $500 million dollars and cut taxes so that they will only increase by $450 million. Is that a $50 million reduction or a $450 million increase? What if a tax cut results in increased revenues in year one, but lower revenues in year two? Numerous other examples are conceivable.

Elsewhere in ARPA Congress was clear. In determining whether ARPA funds are used "for the provision of government services" affected by reduced state revenue, Congress specified that that the baseline is "the most recent full fiscal year . . . prior to the emergency." 42 U.S.C. § 802(c)(1)(C). The failure to say the same or something similar in the Tax Mandate suggests Congress may have meant something different, but the answer to what it meant is not in ARPA. The Secretary has not argued otherwise; she erroneously relies entirely on the Interim Rule to

"set[] forth [the] framework." ECF 19 at 5.

### 3.   The Secretary cannot cure Congress's failure to specify unambiguous conditions.

Treasury regulations cannot save the Tax Mandate by resolving the statutory ambiguities. The Fifth Circuit recently held that "regulations cannot provide the clarity" required for a State's acceptance of a Spending Clause condition to be "knowing." *Tex. Educ. Agency*, 992 F.3d at 361–62. "First, when Congress places conditions on the States' receipt of federal funds, it must do so unambiguously," but "[r]egulations that interpret statutes are valid only if they either match Congress's unambiguous command or are clarifying a statutory ambiguity." *Id.* at 361 (cleaned up). "Relying on regulations to present the clear condition, therefore, is an acknowledgement that Congress's condition was not unambiguous . . . ." *Id.* Second, allowing the Secretary to specify the condition "would grant the Executive a power of the purse and thus would be inconsistent with the Constitution's meticulous separation of powers." *Id.* at 362.

The Fourth Circuit reached the same conclusion. *Va. Dep't of Educ. v. Riley*, 106 F.3d 559, 567 (4th Cir. 1997) (en banc) (per curiam) ("The Department of Justice argues . . . that in the event of ambiguity in the IDEA provision at issue, we defer to a reasonable interpretation by the agency, as if we were interpreting a statute which has no implications for the balance of power between the Federal Government and the States. We do not." (footnote omitted)).[5] As did another district court considering the Tax Mandate. *Ohio II*, 2021 WL 2712220, at *15–20 (concluding that, "while Congress may be able to delegate authority to an agency to supply the requisite clarity, Congress must provide for such delegation in clear and unambiguous terms" and "Congress did

---

[5] In *Riley*, a majority "adopted as their own the dissenting panel opinion of Judge Luttig," 106 F.3d at 560–61, which is reproduced at the end of the en banc court's per curiam opinion.

not do so here"). The Secretary argues that "[t]he district court in *Ohio v. Yellen* misread the governing case law," ECF 19 at 22, but she fails to acknowledge the Fifth Circuit's holding that binds this Court.

### C.  The Tax Mandate is unrelated to ARPA's purpose.

The exceptional nature of the Tax Mandate is further highlighted by Congress's failure to satisfy one of *Dole*'s most basic requirements for valid Spending Clause legislation—conditions must be "reasonably related to the purpose of the expenditure to which they are attached." *Miller v. Tex. Tech Univ. Health Scis. Ctr.*, 421 F.3d 342, 348 & n.15 (5th Cir. 2005) (citing *Dole*, 483 U.S. at 207–08). Congress's purpose in passing ARPA was to make federal funds available "to States, territories, and Tribal governments to mitigate the fiscal effects stemming from the public health emergency with respect to the Coronavirus Disease (COVID-19)." 42 U.S.C. § 802(a)(1). To that end, Congress made nearly $220 billion in federal funds available. *Id.* § 802(a)(1). To ensure that those funds were spent on COVID-19 relief efforts, Congress specified four categories of permissible uses—assistance to households and businesses, essential worker compensation, replacement of lost government revenues, and infrastructure investment. *Id.* § 802(c)(1).

