# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| STATE OF TEXAS, STATE OF MISSISSIPPI, STATE OF LOUISIANA, <br><br> *Plaintiffs*, <br><br> v. <br><br> JANET YELLEN, in her official capacity as Secretary of the Treasury; RICHARD K. DELMAR, in his official capacity as acting inspector general of the Department of the Treasury; U.S. DEPARTMENT OF THE TREASURY; and the UNITED STATES OF AMERICA, <br><br> *Defendants*. | No. 2:21-cv-00079-Z |

## BRIEF FOR *AMICI CURIAE* CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AND NATIONAL FEDERATION OF INDEPENDENT BUSINESS SMALL BUSINESS LEGAL CENTER

PAUL D. CLEMENT
KASDIN M. MITCHELL
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
paul.clement@kirkland.com

*Counsel for* Amici Curiae *Chamber of Commerce of the United States of America and National Federation of Independent Business Small Business Legal Center*

October 4, 2021

## CORPORATE DISCLOSURE STATEMENT

The Chamber of Commerce of the United States of America is a nonprofit, tax-exempt organization incorporated in the District of Columbia.  The National Federation of Independent Business Small Business Legal Center is a 501(c)(3) public interest law firm and is affiliated with the National Federation of Independent Business, a 501(c)(6) business association.  Neither the Chamber of Commerce of the United States of America nor the National Federation of Independent Business has a parent corporation, nor does any publicly held corporation own 10% or more of their stock.  No publicly held corporation or its affiliate that is not a party to this case or appearing as *amici curiae* has a substantial financial interest in the outcome of this litigation by reason of insurance, a franchise agreement, or an indemnity agreement.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................... i

TABLE OF AUTHORITIES..................................................................................... iii

STATEMENT OF INTEREST................................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT........................................ 2

ARGUMENT ............................................................................................................. 5

I.      The Tax Mandate Is Unconstitutional ............................................................ 8

II.     Left Standing, The Tax Mandate Will Have Dire Consequences................. 17

CONCLUSION ...................................................................................................... 24

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
  548 U.S. 291 (2006) ...................................................................................22

*Bond v. United States*,
  564 U.S. 211 (2011) ................................................................................8, 9

*City of Philadelphia v. Sessions*,
  280 F.Supp.3d 579 (E.D. Pa. 2017) ..........................................................24

*Coyle v. Smith*,
  221 U.S. 559 (1911) ...................................................................................10

*Dearmore v. City of Garland*,
  400 F.Supp.2d 894 (N.D. Tex. 2005) .........................................................23

*Dep't of Revenue v. ACF Indus., Inc.*,
  510 U.S. 332 (1994) .....................................................................................8

*Dows v. City of Chicago*,
  78 U.S. 108 (1870) .....................................................................................18

*Free Enter. Fund v. PCAOB*,
  561 U.S. 477 (2010) ...................................................................................11

*Gibbons v. Ogden*,
  22 U.S. (9 Wheat.) 1 (1824) .........................................................................9

*Kentucky v. Yellen*,
  ___ F.Supp.3d ___, 2021 WL 4394249
  (E.D. Ky. Sept. 24, 2021) .................................................................. *passim*

*M'Culloch v. Maryland*,
  17 U.S. (4 Wheat.) 316 (1819) .....................................................................8

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) ......................................................................... 4, 13, 14

*New York v. United States*,
  505 U.S. 144 (1992) ...................................................................................13

*Ohio v. Yellen*,
___ F.Supp.3d ___, 2021 WL 2712220
(S.D. Ohio July 1, 2021) ................................................................. *passim*

*Plaut v. Spendthrift Farm, Inc.*,
514 U.S. 211 (1995) ........................................................................11

*Providence Bank v. Billings*,
29 U.S. (4 Pet.) 514 (1830) ...........................................................8, 13

*South Dakota v. Dole*,
483 U.S. 203 (1987) ........................................................................22

*Steward Mach. Co. v. Davis*,
301 U.S. 548 (1937) ........................................................................13

**Constitutional Provisions**

U.S. Const. Art. I, §8 ..........................................................................8

U.S. Const. Art. I, §9 ..........................................................................8

U.S. Const. Art. I, §10 ........................................................................8

U.S. Const. Amend. XVI .................................................................8, 9

**Legislative Materials**

*Coronavirus State and Local Fiscal Recovery Funds*,
86 Fed. Reg. 26,786 (May 17, 2021) ............................................ *passim*

H.B. 1023, 93rd Gen. Assemb., Reg. Sess. (Ark. 2021) ........................20

H.B. 114, 156th Gen. Assemb., Reg. Sess. (Ga. 2021) .........................20

H.B. 227, 2021 Leg., Reg. Sess. (Ala. 2021) .......................................20

H.B. 279, 67th Leg., Reg. Sess. (Mont. 2021) .....................................20

H.B. 2960, 58th Leg., Reg. Sess. (Okla. 2021) ....................................19

H.B. 429, 101st Gen. Assemb., 1st Reg. Sess. (Mo. 2021) ...................20

Pub. L. No. 117-2, §9901 ............................................................. 3, 6, 24

S.B. 1, 55th Leg., 1st Sess. (N.M. 2021) .................................................................19

S.B. 161, 2021 Leg., Reg. Sess. (La. 2021) ...........................................................18

S.B. 2500, 2021 Leg., Reg. Sess. (N.Y. 2021) ........................................................23

S.B. 496, 442d Gen. Assemb., Reg. Sess. (Md. 2021) ...........................................19

S.B. 8, 87th Leg., 2d Spec. Sess. (Tex. 2021) ........................................................19

**Other Authorities**

Alex Sherman,
*Five Charts That Show How COVID-19 Stopped
the U.S. Economy In Its Tracks*, CNBC (Mar. 11, 2021),
https://cnb.cx/3cZ97O0..............................................................................15

Anne Sraders & Lance Lambert,
*Nearly 100,000 Establishments That Temporarily
Shut Down Due to the Pandemic Are Now Out of Business*,
Fortune (Sept. 28, 2020), https://bit.ly/3t6dpci ..................................16

