FILED
October 20, 2021
KAREN MITCHELL
CLERK, U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | Civil Action No. 2:21-cv-0079 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JANET YELLEN, in her official capacity as | ) | |
| Secretary of the Treasury, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**BRIEF OF AMICI CURIAE GOLDWATER INSTITUTE AND
TEXAS PUBLIC POLICY FOUNDATION IN SUPPORT OF PLAINTIFFS**

MATTHEW MILLER
mmiller@texaspolicy.com
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone:      (512) 472-2700
Facsimile:      (512) 472-2728

*Attorney for Goldwater Institute and
Texas Public Policy Foundation*

## TABLE OF CONTENTS

Table of Contents ........................................................................................................ ii

Table of Authorities .................................................................................................. iii

Corporate Disclosure Statement ............................................................................... 1

Interest of Amici Curiae.............................................................................................. 1

Argument .................................................................................................................... 2

I.     The States have standing to challenge the Tax Mandate for failing the
       "relatedness"requirement. .............................................................................. 3

II.    The Tax Mandate is not reasonably related to ensuring that states use Funds for the Act's
       permitted purposes. ......................................................................................... 4

III.   The Tax Mandate's true purposes are to force a pro-tax political philosophy on the states
       and to stifle tax competition among the states. ............................................... 7

IV.    The Tax Mandate contravenes the Act's purpose of providing relief to people, small
       businesses, and industries affected by COVID-19's negative economic impacts. .......... 11

Conclusion ............................................................................................................... 13

Certificate of Service ............................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Dep't of Tex., Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427 (5th Cir. 2014).................................................................................................................................... 3

*Hoffman v. Rauch,* 300 U.S. 255 (1937)........................................................................................ 12

*Massachusetts v. Mellon*, 262 U.S. 447 (1923) .............................................................................. 4

*New York v. United* States, 505 U.S. 144 (1992) ........................................................................... 2

*South Dakota v. Dole*, 483 U.S. 203 (1987) ................................................................................... 2

*United States v. Salcido-Medina*, 483 F.2d 162 (9th Cir. 1973)................................................... 3

**Statutes**

42 U.S.C. § 802(a)(1)....................................................................................................................... 4

42 U.S.C. § 802(c)(1)....................................................................................................................... 5

42 U.S.C. § 802(c)(1)(A) ............................................................................................................... 11

42 U.S.C. § 802(c)(2)(A) ................................................................................................................. 6

42 U.S.C. § 802(c)(2)(B) ................................................................................................................. 6

42 U.S.C. § 802(d)(2) ...................................................................................................................... 5

42 U.S.C. § 802(d)(2)(A) ................................................................................................................. 7

42 U.S.C. § 802(e) ................................................................................................................. 5, 7, 13

**Regulations**

86 Fed. Reg. 26786 (May 17, 2021) ............................................................................................... 7

**Other Authorities**

Adam Schuster, *Federal COVID-19 Relief Going to Illinois Debt Rather Than Business Relief*, Illinois Policy, May 27, 2021 ..................................................................................................... 7

Alan Rappeport, *A Last-Minute Add to Stimulus Bill Could Restrict State Tax Cuts*, N.Y. Times, Mar. 12, 2021 ........................................................................................................................... 6, 8

Andrew Osterland, *Pandemic Heats up State Tax Competition to Attract Businesses and Residents*, CNBC, Feb. 8, 2021 ................................................................................ 10

Chris Edwards, *Migration to Low-Tax States Continues*, Cato at Liberty, Jan. 9, 2020 ............. 10

Garrett Watson & Erica York, *The American Rescue Plan Act Greatly Expands Benefits Through the Tax Code in 2021*, Tax Foundation, Mar. 12, 2021 ......................................................... 11

Jeremy Duda, *Ducey Calls for $600 Million in Permanent Income Tax Cuts*, Ariz. Mirror, Jan. 15, 2021 .................................................................................................................... 8

Jonathan J. Cooper, *Arizona Governor Signs $12.8 Billion Budget with Big Tax Cut*, AP, June 30, 2021 .................................................................................................................... 9