As long as a State uses ARPA funds for one of these purposes, it is generally free to use its own funds as its sees fit with one glaring exception—the Tax Mandate forbids States from using their own funds to cut taxes or otherwise reduce net tax revenue for fear that the Secretary will deem the State to have used ARPA funds "to either directly or indirectly offset a reduction in [its] net tax revenue." *See id.* §802(c)(2)(A). Defendants assert that the Tax Mandate is "related to the funding program" because it specifies how States may use federal funds and "ensures that federal funds are used for the public-health and economic-recovery 'federal purposes' of the spending program. ECF 19 at 15–16. However, a simple example illustrates the fallacy in this argument.

A State that receives ARPA funds could choose to spend that money on aid to its tourism

industry pursuant to 42 U.S.C. § 802(c)(1)(A). These federal funds free up state funds that would otherwise have been spent on the State's tourism industry. A State could spend these state funds on new office furniture, or for numerous other purposes that do not promote COVID-19 recovery, without violating the Tax Mandate.

Problems arise for the State only when it cuts taxes. If the same State uses its new surplus of state funds to cut taxes on small businesses impacted by the pandemic, the Secretary may deem that a Tax Mandate violation. As this example illustrates, the Tax Mandate does not specify how to use ARPA funds or ensure that they are used for COVID-19 relief. Instead, it regulates the use of state funds, and its purpose is to drive States to implement Congress's preferred policy of increased government spending over tax relief. By allowing States to spend state funds for purposes other than pandemic relief while, at the same time, punishing States for providing tax relief to those impacted by the pandemic, the Tax Mandate does not just fail to serve ARPA's purpose, it actively impedes it.

The Tax Mandate's prohibition of state tax cuts is irrational, as it runs counter to Congress's endorsement of tax cuts as a tool for economic recovery in ARPA itself. ARPA explicitly recognizes that tax cuts promote economic recovery by providing federal tax relief for families and businesses. ARPA, Pub. L. No. 117-2, § 9621 (expanding earned income tax credit), § 9673 (exempting revitalization funds). And ARPA implicitly recognizes that governments may want to cut taxes to promote recovery from the pandemic by providing ARPA funds to localities free from any Tax Mandate. 42 U.S.C. § 803(c).

Defendants equate the Tax Mandate to provisions requiring that States use federal funds to supplement, not supplant, state spending, ECF 19 at 16–17, but the provisions at issue in the cited cases are substantively different from the Tax Mandate. For example, the Title I funds at issue in

*Bennett* were to be used "to support compensatory education programs for disadvantaged children." *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 659 (1985). "In order to assure that federal funds would be used to support additional services that would not otherwise be available, the Title I program . . . prohibited the use of federal grants merely to replace state and local expenditures." *Id.* The other cited cases also require that States maintain spending in areas where federal funds are applied. *See Mayhew*, 772 F.3d at 83–84 (requiring a freeze of eligibility standards to continue receiving Medicaid funds); *S.C. Dep't of Educ. v. Duncan*, 714 F.3d 249, 251 (4th Cir. 2013) (grants for educating disabled children conditioned on maintaining prior state spending level); *Kansas v. United States*, 214 F.3d 1196, 1197 (10th Cir. 2000) (program providing "greater flexibility" but imposing "a maintenance-of-effort requirement for the expenditure of state funds"). Neither ARPA nor the Tax Mandate similarly prohibit replacing state expenditures with ARPA funds. States are required to spend ARPA funds for one of the four purposes enumerated in the statute, 42 U.S.C. § 802(c)(1), but States do not have to use the funds to supplement preexisting state spending in those areas. States are free to supplant planned state spending with ARPA funds and spend the resulting surplus of state funds as they see fit, even if that spending has nothing to do with COVID-19 relief. What the Tax Mandate prohibits is returning excess state funds to the public via tax cuts.

The Tax Mandate serves one purpose—bigger state government. But ARPA's purpose is pandemic relief, not bigger state government. Where, as here, Congress attaches a condition unrelated to the purpose of the spending program—a condition that impinges on the States' sovereign authority over state tax policy—that condition must be held unconstitutional, or else "the spending power could render academic the Constitution's other grants and limits of federal authority." *New York*, 505 U.S. at 167.