Anshu Siripurapu & Jonathan Masters,
*How COVID-19 Is Harming State and City Budgets*,
Council on Foreign Relations (Mar. 19, 2021),
https://on.cfr.org/3f9vjqm ......................................................................16

Bethany Blankley,
*Texas Lawmakers to Consider Property Tax Relief Measures*,
The Center Square (July 12, 2021), https://bit.ly/3ASoj93 ...............................22

Comment from Almy,
Rep. Susan, *Coronavirus State
and Local Fiscal Recovery Funds*, Regulations.gov
(June 29, 2021), https://bit.ly/3Ae135X ...........................................................21

Complaint,
*Arizona v. Yellen*,
No. 2:21-cv-00514-DJH (filed Mar. 25, 2021)...................................................14

Congressional Rsch. Serv.,
*Global Economic Effects of COVID-19*
(Sept. 28, 2021), https://bit.ly/3AitAqJ ............................................................16

Erin Huffer & Aravind Boddupalli,
*The Leisure & Hospitality Sector Has an Employment Crisis—
and It Might Be Getting Worse*, Urb. Wire
(July 20, 2020), https://urbn.is/397ptlz ................................................................15

*How the COVID-19 Pandemic is Transforming State Budgets*,
Urb. Inst. (Sept. 24, 2021), https://urbn.is/3jsU9ni ............................................14

Jack M. Mintz,
*Tax Policy and Fiscal Sustainability Post-Covid*,
BloombergTax.com (Feb. 2, 2021), https://bit.ly/3641G47 ..............................18

Jack Reagan,
*Reporting Requirements for the American Rescue Plan Act
Money—
What Cities and Counties Should Consider*, Am. City & County
(Sept. 9, 2021), https://bit.ly/3u0FGSD ................................................................11

Jared Walczak,
*Four Questions Treasury Must Answer About the State Tax Cut
Prohibition
in the American Rescue Plan Act*, Tax Found. (Mar. 18, 2021),
https://bit.ly/3cYu0YB ............................................................................................14

Kate Davidson,
*Covid-19's Hit to State and Local Revenues
Is Smaller Than Many Feared*, WSJ.com (Feb. 7, 2021),
https://on.wsj.com/3wWBAe4........................................................................17

Linda Gandee,
*Avon to Receive Almost $4.6 Million From the
American Rescue Plan Act of 2021*, Cleveland.com
(June 14, 2021), https://bit.ly/2TiSwy1 ............................................................22

Malea Martin,
*As Cities Await Finalized American Rescue Plan Act Guidelines,
Some Funding Decisions Remain in Limbo*, Santa Maria Sun
(June 16, 2021), https://bit.ly/3qHcn5S..........................................................21

Michael Ettlinger & Jordan Hensley,
    *Covid-19 Economic Crisis: By State*,
    Univ. of N.H. Carsey Sch. of Pub. Pol'y
    (Sept. 17, 2021), https://bit.ly/3nWARsQ ........................................................16

Nat'l Restaurant Ass'n,
    *49 States and DC Added Restaurant Jobs in May 2021*
    (June 24, 2021), https://bit.ly/3hn5jHA ............................................................15

Nat'l Restaurant Ass'n,
    *Restaurant Employment Fell for the Third Consecutive Month*
    (Feb. 5, 2021), https://bit.ly/31b0pG3 .............................................................15

Nat'l Restaurant Ass'n,
    *Restaurant Sales Fell to Their Lowest Level Since June*
    (Jan. 15, 2021), https://bit.ly/3d5gVwu .............................................................15

NFIB Res. Ctr.,
    *Covid-19 Small Business Survey (17)*
    (Apr. 28, 2021), https://bit.ly/3ycOcyO ............................................................15

NFIB Res. Ctr.,
    *Covid-19 Small Business Survey (19)*
    (September 15, 2021), https://bit.ly/3CzBVXz ......................................... 15, 16

Office of Gov. Gavin Newsom,
    *Governor Newsom Signs Legislative Package Providing Urgent Relief*
    *to Californians Experiencing Pandemic Hardship* (Feb. 23, 2021),
    https://bit.ly/2Q6wXOU ....................................................................................19

Office of Gov. Larry Hogan,
    The RELIEF Act of 2021,
    https://bit.ly/2O6yoMG.....................................................................................19

Patrick Gleason,
    *How Senator Joe Manchin's Move To Block Tax Relief*
    *in His Own State Costs All U.S. Taxpayers*, Forbes
    (Mar. 16, 2021), https://bit.ly/31vV782............................................................24

Paul Davidson,
  *Vaccines Could Help Steady Economy;*
  *Yet Pandemic Isn't Over, Effects Are Likely to Linger*,
  USA Today (Dec. 31, 2020).................................................................16

Press Release,
  *President Biden Announces American Rescue Plan*,
  White House (Jan. 20, 2021), https://bit.ly/3f4S5Qe ........................................24

Ruth Simon,
  *Delta Variant Drops Small-Business Confidence*
  *to Lowest Level Since March*, WSJ.com (Aug. 13, 2021),
  https://on.wsj.com/37OGHTC ................................................................16

Stacey Barchenger,
  *States Have Billions of Dollars from the American Rescue Plan.*
  *Now They Have to Spend It*, NorthJersey.com (May 5, 2021),
  https://njersy.co/3jvHOi5 ............................................................. 16, 21

*State-by-State Job Loss: COVID-19 Continues*
  *to Devastate Hotel Industry*, Am. Hotel & Lodging Ass'n
  (Feb. 2021), https://bit.ly/3uG0H47 ......................................................16

U.S. Bureau of Labor Statistics,
  *All Employees, Total Nonfarm [PAYEMS]*,
  retrieved from FRED, Fed. Rsrv. Bank of St. Louis
  (Sept. 3, 2021), https://bit.ly/3dPMhbQ .............................................. 16

## STATEMENT OF INTEREST

Founded in 1912, the Chamber of Commerce of the United States of America (the "Chamber") is the world's largest business federation. It represents approximately 300,000 members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every economic sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members by participating as a litigant or *amicus curiae* in cases involving issues of concern to American businesses, such as this one.