Keith Ridler, *Idaho Lawmakers Propose Sweeping Cuts to Income, Sales Taxes*, AP, Feb. 16, 2021 .................................................................................................................... 9

Lynn A. Baker, *Conditional Federal Spending After* Lopez, 95 Colum. L. Rev. 1911 (1995) ...... 9

Patrick Gleason, *How Senator Joe Manchin's Move to Block Tax Relief In His Own State Costs All U.S. Taxpayers*, Forbes, Mar. 16, 2021 ................................................................ 8

Press Release, Idaho Office of the Governor, *Idaho Achieves Single Largest Tax Cut in State History* (May 12, 2021) ............................................................................................. 9

State of Arizona Executive Budget Summary, Fiscal Year 2022, January 2021 .................... 8, 11

Victor Riches, *We Won the Battle for an Arizona Flat Tax!*, In Defense of Liberty, June 25, 2021 .................................................................................................................... 2

## CORPORATE DISCLOSURE STATEMENT

The Goldwater Institute is a nonprofit corporation incorporated under the laws of the State of Arizona. It has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

Texas Public Policy Foundation is a nonprofit corporation incorporated under the laws of the State of Texas. It has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

## INTEREST OF AMICI CURIAE

The Goldwater Institute was established in 1988 as a nonpartisan public policy and research foundation devoted to advancing the principles of limited government, individual freedom, and constitutional protections through litigation, research, policy briefings, and advocacy. Through its Scharf-Norton Center for Constitutional Litigation, the Institute litigates cases and files *amicus* briefs when its or its clients' objectives are directly implicated.

The Goldwater Institute advances the idea that the U.S. Constitution provides a guaranteed minimum of protection for individual rights, while leaving states free to enact laws that protect those rights more broadly. That is why the Institute directs its efforts primarily toward states—the "laboratories of democracy"—to introduce innovative ideas that expand freedom. The Goldwater Institute also takes interest in this case because it concerns an important constitutional limit on federal power, and the "Tax Mandate" that Plaintiffs challenge threatens states' ability to act as laboratories of democracy and to enact policies that better respect individuals' liberty to direct their income as they see fit. Further, as discussed below, the Tax Mandate potentially threatens to punish the State of Arizona for enacting tax cuts for which the Institute was a leading advocate.

*See* Victor Riches, *We Won the Battle for an Arizona Flat Tax!*, In Defense of Liberty, June 25, 2021.[1]

The Texas Public Policy Foundation (TPPF) is a non-profit, non-partisan research organization dedicated to promoting liberty, personal responsibility, and free enterprise through academically sound research and outreach.

Since its inception in 1989, the Foundation has emphasized the importance of liberty, personal responsibility, limited government, and free enterprise through academically sound research and advocacy. In accordance with its central mission, the Foundation has hosted policy discussions, authored research, presented legislative testimony and drafted model ordinances to reduce the burden of government on Texans. Specifically, the Foundation seeks to promote federalism and the proper allocation of power between federal and state governments, concerns that are directly at-issue in this case.

## ARGUMENT

The *amici* submit this brief to emphasize that the "Tax Mandate" in the American Rescue Plan Act of 2021 is unconstitutional because it is not reasonably related to the purpose of the Act's spending. *See New York v. United* States, 505 U.S. 144, 167 (1992); *South Dakota v. Dole*, 483 U.S. 203, 207–08 & n.2 (1987). The Plaintiffs have standing to pursue their Spending Clause challenge on that basis, and their argument is meritorious.

---

[1]   https://indefenseofliberty.blog/2021/06/25/we-won-the-battle-for-an-arizona-flat-tax/

I.     **The States have standing to challenge the Tax Mandate for failing the "relatedness" requirement.**

Plaintiffs have standing, as States, to challenge the Tax Mandate on the basis that it fails the "relatedness" requirement. As the States have explained, the Tax Mandate's intrusion on their sovereignty is a sufficient injury to give them standing.

"Congress … may not condition the conferral of a government benefit on the forfeiture of a constitutional right." *Dep't of Tex., Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 438 (5th Cir. 2014) ("*Texas VFW*"). The Plaintiff States have alleged that Congress has done exactly that here by conditioning the benefit of Funds on states' surrender of their sovereign authority—i.e., their Tenth Amendment "right" to determine their own tax policies. *See* Plfs.' Br. at 7–13.