31

### III.    Plaintiffs are entitled to a permanent injunction.

A plaintiff is entitled to a permanent injunction if (1) "it has suffered an irreparable injury"; (2) "remedies available at law, such as monetary damages, are inadequate to compensate for that injury"; (3) "the balance of hardships between the plaintiff and defendant" warrant an equitable remedy; and (4) "the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Each of these factors weigh in favor of a permanent injunction.

Plaintiffs have already explained that they are suffering, and will continue to suffer, irreparable harm if the Tax Mandate is not enjoined. *Supra* § I(A). Specifically, Plaintiffs are "suffering irreparable harm to the exercise of [their] 'indispensable' sovereign power to tax." *Ohio II*, 2021 WL 2712220, at *21 (citing *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 199 (1824)). Monetary damages do nothing to remedy the harm they are suffering. *Id.* And the federal government is immune from claims for money damages in any event. *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994). Defendants will suffer no countervailing harm if an injunction issues because the Secretary may enforce the remaining provisions of ARPA, and Defendants have no cognizable interest in enforcing the unconstitutional Tax Mandate. *See, e.g.*, *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020) ("[N]either the government nor the public has any legitimate interest in enforcing an unconstitutional ordinance."); *see also Ohio II*, 2021 WL 2712220, at *21. The public-interest factor also weighs heavily in favor of a permanent injunction because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) (quoting *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)); *see also Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1056 (5th Cir. 1997) (agreeing that allowing unconstitutional actions to stand would undermine the public interest).

## CONCLUSION

Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss, permanently enjoin enforcement of the Tax Mandate against Texas, Mississippi, and Louisiana, and declare the Tax Mandate unconstitutional.

Date: September 27, 2021        Respectfully submitted.

KEN PAXTON                   PATRICK K. SWEETEN
Attorney General of Texas       Deputy Attorney General for Special Litigation
                                    Tx. Bar No. 00798537
BRENT WEBSTER
First Assistant Attorney General    WILLIAM T. THOMPSON
                                    Deputy Chief, Special Litigation Unit
JUDD E. STONE II            Tx. Bar No. 24088531
Solicitor General
Tx. Bar No. 24076720         _/s/ Jeffrey M. White_____
                                    JEFFREY M. WHITE
                                    Special Counsel
                                    Tx. Bar No. 24064380

                                    RYAN D. WALTERS
                                    Special Counsel
                                    Tx. Bar No. 24105085

                                    OFFICE OF THE ATTORNEY GENERAL
                                    P.O. Box 12548 (MC-009)
                                    Austin, Texas 78711-2548
                                    Tel.: (512) 463-2100
                                    Fax: (512) 457-4410
                                    judd.stone@oag.texas.gov
                                    will.thompson@oag.texas.gov
                                    jeff.white@oag.texas.gov
                                    ryan.walters@oag.texas.gov

                                  **COUNSEL FOR PLAINTIFF STATE OF TEXAS**

LYNN FITCH
Attorney General of Mississippi

_/s/ Justin L. Matheny_____
JUSTIN L. MATHENY
Deputy Solicitor General
MS Bar No. 100754
State of Mississippi
Office of the Attorney General
P.O. Box 220
Jackson, MS 39205
Tel: (601) 359-3680
justin.matheny@ago.ms.gov

**Counsel for the State of Mississippi**

JEFF LANDRY
Attorney General

 */s/ Elizabeth B. Murrill*
ELIZABETH B. MURRILL*
Solicitor General
Office of the Attorney General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (205) 326-6085
murrille@ag.louisiana.gov
*Admitted *Pro hac vice*

**Counsel for the State of Louisiana**

**CERTIFICATE OF SERVICE**

I certify that on September 27, 2021, a true and accurate copy of the foregoing document was filed electronically (via CM/ECF), which automatically serves all counsel of record who are registered to receive notices in this case.

*/s/ Jeffrey M. White*
Jeffrey M. White