The National Federation of Independent Business ("NFIB") is the nation's leading small business association. Its membership spans the spectrum of business operations, ranging from sole proprietor enterprises to firms with hundreds of employees. Founded in 1943 as a nonprofit, nonpartisan organization, NFIB's mission is to promote and protect the right of its members to own, operate, and grow their businesses. The NFIB Small Business Legal Center is a nonprofit, public interest law firm established to provide legal resources and be the voice for small businesses in the nation's courts through representation on issues of public interest affecting small businesses. To fulfill its role as the voice for small business, the Legal Center frequently files *amicus* briefs in cases that will impact small businesses.

1

*Amici* have a strong interest in this case, as the tax mandate poses a grave threat both to structural principles of federalism and separation of powers that have well-served the Nation and to the economic vitality of U.S. businesses. *Amici* are concerned that the tax mandate will hobble States seeking to ease tax burdens on businesses of all sizes and industries that have been substantially harmed through no fault of their own, but instead from government closures and restrictions imposed on them due to the pandemic. The tax mandate will undoubtedly stifle innovation in the States by limiting their options to support economic activity, which are critical to their businesses' economic recovery and the general well-being of businesses and their employees. For these reasons and others described below, *amici* respectfully urge this Court to grant the plaintiff States' motion for partial summary judgment on Counts I-III, deny defendants' motion to dismiss, and enjoin defendants from enforcing the tax mandate.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

The novel tax mandate at the heart of this case is unprecedented and unconstitutional—and has now twice been enjoined. *See Kentucky v. Yellen*, ___ F.Supp.3d ___, 2021 WL 4394249, at *4 (E.D. Ky. Sept. 24, 2021) (permanent injunction); *Ohio v. Yellen*, ___ F.Supp.3d ___, 2021 WL 2712220, at *15 (S.D. Ohio

---

[1] No party or counsel for any party authored this brief in whole or in part, and no one other than the *amici*, their members, or their counsel made a monetary contribution intended to fund the preparation or submission of this brief.

2

July 1, 2021) (permanent injunction).  Never in the history of the Republic has the federal government conditioned the receipt of federal funds on a State's surrender of its power to control its own tax policies.  It is beyond question that Congress cannot dictate state tax policy directly, and such an intrusion into core matters of state sovereignty is ultra vires even as a condition on federal funds.  Congress has resisted the temptation to impose such a condition for over two centuries, not out of self-restraint, but because it lacks the power to do so.  And at a bare minimum, Congress cannot coerce States into surrendering such a core aspect of sovereignty with an offer they cannot refuse—a massive federal relief package, ultimately funded by the States' own taxpayers, in the aftermath of a global pandemic.

In the American Rescue Plan Act of 2021 ("ARPA"), Congress has made $195.3 billion in taxpayer dollars—i.e., money collected from the States' citizens— available to States if and only if States agree not to pass any laws or take any administrative actions that decrease their net revenue, whether that decrease comes through tax credits, rebates, reductions in tax rates, or new or expanded deductions. Pub. L. No. 117-2, §9901(b)(3)(A).  And under the recent interim final rule promulgated by the Treasury Department, the net revenue baseline is measured for the next three years against a State's revenues from 2019.  *See Coronavirus State and Local Fiscal Recovery Funds*, 86 Fed. Reg. 26,786, 26,808 (May 17, 2021) (codified at 31 C.F.R. pt. 35).  For most States, the massive amount of funds available

3

under ARPA—nearly 20% of state government revenues nationwide—eclipses even the extraordinary volume of Medicaid funding held to be coercive under *National Federation of Independent Business v. Sebelius* ("*NFIB v. Sebelius*"), 567 U.S. 519, 581-82, 588 (2012). As the U.S. District Court for the Eastern District of Kentucky recently observed, "refusing to accede to the conditions set out in [the tax mandate] is not a realistic option." *Kentucky*, 2021 WL 4394249, at *4. And the coercion is even more acute here given that the entire point of ARPA is to help alleviate the effects of a once-in-a-lifetime global pandemic that has left some States and many of their residents in financial ruin. The notion that a State could refuse such a massive amount of federal relief money raised from its own taxpaying citizenry in these extraordinary times is fanciful. In effect, then, Congress has commandeered the tax power of the States—something it plainly lacks the power to do.

Unless and until this Court enjoins it, the mandate will continue to imperil States' efforts to implement revenue-related measures to foster a healthy business community and promote recovery from the economic devastation caused by COVID-19—devastation that disproportionately harmed certain industries and carried particularly harsh effects for small businesses. Many States have recently enacted legislation to help businesses, and the economy as a whole, recover. These measures, which include new tax deductions and credits for restaurants and small businesses, reductions in corporate tax rates, and fee waivers for eating and drinking

4

establishments, are designed to jump-start recovery.  Under ARPA, however, these measures may subject the States to a Treasury recoupment action if they correspond to a short-term revenue decrease.  The threat of such adverse action will constrain State policymaking now and in future legislative sessions.  There can be no question that the States, as well as their citizens and the businesses operating within them, are suffering irreparable injury, while any contrary federal interest is minimal, if not entirely ultra vires.  The Court should permanently enjoin this unprecedented and patently unconstitutional prohibition.

## ARGUMENT

ARPA offers approximately $195 billion to States to aid the States' and their residents' financial recovery from the COVID-19 pandemic.  Like most spending power legislation, the Act expressly enumerates the purposes to which States may put those funds.  States may use the money to: (a) "respond to the public health emergency with respect to [COVID-19] or its negative economic impacts, including assistance to households, small businesses, and nonprofits, or aid to impacted industries such as tourism, travel, and hospitality"; (b) "respond to workers performing essential work" during the pandemic by providing premium pay or grants; (c) provide government services "to the extent of the reduction" in local revenue "due to [COVID-19] relative to revenues collected in the most recent full

5

fiscal year ... prior to the emergency"; and (d) "make necessary investments in water, sewer, or broadband infrastructure." Pub. L. No. 117-2, §9901(c)(1)(A)-(D).