The States' acceptance of that benefit (Funds) does not eliminate their constitutional injury. *Cf. Texas VFW*, 760 F.3d at 430–31 (plaintiffs with bingo licenses had standing to challenge unconstitutional condition placed on those licenses). A party has standing to challenge an unconstitutional condition placed on a federal benefit regardless of whether it accepts that benefit or declines to accept it to avoid the condition. Either way, the party is injured by being forced to make a choice that the Constitution forbids Congress from presenting. *See United States v. Salcido-Medina*, 483 F.2d 162, 164 (9th Cir. 1973) (where government creates a "package" requiring a party to select one of two options, one of which is alleged to be constitutional, the "choice of either … would carry with it the elements of a case or controversy within the framework of Article III"). If the party accepts the benefit, it is injured because it is forced to comply with a condition Congress was not entitled to impose. If it declines the benefit, it is injured because it has foregone the benefit based on a condition Congress never should have attached to it.

Further, the States' standing is essential if the Spending Clause's "relatedness" requirement is to be enforced—and therefore to be meaningful—at all. It is the States that are forced to make the unconstitutional choice, and it is the States' sovereignty that is infringed if they are forced to make an unconstitutional choice. Thus, when Congress violates the Spending Clause's relatedness rule, it is the States—and perhaps *only* the States—that suffer the direct injury required to have Article III standing. Although the Tax Mandate indirectly (though significantly) harms state taxpayers, it is not apparent that they would have standing to raise a relatedness challenge, given that taxpayers lack Article III standing if they are not "immediately in danger of sustaining some direct injury" and "merely … suffer[] in some indefinite way in common with people generally." *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923).

Therefore, here, the States must and do have standing based on their acceptance of ARPA funds, which subjects them to a condition they allege to be unconstitutional for lack of any reasonable relationship to the federal spending at issue.

## II.   The Tax Mandate is not reasonably related to ensuring that states use Funds for the Act's permitted purposes.

Defendants have argued that the Tax Mandate satisfies the relatedness requirement because that Mandate is one of the conditions that "specify the uses to which a State may and may not devote the [Act's] federal funds." Doc. 19, Defs.' Mot. to Dismiss at 15–16. But the Tax Mandate is not reasonably related to ensuring that states use federal grant money disbursed under the Act ("Funds") for the Act's stated purposes.

The Act's stated purpose for providing Funds to states is "to mitigate the fiscal effects stemming from the public health emergency with respect to the Coronavirus Disease (COVID-19)." 42 U.S.C. § 802(a)(1). Specifically, the Act allows states to use Funds for four purposes:

(1) "to respond to the public health emergency … or its negative economic impacts, including assistance to households, small businesses, and nonprofits, or aid to impacted industries such as tourism, travel and hospitality";

(2) "to respond to workers performing essential work … by providing premium pay to eligible workers … or by providing grants to eligible employers that have eligible workers who perform essential work";

(3) "for the provision of government services to the extent of the reduction in revenue … due to the [pandemic] relative to revenues collected in the most recent full fiscal year"; and

(4) "to make necessary investments in water, sewer, or broadband infrastructure."

*Id*. § 802(c)(1). The Act requires States, territories, and Tribal governments to report their uses of Funds to the Secretary, and it allows the Secretary to recoup Funds that were used for a purpose other than those the Act allows. *Id*. §§ 802(d)(2), (e).

*These provisions give the Secretary all that she needs to ensure that states use Funds only for purposes the Act authorizes*. Under these provisions, if a state receives, say, $15.8 billion in Funds (Texas's expected amount, Doc. 29 at App.150), the Secretary can confirm that the state actually spent $15.8 billion on those four purposes, and she can recoup any funds out of the reported $15.8 billion that were used for unauthorized purposes.

The Tax Mandate, by contrast, does *not* help ensure that states use Funds for their intended purposes. A state can run afoul of the Tax Mandate even if it accurately reports that it *did* spend all of the Funds it received under the Act for those authorized purposes.