In addition to those conditions, the Act includes a section titled "further restriction" on the "use of funds." *Id.* §9901(c)(2) (capitalization altered). One such restriction provides:

> A State or territory shall not use the funds provided under this section or transferred pursuant to section 603(c)(4) to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

*Id*. §9901(c)(2)(A). If a State violates that prohibition, it must repay the funds in "an amount equal to the amount of funds used in violation" of the Act. *Id*. §9901(e). The Act also prohibits States from using the funds for "deposit into any pension fund." *Id*. §9901(c)(2)(B).

By its plain terms, the tax mandate is breathtakingly broad. As the U.S. District Court for the Southern District of Ohio recently noted in its order enjoining enforcement of the tax mandate against Ohio, "[b]ased on the Tax Mandate's language, the Secretary could deem essentially *any* reduction in the rate of any one or more state taxes—even if other tax rates were increased—to be a 'change in [tax] laws' that results in an 'indirect[] offset [of] a reduction in [Ohio's] net tax revenues.'" *Ohio*, 2021 WL 2712220, at *15 (alterations and emphasis in original)

6

(citation omitted).  By prohibiting funds from "indirectly" offsetting a decrease in state revenue, the provision appears to reach any action that effects a reduction in rate, rebate, deduction, or credit, regardless of whether any federal funds were used to finance that tax measure.  It also appears to preclude any state official from adopting any pro-taxpayer interpretation of a disputed provision.  The mandate even goes so far as to forbid a State to delay the imposition of a tax or tax increase, even as a hardship allowance for the pandemic's crippling financial consequences.

To be sure, Treasury purported to limit the scope of the tax mandate by promulgating an interim final rule that allows States to replace revenue reductions with spending cuts in "areas not being replaced by" ARPA money.  86 Fed. Reg. at 26,808.  But setting aside whether Treasury can cure constitutional infirmities in the statute, *see* Texas.Br.22-27, it is hard to see how Treasury's interpretation can be squared with ARPA's plain text—not to mention the fungible nature of money.  In all events, the interim rule ultimately creates more problems than it solves.  Among other things, the rule dictates that States may not decrease their net tax revenues relative to their revenues in 2019—a baseline that implicitly locks in policy choices of past legislatures and governors all the way through 2024.  The rule also requires States to provide a detailed accounting of their tax measures to ensure compliance with the mandate.  That level of micromanaging a core sovereign function is

7

unprecedented and extreme. *See Ohio*, 2021 WL 2712220, at *19. The only proper judicial course is to enjoin the provision.

## I.   The Tax Mandate Is Unconstitutional.

1. The power to tax or not to tax lies at the absolute core of sovereignty. Misguided taxes spurred the revolution that produced our Republic. Our founding document includes multiple specifications of what federal and state governments can and cannot tax. U.S. Const. Art. I, §8, cl. 1; *id*. Art. I, §9, cl. 1, 4, 5; *id*. Art. I, §10, cl. 2. Amendments reallocating the taxing power have had a profound effect on the federal-state balance. *See id*. Amend. XVI. And our earliest judicial decisions recognize that "the power to tax involves the power to destroy." *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 431 (1819).

It is no surprise, then, that the Supreme Court recognizes that the tax power is "central to state sovereignty," *Dep't of Revenue v. ACF Indus., Inc.*, 510 U.S. 332, 345 (1994), and that the "power of self government … cannot exist distinct from the power of taxation," *Providence Bank v. Billings*, 29 U.S. (4 Pet.) 514, 546, 548 (1830). Thus, it has been settled law from the Republic's earliest days that a State "alone" may, "within its own jurisdiction," "judge and determine how, in what manner, and upon what objects [the tax] power shall be exercised." *Id.* at 544. Simply put, it is difficult to conceive of a greater threat to the "integrity, dignity, and residual sovereignty of the States," *Bond v. United States*, 564 U.S. 211, 221 (2011),

8

than the loss of their tax power.  Indeed, the "power to tax" is a "core State function … that has long been recognized as 'indispensable' to the States' very existence." *Ohio*, 2021 WL 2712220, at *19 (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 199 (1824)); *see also Kentucky*, 2021 WL 4394249, at *6 ("[T]here is no power more central to a state government's sovereignty than the power to tax[.]").

If anything, that core attribute of state sovereignty has taken on even greater importance in the wake of the Sixteenth Amendment, which empowers the federal government to tax the income of the States' citizenry.  *See* U.S. Const. Amend. XVI. Taxing citizens is a zero-sum game.  No matter how many sovereigns tax them, citizens cannot be taxed more than 100%, and they begin avoiding taxable activity at far lower rates.  That makes the States' power to set their own tax policy in the shadow of the Sixteenth Amendment critical not only to their ability to sustain their own governments, but also to serve as a check on the federal government's own taxing power.  States may not be able to stop the federal government from taxing the income their citizens produce.  But at least States can try to alleviate the burden on their citizens by reducing their own reliance on tax revenues.  The States' ability to play this safety-valve role is critical to preserving the framers' vision that a system of dual-sovereignty would enhance, rather than threaten, individual liberty.  *See Bond*, 564 U.S. at 221.

9

Those bedrock tenets of federalism resolve this case. Some matters are simply too close to the core of state sovereignty for the federal government to dictate their terms, even if those terms are framed as conditions. *See Coyle v. Smith*, 221 U.S. 559, 577 (1911) (holding unconstitutional an effort to prevent Oklahoma from relocating its capitol as a condition of its admission to the Union). Just as the federal government may not dictate the location of a State capitol, the federal government may not dictate whether a State can lower or raise taxes. That Congress purports to do so here as a condition on the receipt of federal funds (or, more aptly, federal tax revenues collected from the States' citizens) makes no difference. As *Coyle* recognizes, some conditions are *per se* ultra vires.