That means the Tax Mandate, by its own terms, does not concern whether a state spends Funds on the Act's express purposes. Instead, it concerns whether a state "directly or indirectly"

5

uses Funds to "offset" revenue lost from a tax cut. 42 U.S.C. § 802(c)(2)(A). That is, it seeks to ensure that States do not use the Act's Funds to "pay for" (subsidize) a tax cut, which supposedly would be unrelated to the Act's purposes. *See* Alan Rappeport, *A Last-Minute Add to Stimulus Bill Could Restrict State Tax Cuts*, N.Y. Times, Mar. 12, 2021.[2]

Not only does the Tax Mandate apply even to states that do spend the Funds on the Act's enumerated purposes, but the Act also does not otherwise prohibit States from using Funds to indirectly subsidize activities *un*related to the Act's specified purposes. Instead, it arbitrarily singles out and effectively prohibits just *one* thing: cutting taxes.

The Tax Mandate might make sense if the Act were otherwise designed to deny Funds to states that could afford to pay for their own COVID relief without help (if they put other policy priorities aside). But the Act does not do that; it leaves states free to spend money other than Funds on whatever they want, regardless of how wasteful, frivolous, or otherwise unrelated to COVID relief that spending might be. *See* Plfs.' Br. at 29–30.

The Act does prohibit states from using Funds "for deposit into any pension fund." 42 U.S.C. § 802(c)(2)(B). At first glance, that might appear to be a restriction on state spending—and particularly a restriction on "blue states" that face large unfunded pension liabilities, such as California and Illinois, as in some sense a "balance" against the Tax Mandate, to which "red states" have objected.[3] But the pension-deposit restriction actually means little because, in contrast with the Tax Mandate, it does *not* prohibit states from "indirectly" using Funds to subsidize pension deposits. The pension-deposit restriction only means that, when a state reports its uses of Funds to

---

[2]   https://www.nytimes.com/2021/03/12/us/politics/biden-stimulus-state-tax-cuts.html

[3]   *See* Jason Willick & Alexander Sholtz, *Blue States Have Bigger Pension Debts Than Red States*, Am. Interest, Dec. 16, 2016, https://www.the-american-interest.com/2016/12/16/blue-states-have-bigger-pension-debts-than-red-states/; Rappeport, *supra* (noting that Republican attorneys general have been the Tax Mandate's prominent critics).

the Secretary, it may not include pension deposits. The Act does not otherwise require states to report pension deposits (as they must report "modifications to … tax revenue sources," *id.* § 802(d)(2)(A)), and it does not allow the Secretary to recoup money spent on pension deposits if a state does not include that expenditure among its reported uses of Funds (as she may recover amounts equal to state tax revenues lost. *Id.* § 802(e)).

Similarly, the interim final rule in which the Treasury Department has attempted to clarify the Act states that the Act "precludes use of [Funds] to cover the costs of debt incurred prior to March 3, 2021." 86 Fed. Reg. 26786, 26796 (May 17, 2021). But that rule and the Act lack any restriction on states "indirectly" using Funds to subsidize debt payments. Thus, when the rule was announced, Illinois Governor J.B. Pritzker—who previously stated his intention to use Funds to pay off debt that Illinois incurred during the pandemic, as it had increased spending by $2.4 billion—announced that the state would instead pay the debt using tax revenues. Adam Schuster, *Federal COVID-19 Relief Going to Illinois Debt Rather Than Business Relief*, Illinois Policy, May 27, 2021.[4] Of course, because money is fungible, that makes no practical difference, *id.*—but the Act and the rule do not prohibit "indirectly" subsidizing debt payments (or spending of any kind), so that is permitted.

Thus, the Act and the Tax Mandate are not designed to protect against states "indirectly" using Funds for unapproved purposes. They are designed *only* to stop states from cutting taxes.

## III.   The Tax Mandate's true purposes are to force a pro-tax political philosophy on the states and to stifle tax competition among the states.

In fact, the Tax Mandate's true purposes are to impose a pro-tax political philosophy on states that otherwise would reject it and to stifle tax competition among the states.