That is clearly true of this unprecedented effort to dictate state tax policy. If the power to tax is indeed the power to destroy, then the federal government has no more business dictating what state governments may and may not tax than States have taxing federal instrumentalities. Indeed, where the Constitution puts certain revenue sources off-limits to States, it does so directly, as with Article I, Section 10's express prohibition on state taxes on imports and exports without Congress' consent. The idea that Congress can add to Article I, Section 10 as a condition of federal funding should be a non-starter. That likely explains why Congress has never taken this extraordinary step. Congress' "prolonged reticence would be amazing if such interference were not understood to be constitutionally proscribed." *Plaut v.*

10

*Spendthrift Farm, Inc.*, 514 U.S. 211, 230 (1995); *see also Free Enter. Fund v. PCAOB*, 561 U.S. 477, 505 (2010) ("Perhaps the most telling indication of the severe constitutional problem … is the lack of historical precedent.").

The intrusive effects of the tax mandate only became more apparent when Treasury promulgated its interim final rule purporting to add post hoc clarity to the statute. *See* 86 Fed. Reg. 26,786. Far from clarifying or narrowing the sweep of the tax mandate, the rule only highlights the extent of the tax mandate's intrusion on a core area of the States' sovereignty. The rule requires each State to perform a multi-step assessment every year of how the amount of funds received under ARPA compares to any reductions in the State's tax revenue. Each State must also "provide to the Secretary periodic reports providing *detailed accounting* of the uses of funds, *all modifications* to a State or Territory's tax revenue sources, and such *other information* as the Secretary may require." *Id.* at 26,821 (emphasis added). And "the Secretary may request other additional information as may be necessary or appropriate." *Id.* As a recent article on ARPA advised, the "many new requirements to gather and report non-financial data on these ARPA funded projects" represent "a significant change from past grants management practices."[2] The rule thus confirms

---

[2] Jack Reagan, *Reporting Requirements for the American Rescue Plan Act Money—What Cities and Counties Should Consider*, Am. City & County (Sept. 9, 2021), https://bit.ly/3u0FGSD.

that the tax mandate gives the federal government unprecedented authority to micromanage the taxing power of the States.

The burdensome system of "accounting" is not the only way in which the interim final rule exacerbates the constitutional problems with the tax mandate. The rule requires States to measure a "reduction" in net tax revenue by reference to the 2019 fiscal year. Although Treasury justifies this requirement by describing 2019 as the "last full fiscal year prior to the COVID-19 public health emergency," 86 Fed. Reg. at 26,800, it is also necessarily a baseline that reflects the policy preferences of past legislatures and governors, and not the will of the people as reflected in intervening elections. Thus, by way of the interim final rule, Treasury seeks to subvert the will of each State's voters on an always-important election issue. Moreover, the rule does not take account of the many things that could transpire between 2021 and 2024 that make freezing in amber the 2019 fiscal year an especially burdensome and intrusive requirement. And tying recoupment to the year 2019 forces States to look to the past rather than the future in gauging their policy priorities. Thus, even if a State projects that a tax cut will increase its revenue in the long run, the State must weigh that benefit against the risk that one year's revenue will dip below the 2019 level and subject the State to a potential recoupment action. In short, the tax mandate and the interim final rule install Treasury in a supervisory

12

capacity over the States that is foreign to our system of federalism. *See Billings*, 29 U.S. at 544.

2. On top of all that, the mandate suffers from the additional infirmity of being impermissibly coercive. As the Supreme Court reaffirmed in *NFIB v. Sebelius*, when Congress offers federal funds to States on the condition that they enact or refrain from enacting certain policies, the condition is permissible only if the offer is voluntary not just in theory, but in fact. *See* 567 U.S. at 577. This remains true regardless of whether the condition is framed as a grant or a withdrawal of funds. In either instance, the limitation is critical because, "[n]o matter how powerful the federal interest involved, the Constitution simply does not give Congress the authority to require the States to regulate." *New York v. United States*, 505 U.S. 144, 178 (1992). By circumventing that rule, efforts to use the power of the federal purse to coerce States to do Congress' bidding "undermine the status of the States as independent sovereigns in our federal system." *NFIB v. Sebelius*, 567 U.S. at 577. It is thus incumbent on courts to carefully "scrutinize" spending legislation to ensure that Congress is "not using financial inducements to exert a 'power akin to undue influence'" on the States. *Id.* (quoting *Steward Mach. Co. v. Davis*, 301 U.S. 548, 590 (1937)). Federal "pressure turns into compulsion" when States no longer have a "legitimate choice whether to accept the federal conditions in exchange for federal funds." *Id.* at 577, 643.

ARPA is clearly coercive by that standard. In *NFIB v. Sebelius*, the threatened "loss of over 10 percent of a State's overall budget" was "surely beyond" the constitutional line. *Id*. at 582, 585. Here, the $195 billion available to States and the District of Columbia eclipses that by a wide margin. The amount available to plaintiff Mississippi, for instance, is equivalent to more than 30% of the State's 2021 budget.[3] The amount available to Arizona is equivalent to about 40% of that State's general fund budget.[4] Kentucky and Tennessee each will receive amounts equal to roughly one fifth of their respective general fund revenues for the preceding year. *Kentucky*, 2021 WL 4394249, at *4. Indeed, the total amount available is equivalent to a whopping *20%* of the annual state tax collections of state governments.[5] As in *NFIB v. Sebelius*, the sheer amount of money at issue "leaves the States with no real option but to acquiesce." 567 U.S. at 582.

Numbers alone do not tell the whole story. Over the past year and a half, the COVID-19 pandemic has forced the whole world to endure extreme economic hardship. Entire industries shut down for months on end, while others operated with reduced hours and customer capacities, all under the continued pressure of supply

---

[3] *How the COVID-19 Pandemic is Transforming State Budgets*, Urb. Inst. (Sept. 24, 2021), https://urbn.is/3jsU9ni; *see* Texas.Br.1.
[4] *See* Complaint ¶11, *Arizona v. Yellen*, No. 2:21-cv-00514-DJH (filed Mar. 25, 2021).
[5] Jared Walczak, *Four Questions Treasury Must Answer About the State Tax Cut Prohibition in the American Rescue Plan Act*, Tax Found. (Mar. 18, 2021), https://bit.ly/3cYu0YB.

chain constraints.  Thousands of Americans lost their jobs, had to forgo higher education, and have been crushed by medical bills related to COVID-19 treatments.