---

[4]     https://www.illinoispolicy.org/federal-covid-19-relief-going-to-illinois-debt-rather-than-business-relief/

7

Indeed, the Mandate was inserted into the Act as a "last-minute change," at the behest of West Virginia Senator Joe Manchin, based on his view that "states should not be cutting taxes." Rappeport, *supra*. Manchin reportedly insisted on the provision to thwart a plan by the Governor of West Virginia (an office Manchin previously held) to phase out the state's income tax. *See* Patrick Gleason, *How Senator Joe Manchin's Move to Block Tax Relief In His Own State Costs All U.S. Taxpayers*, Forbes, Mar. 16, 2021.[5] In other words, the Tax Mandate apparently was inserted into the Act specifically to prevent a particular state from pursuing its preferred tax policy.

And although some of its defenders suggest that the Tax Mandate exists to prevent states from opportunistically taking advantage of the Act's grant of Funds to subsidize new tax cuts, *see* Rappeport, *supra*, this case—and examples from other states—show that the Tax Mandate also threatens state plans for tax reform that *predate* the Act.

In Arizona, Governor Doug Ducey signed an income tax reduction each year since taking office, having promised long before the pandemic to reduce that tax as close to zero as possible. State of Arizona Executive Budget Summary, Fiscal Year 2022, January 2021 ("Ariz. Exec. Budget Summary") at 22.[6] Consistent with that pattern, and facing a budget surplus, Ducey called for further income tax reductions in his latest state budget proposal, issued well before the Act's passage. *Id.*; Jeremy Duda, *Ducey Calls for $600 Million in Permanent Income Tax Cuts*, Ariz. Mirror, Jan. 15, 2021[7]. Since then, the State has enacted a $1.9 billion tax cut, for which the Tax

---

[5]      https://www.forbes.com/sites/patrickgleason/2021/03/16/how-senator-joe-manchins-move-to-block-tax-relief-in-his-own-state-costs-all-us-taxpayers/?sh=13bd6cf56188

[6]      https://www.azospb.gov/Documents/2021/FY%202022%20Summary%20Book.pdf

[7]      https://www.azmirror.com/2021/01/15/ducey-calls-for-600-million-in-permanent-income-tax-cuts/

Mandate threatens to punish it. *See* Jonathan J. Cooper, *Arizona Governor Signs $12.8 Billion Budget with Big Tax Cut*, AP, June 30, 2021.[8]

Similarly, before the Act's passage, Idaho Governor Brad Little proposed to partially return that state's budget surplus to Idahoans through tax relief. Keith Ridler, *Idaho Lawmakers Propose Sweeping Cuts to Income, Sales Taxes*, AP, Feb. 16, 2021.[9] The state has since enacted those tax cuts, *see* Press Release, Idaho Office of the Governor, *Idaho Achieves Single Largest Tax Cut in State History* (May 12, 2021)[10]—and now the Tax Mandate threatens to punish the state for that choice. A letter that the Arizona Attorney General and 20 other state attorneys general sent to the Secretary regarding the Tax Mandate provides many more examples of proposed tax reforms in various states that were pending before the Act's passage, for which the Tax Mandate could punish the states if they are enacted. *See* App.172–74.

Further, the Tax Mandate serves to protect high-tax states against legitimate competition from lower-tax states for residents and businesses.

Decades before the current controversy arose, legal scholar Lynn A. Baker identified conditional federal grants as a tool by which "a simple majority of states [can] harness the federal lawmaking power to restrict the competition for residents and tax dollars that would otherwise exist among them." Lynn A. Baker, *Conditional Federal Spending After* Lopez, 95 Colum. L. Rev. 1911, 1948 (1995). Through conditional grants, states that already comply with a condition—i.e., those that already pursue the policy the condition mandates—can coerce other states into pursuing that same policy and thus "divest the outlier state[s] of any competitive gains" they obtained from

---

[8]     https://apnews.com/article/az-state-wire-arizona-personal-taxes-health-coronavirus-pandemic-f2221dc329974f9f067832abdab14836

[9]     https://apnews.com/article/personal-taxes-brad-little-legislation-coronavirus-pandemic-sales-taxes-283c8db434ccc0fe6c84a3b6167da907

[10]    https://gov.idaho.gov/pressrelease/idaho-achieves-single-largest-tax-cut-in-state-history/

their different policies. *Id.* That, of course, undermines a key purpose of our federalist system, which is to encourage a diversity of laws throughout the country and competition among the states, which, combined with constitutional protections for individual rights, helps limit governments' ability to abuse their citizens. *See id.* at 1950–54.