*Amici* have witnessed firsthand the economic devastation of the pandemic. Small businesses, in particular, have faced unprecedented hardship.  In surveys of small business owners, 82% of participants reported losing sales opportunities because of a labor shortage, and 94% of participants in September stated that their labor shortage was roughly the same as or worse than it was one month ago.[6]  More than half of respondents to an earlier survey had employees take pandemic-related sick leave or family leave; 87% of those businesses reported at least some of that leave was paid leave.[7]  The hospitality industry was also ravaged:  At the beginning of this year, foodservice sales were down $240 billion from expected levels in 2020.[8] Nearly a third of all restaurant and hospitality workers lost their jobs in the first few months of the pandemic,[9] and many have yet to return.[10]   More than 100,000

---

[6] *See* NFIB Res. Ctr., *Covid-19 Small Business Survey (19)* at 6-7 (September 15, 2021), https://bit.ly/3CzBVXz.

[7] *See* NFIB Res. Ctr., *Covid-19 Small Business Survey (17)* at 8-9 (Apr. 28, 2021), https://bit.ly/3ycOcyO.

[8] *See* Nat'l Restaurant Ass'n, *Restaurant Sales Fell to Their Lowest Level Since June* (Jan. 15, 2021), https://bit.ly/3d5gVwu; *see also* Alex Sherman, *Five Charts That Show How COVID-19 Stopped the U.S. Economy In Its Tracks*, CNBC (Mar. 11, 2021), https://cnb.cx/3cZ97O0.

[9] Erin Huffer & Aravind Boddupalli, *The Leisure & Hospitality Sector Has an Employment Crisis—and It Might Be Getting Worse*, Urb. Wire (July 20, 2020), https://urbn.is/397ptlz.

[10] *See* Nat'l Restaurant Ass'n, *49 States and DC Added Restaurant Jobs in May 2021* (June 24, 2021), https://bit.ly/3hn5jHA (restaurant employment in all but four states remained below June 2019 level); Nat'l Restaurant Ass'n, *Restaurant Employment Fell for the Third Consecutive Month* (Feb. 5, 2021), https://bit.ly/31b0pG3 (nearly 450,000 restaurant jobs lost in the three months

15

businesses of all stripes have permanently shuttered their doors,[11] and some states have recovered fewer than 50% of the jobs they lost between February and April 2020.[12]  The pandemic continues to inflict new harms on businesses, as nearly 45% of small businesses either have been affected already or expect to be affected by the rise in cases linked to the Delta variant of COVID-19.[13]

These economic hardships not only impact States' residents, but have a direct impact on States' budgets, many of which face dwindling tax revenues alongside rising healthcare costs and record unemployment claims.[14]  Indeed, the pandemic is

---

preceding February 2021); *State-by-State Job Loss: COVID-19 Continues to Devastate Hotel Industry*, Am. Hotel & Lodging Ass'n (Feb. 2021), https://bit.ly/3uG0H47 (hospitality industry unemployment rate 300% higher than rest of economy); Michael Ettlinger & Jordan Hensley, *Covid-19 Economic Crisis: By State*, Univ. of N.H. Carsey Sch. of Pub. Pol'y (Sept. 17, 2021), https://bit.ly/3nWARsQ (nationwide employment in the accommodation and food services industry is down 9.2% since February 2020).

[11] Anne Sraders & Lance Lambert, *Nearly 100,000 Establishments That Temporarily Shut Down Due to the Pandemic Are Now Out of Business*, Fortune (Sept. 28, 2020), https://bit.ly/3t6dpci; Paul Davidson, *Vaccines Could Help Steady Economy; Yet Pandemic Isn't Over, Effects Are Likely to Linger*, USA Today at 3B (Dec. 31, 2020).

[12] Michael Ettlinger & Jordan Hensley, *supra* n.10; *see also* Congressional Rsch. Serv., *Global Economic Effects of COVID-19* at Fig. 20 (Sept. 28, 2021), https://bit.ly/3AitAqJ (in only one of sixteen measured sectors has the number of jobs lost in April 2020 been fully recovered); U.S. Bureau of Labor Statistics, *All Employees, Total Nonfarm [PAYEMS]*, retrieved from FRED, Fed. Rsrv. Bank of St. Louis (Sept. 3, 2021), https://bit.ly/3dPMhbQ (total nonfarm employment in the United States is still more than 5.3 million jobs below its February 2020 level).

[13] *See* Ruth Simon, *Delta Variant Drops Small-Business Confidence to Lowest Level Since March*, WSJ.com (Aug. 13, 2021), https://on.wsj.com/37OGHTC; *see also Covid-19 Small Business Survey (19)* at 5 (45% of respondents reporting a moderate or large negative effect on their business as a result of the recent rise in COVID-19 cases).

[14] *See* Anshu Siripurapu & Jonathan Masters, *How COVID-19 Is Harming State and City Budgets*, Council on Foreign Relations (Mar. 19, 2021), https://on.cfr.org/3f9vjqm; *see also* Stacey Barchenger, *States Have Billions of Dollars from the American Rescue Plan. Now They Have to Spend It*, NorthJersey.com (May 5, 2021), https://njersy.co/3jvHOi5 (reporting that the

16

projected to slash state revenues by $300 billion through 2022—significantly more than the amount of money offered under ARPA.[15]  Under normal circumstances, to refuse such a massive influx of tax dollars would be unthinkable; in these extraordinary times, to do so would border on unconscionable given that States' taxpayers will be the ultimate source of the funds whether or not a State accepts the funds.  In short, "the coercion presented in the ARPA is exactly the kind of intrusion on state sovereignty that the Constitution prohibits."  *Kentucky*, 2021 WL 4394249, at \*6.  The tax mandate should be seen—and rejected—as exactly what it is:  an unconstitutional effort to strip States of their core sovereign right to determine their own tax policy.