The Tax Mandate is a quintessential example of one group of states using a conditional grant to stifle competition from another group of states.

Americans have been moving from higher-tax states to lower-tax states for years. *See* Chris Edwards, *Migration to Low-Tax States Continues*, Cato at Liberty, Jan. 9, 2020 (reporting that census data confirms "people are moving, on net, from tax-punishing places such as California, Connecticut, Illinois, New York, and New Jersey to tax-friendly places such as Florida, Idaho, Nevada, Tennessee, and South Carolina").[11] The pandemic—and the vastly increased opportunities for remote work that have accompanied it—have accelerated that trend. Andrew Osterland, *Pandemic Heats up State Tax Competition to Attract Businesses and Residents*, CNBC, Feb. 8, 2021.[12] "Last year, the five states with the biggest proportionate outbound migration were California, Connecticut, Illinois, New Jersey and New York," four of which "were ranked in the bottom five for business tax climate in 2021 by the Tax Foundation" (the other, Illinois, ranked 36th). *Id.* "Most experts expect more people and businesses will choose to locate where they can pay lower taxes." *Id.*

In light of these facts, the true motive of Senators and Representatives from high-tax states to enact the Tax Mandate is obvious: to stem their states' loss of residents and businesses to lower-tax states, while rescuing their states from the unfortunate consequences of their governments'

---

[11]     https://www.cato.org/blog/migration-low-tax-states-continues
[12]     https://www.cnbc.com/2021/02/08/pandemic-heats-up-state-tax-competition-to-attract-businesses-residents-.html

fiscal policies. The Senate vote on the final version of the Act reflects this: all Senators from the high-tax states with the most outmigration voted for it.[13]

## IV. The Tax Mandate contravenes the Act's purpose of providing relief to people, small businesses, and industries affected by COVID-19's negative economic impacts.

Finally, the Tax Mandate is not reasonably related to the Act's purpose because it contravenes one of the Act's stated purposes for granting Funds: providing assistance to households, small businesses, and industries affected by COVID-19's negative economic impacts. *See* 42 U.S.C. § 802(c)(1)(A). The Tax Mandate wrongly assumes that state tax cuts or credits cannot themselves be a means of providing relief for economic harm caused by COVID-19. But in reality, enforcing the Tax Mandate would prevent, rather than facilitate, the use of Funds for the Act's approved purposes.

As Plaintiffs have observed, the Tax Mandate effectively prohibits states from independently providing a form of COVID-19 relief—tax relief—that *the Act itself* elsewhere recognizes as legitimate. *See* Plfs.' Br. at 30. In fact, the Act provides billions of dollars in *federal* tax credits. *See* Garrett Watson & Erica York, *The American Rescue Plan Act Greatly Expands Benefits Through the Tax Code in 2021*, Tax Foundation, Mar. 12, 2021.[14] And many states have, like Congress, deemed tax credits or tax reductions to be an appropriate means of mitigating the economic harm caused by COVID-19. For example, Arizona's governor proposed the State's recent income tax reductions "to ensure that Arizonans and Arizona small businesses that were hit hard by the COVID-19 pandemic, through no fault of their own, are given true and meaningful tax relief." Ariz. Exec. Budget Summary at 22. Yet the former are *provided* by the Act, while the latter

---

[13]     Senate Roll Call Vote, H.R. 1319, 117th Cong. (Mar. 6, 2021), https://www.senate.gov/legislative/LIS/roll_call_lists/roll_call_vote_cfm.cfm?congress=117&session=1&vote=00110.