## II.    Left Standing, The Tax Mandate Will Have Dire Consequences.

Not only is the tax mandate unconstitutional; its ostensible ban on *any* tax measure that reduces a State's net revenues also creates ongoing hardships for state and local governments, as well as businesses and citizens who rely on tax relief or other changes in tax policy to promote economic growth—especially in times like these.  The Supreme Court has long recognized that any "delay" in a State's ability to enforce its tax policies "may derange the operations of government," causing

---

government of Maryland intends to spend more than 25% of its ARPA funds "to refill the state's unemployment trust fund and stabilize unemployment insurance tax rates").

[15] *See* Kate Davidson, *Covid-19's Hit to State and Local Revenues Is Smaller Than Many Feared*, WSJ.com (Feb. 7, 2021), https://on.wsj.com/3wWBAe4.

"serious detriment to the public." *Dows v. City of Chicago*, 78 U.S. 108, 110 (1870). That is as true today as it was 150 years ago. If anything, the threat is even more pronounced at this critical juncture in our Nation's history because many of the policies States are pursuing or wish to pursue are designed to reduce the financial strain of the pandemic within their respective borders. Indeed, many State legislatures recently passed measures specifically aimed at reducing tax burdens on businesses; many of these laws were designed to bolster small businesses and industries that have suffered substantial harm as the result of government-mandated closures and other restrictions. The ability to reduce the tax burdens of these businesses is a critical tool for the States in their efforts to restore economic vitality within their borders,[16] but to the extent those measures or others like them contribute to a reduction in net tax revenue, the States' ARPA funds may be in jeopardy.

For example, Louisiana recently reduced its small-business franchise tax rate (contingent on ratification of a state constitutional amendment) and extended certain pandemic-related tax-relief measures.[17]  New Mexico recently passed a bill establishing a gross receipts tax deduction for food and beverage establishments,

---

[16] *See* Jack M. Mintz, *Tax Policy and Fiscal Sustainability Post-Covid*, BloombergTax.com (Feb. 2, 2021), https://bit.ly/3641G47 (noting that "[c]urrent tax policy is supportive of households and businesses through deferrals or tax reductions as governments continue to deal with health restrictions," and a "first priority is to support private investment and improve productivity with corporate and personal tax rate reductions").

[17] *See* S.B. 161, 2021 Leg., Reg. Sess. (La. 2021).

which were hit particularly hard by pandemic-related closures and restrictions.[18] Maryland recently passed its own sweeping COVID-19 relief bill that, among other things, supports small businesses with a sales tax credit of up to $3,000 per month— a nearly $200 million commitment.[19]  In May, Oklahoma reduced its corporate income tax rate by 2%.[20]  And California's recent relief law includes $2.1 billion for grants to small businesses impacted by the pandemic, as well as fee waivers for the nearly 60,000 restaurants and bars licensed throughout the State.[21]

The States' efforts also provide critical aid to individuals.  New Mexico recently passed a $600 income tax rebate to families and individuals who receive the State's Working Families tax credit.[22]  Maryland's relief law provides direct stimulus payments to low-income residents—a total of $178 million in relief to 400,000 Marylanders.[23]  Texas recently passed a property-tax bill that accelerates new homeowners' eligibility for a tax exemption.[24]  In addition, many States have

---

[18] S.B. 1, 55th Leg., 1st Sess. (N.M. 2021).

[19] S.B. 496, 442d Gen. Assemb., Reg. Sess. (Md. 2021).

[20] H.B. 2960, 58th Leg., Reg. Sess. (Okla. 2021).

[21] *See* Office of Gov. Gavin Newsom, *Governor Newsom Signs Legislative Package Providing Urgent Relief to Californians Experiencing Pandemic Hardship* (Feb. 23, 2021), https://bit.ly/2Q6wXOU.

[22] S.B. 1, 55th Leg., 1st Sess. (N.M. 2021).

[23] *See* Office of Gov. Larry Hogan, The RELIEF Act of 2021, https://bit.ly/2O6yoMG.

[24] S.B. 8, 87th Leg., 2d Spec. Sess. (Tex. 2021); *see also* Texas.Br.11-12 (describing multiple tax relief measures affecting individuals and businesses that have recently been enacted or considered by Texas, Mississippi, and Louisiana).

19

recently enacted tax measures that have nothing to do with COVID-19 relief, but that are manifestly in the public interest.  For instance, in its most recent legislative session, Missouri extended tax credits for families who adopt a child out of foster care.[25]  Georgia did the same.[26]  Alabama established tax deductions for residents who purchase storm shelters to protect their families from tornadoes.[27]  Montana increased its current education tax credit for families.[28]  And Arkansas enacted an exemption from taxation for sales at certain school events.[29]  Given its most natural construction, the tax mandate may implicate all of these measures, and more.

To be sure, the federal government has tried to assure States that the mandate need not be read so broadly, and has purported to fix any ambiguity in the statutory language through the interim final rule.  But state and local officials remain unsure as to how they may permissibly exercise their own sovereign tax powers without risking a federal objection and recoupment action.  In a public comment submitted to the Treasury in late June, leadership on New Hampshire's House Ways and Means Committee indicated that the committee is "struggling with the implications of the

---

[25] *See* H.B. 429, 101st Gen. Assemb., 1st Reg. Sess. (Mo. 2021).

[26] H.B. 114, 156th Gen. Assemb., Reg. Sess. (Ga. 2021).

[27] *See* H.B. 227, 2021 Leg., Reg. Sess. (Ala. 2021).

[28] *See* H.B. 279, 67th Leg., Reg. Sess. (Mont. 2021).