[14]     https://taxfoundation.org/american-rescue-plan-covid-relief/

are effectively *prohibited* by it. Thus the Tax Mandate effectively accomplishes only a shift of power from states to the federal government, on a matter—tax policy—that is fundamental to states' constitutional autonomy.

The view that state tax cuts can help Americans recover from the pandemic is not at odds with the Act or its purposes in principle (even apart from Congress's implicit recognition that tax relief can be COVID relief). As part of a comprehensive pandemic recovery plan, a state could use Funds as the Act prescribes and also enact tax reforms to encourage business and job growth after a long period of business closures and high unemployment due to the pandemic. Just as a state could complement the Act's COVID relief with additional state *spending* on COVID relief—something the Act does not discourage—a state could also do the same with tax relief. After all, a reduction in tax liability is economically equivalent to an increase in the taxpayer's assets. *Hoffman v. Rauch,* 300 U.S. 255, 256 (1937). Yet the Tax Mandate, while permitting state COVID relief spending, penalizes state COVID relief tax cuts.

There is no reason why the Act should force states that want to provide extra COVID relief to choose spending over tax cuts. To allow a state to, for example, assist businesses by sending them a check for $1,000, but not by giving them a tax credit for $1,000, is arbitrary. And it is not Congress's place to tell states that they should prefer *state* government spending to *state* tax relief as a means of addressing the pandemic *separately from the state's use of Funds*. Congress's only legitimate concern—which, again, the Act fully addresses separately from the Tax Mandate, and the Tax Mandate does not address—is to ensure that Funds provided by the federal government are spent on the purposes the Act prescribes.

Further, enforcing the Tax Mandate by forcing a state to return Funds based on decreased tax revenue would contravene the Act's purpose. If a state cuts taxes and its revenue declines as a

result, the Tax Mandate requires that the state repay Funds received, up to the amount of revenue lost as a result of the tax cut. 42 U.S.C. § 802(e). In that situation, the state would lose federal Funds that it otherwise would have spent on COVID-19 relief—which means that the would-be beneficiaries of that relief would not receive it. In that situation, the Tax Mandate would not serve the Act's ostensible purposes but contravene them by denying people and businesses assistance.

In sum, a state's compliance with the Tax Mandate's condition—i.e., declining to reduce taxes when it otherwise would do so—will not serve the Act's purposes because it will only prevent states from independently pursuing a form of COVID-19 relief that Congress itself has recognized as legitimate. And if a state rejects the Tax Mandate's condition—i.e., if it lowers taxes in a manner that results in lower state tax revenue, and thus has to either decline or pay back Funds—then the Mandate will not serve the Act's purposes, because it will cause people and businesses in a state to lose the federal COVID-19 relief that the Act exists to provide.

## CONCLUSION

The Spending Clause does not allow Congress to impose a condition on a federal grant that is unrelated to the grant's purpose. Therefore, when the federal government forces a state to choose between accepting such an unconstitutional condition and foregoing federal grant money, the state suffers a constitutional injury. Because the Plaintiff States have alleged just such an injury here, they have standing to pursue their "relatedness" Spending Clause challenge to the Tax Mandate.

That challenge should succeed. The Act gives states Funds so they can, in turn, provide relief to their residents, small businesses, and industries that have been affected by the COVID-19 pandemic, and take other measures to address pandemic-related harm. The Tax Mandate does not serve that purpose; it only serves to coerce states to favor government spending over tax cuts and to stifle tax competition among the states. Because the Tax Mandate's condition is not reasonably

related to the Act's purpose for providing Funds—and for the other reasons the Plaintiff States

have presented—the Tax Mandate exceeds Congress's powers under the Spending Clause.

      The Court therefore should deny Defendants' motion to dismiss.

Respectfully submitted,

*/s/Matthew Miller*
MATTHEW MILLER
Texas Bar No. 24046444
mmiller@texaspolicy.com
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone:    (512) 472-2700
Facsimile:    (512) 472-2728

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing amicus brief was filed electronically on October 4, 2021, with the Clerk of the Court for the U.S. Northern District of Texas by using the CM/ECF system, causing electronic service upon all counsel of record.

/s/Matthew Miller
MATTHEW MILLER