[29] H.B. 1023, 93rd Gen. Assemb., Reg. Sess. (Ark. 2021).

tax provisions in ARPA."[30]  The State faces particular confusion over the interaction of New Hampshire's "distinctive version of the corporate income tax" with the rule's carve-out for "income tax changes … that simply conform with recent changes in Federal law."[31]  And "questions about major timing issues" remain, regarding the measurement and collection of recoupment amounts.[32]  The Speaker of the House in Iowa has expressed similar hesitation, remarking that the State is being "cautious" with its policies to ensure that it is "not using" ARPA funds "in a way they're not intended."[33]  And in California, a local regulator expressed his confusion over ARPA, observing, "[w]hen we first got the ARPA, we were told it was going to be, 'You can use it for whatever you want … And then when we got the guidance we realized that that's not really the case."[34]  The local mayor was similarly confused, declaring that the interim rule "unfortunately" created "more confusion" "instead of clarity."[35]  Indeed, some governments have needed to enlist additional resources simply to try to interpret how they can spend the money.  In Ohio, local administrators told

---

[30] Comment from Almy, Rep. Susan, *Coronavirus State and Local Fiscal Recovery Funds*, Regulations.gov (June 29, 2021), https://bit.ly/3Ae135X; 86 Fed. Reg. at 26,808.

[31] 86 Fed. Reg. at 26,808.

[32] Comment from Almy, Rep. Susan, *supra* n.30.

[33] Stacey Barchenger, *supra* n.14.

[34] Malea Martin, *As Cities Await Finalized American Rescue Plan Act Guidelines, Some Funding Decisions Remain in Limbo*, Santa Maria Sun (June 16, 2021), https://bit.ly/3qHcn5S.

[35] *Id.*

21

reporters in June that they were "waiting for a couple of law firms to come out with their interpretations" of the Treasury guidelines and that they were "expecting some seminars on the topic."[36]

This lack of clarity alone is a fatal problem, as Congress must impose any conditions "unambiguously[,] enabl[ing] the States to [be] cognizant of the consequences of their participation." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987); *see also Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (requiring "clear notice" of conditions); *Ohio*, 2021 WL 2712220, at *8-9 (finding ARPA's text violates the Spending Clause because it is ambiguous). But even setting aside the ambiguity problem—which, far from curing, the interim rule only compounds—States do not have time to wait for Treasury to engage in trial and error over the meaning of a statute intruding so deeply on a State's prerogatives. States are confronted with pressing public policy issues now. For example, Alabama's storm-shelter law has taken on increased importance after a tornado devastated part of the State earlier this year. Texas's new property-tax reform responds to polling showing that more than 75% of registered voters view property-tax obligations as a significant problem.[37] And New York's new "return-to-work"

---

[36] Linda Gandee, *Avon to Receive Almost $4.6 Million From the American Rescue Plan Act of 2021*, Cleveland.com (June 14, 2021), https://bit.ly/2TiSwy1.

[37] Bethany Blankley, *Texas Lawmakers to Consider Property Tax Relief Measures*, The Center Square (July 12, 2021), https://bit.ly/3ASoj93.

tax credit of $5,000 per new employee for restaurant owners seeks to directly address the severe staffing shortage in the restaurant industry.[38]

It is difficult to see "any cognizable interest of the federal government" in prohibiting States from lowering the tax burden on their residents, businesses, and entrepreneurs—at precisely the time when they need relief most. *Kentucky*, 2021 WL 4394249, at *7. "Congress may not impose conditions unrelated to the federal interest in enacting spending legislation." *Ohio*, 2021 WL 2712220, at *11 (internal quotation marks and citation omitted). And "enjoining the enforcement of an unconstitutional provision . . . promotes rather than disserves the public interest." *Dearmore v. City of Garland*, 400 F.Supp.2d 894, 905-06 (N.D. Tex. 2005). Indeed, "issuing the requested injunction will promote the public interest" because "the limitations on Congress's ability to use its Spending Clause authority to make funding offers to the States are designed to protect this country's dual-sovereign structure, which in turn is meant to promote individual liberty." *Ohio*, 2021 WL 2712220, at *21; *see also Kentucky*, 2021 WL 4394249, at *6 ("[T]he federal government's condition implicates not only powers at the core of state sovereignty, but individual liberties reserved to citizens, as well.").

But even assuming some countervailing federal interest may exist, the balance of equities plainly favors an injunction. The tax mandate was an eleventh-hour

---

[38] S.B. 2500, 2021 Leg., Reg. Sess. (N.Y. 2021).

23

addition to the bill, reflecting little legislative forethought and no formal legislative history.[39]  Congress did not even bother to explain why it chose to rush in where two centuries of previous Congresses feared to tread.  The whole point of ARPA is to provide economic relief to critical sectors of American society that were hit especially hard by the pandemic.[40]  Tax relief is an obvious means of achieving that policy objective, yet Congress placed it off limits to the States.  *Cf. City of Philadelphia v. Sessions*, 280 F.Supp.3d 579, 657 (E.D. Pa. 2017) (finding it meaningful that requiring the city to forgo funds would prevent the city from addressing the opioid epidemic, which the federal government had described as "a major public health crisis").  In short, even assuming there are some equities on the other side of the ledger, the balance is not close.

## CONCLUSION

For the reasons set forth above, this Court should grant Plaintiffs' motion for partial summary judgment.

---

[39] *See* Patrick Gleason, *How Senator Joe Manchin's Move To Block Tax Relief in His Own State Costs All U.S. Taxpayers*, Forbes (Mar. 16, 2021), https://bit.ly/31vV782.
[40] *See* Pub. L. No. 117-2, §9901(c)(1)(A); Press Release, *President Biden Announces American Rescue Plan*, White House (Jan. 20, 2021), https://bit.ly/3f4S5Qe.

24

Respectfully submitted,

<u>s/Paul D. Clement</u>
PAUL D. CLEMENT
KASDIN M. MITCHELL
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
paul.clement@kirkland.com

*Counsel for* Amici Curiae *Chamber of Commerce of the United States of America and National Federation of Independent Business Small Business Legal Center*

October 4, 2021

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of October, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of Texas using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


<u>s/Paul D. Clement</u>
Paul D. Clement