**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

STATE OF TEXAS, *et al.*,

   Plaintiffs,

  v.

JANET YELLEN, in her official capacity
as Secretary of the Treasury, *et al.*,

   Defendants.

Civil Action No. 2:21-cv-0079-Z

**DEFENDANTS' COMBINED REPLY IN SUPPORT OF MOTION TO DISMISS
PURSUANT TO RULES 12(b)(1) AND 12(b)(6), RESPONSE TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT, AND BRIEF IN SUPPORT OF
<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

SUMMARY ............................................................................................................. 1

ARGUMENT .......................................................................................................... 2

I.  PLAINTIFFS HAVE FAILED TO ESTABLISH JURISDICTION. ................................... 2

    A.  Plaintiffs have neither pleaded nor proved the required elements for
        pre-enforcement standing. ...................................................................... 3

    B.  Plaintiffs' purported injury to their sovereignty is not cognizable. ............... 6

    C.  Plaintiffs' claims are not ripe. ................................................................ 8

II.  PLAINTIFFS FAIL TO STATE A CLAIM ON THE MERITS. ...................................... 8

    A.  The offset provision is not unconstitutionally ambiguous............................ 9

    B.  The offset provision is not coercive or commandeering.............................. 15

    C.  The offset provision is related to the purpose of ARPA. ............................ 19

    D.  The offset provision does not violate equal sovereignty principles. ........... 20

III.  THE COURT SHOULD NOT ENJOIN THE OFFSET PROVISION OR DECLARE IT
     UNCONSTITUTIONAL. ..................................................................................... 22

    A.  Plaintiffs are not entitled to a permanent injunction..................................... 22

    B.  The Court should not issue a declaratory judgment..................................... 23

CONCLUSION ...................................................................................................... 24

# TABLE OF AUTHORITIES

## Cases

*Arizona State Legislature v. Arizona Independent Redistricting Commission*,
   576 U.S. 787 (2015) ................................................................................................ 7

*Arizona v. Yellen*,
   2021 WL 3089103 (D. Ariz. July 22, 2021) *appeal filed*,
   Civ. A. No. 21-16227 (9th Cir. July 26, 2021 ................................................. *passim*

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
   548 U.S. 291 (2006) ............................................................................................ 7, 9

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .......................................................................................... 5, 20

*Ass'n of Priv. Sector Colleges & Univs. v. Duncan*,
   681 F.3d 427 (D.C. Cir. 2012) ............................................................................. 14

*Babbitt v. United Farm Workers*,
   442 U.S. 289 (1979) ............................................................................................ 3, 6

*Bennett v. Ky. Dep't of Educ.*,
   470 U.S. 656 (1985) .......................................................................... 7, 14, 15, 17

*Bennett v. New Jersey*,
   470 U.S. 632 (1985) ................................................................................................ 7

*Benning v. Georgia*,
   391 F.3d 1299 (11th Cir. 2004) ............................................................... 10, 14, 19

*Bucklew v. Precythe*,
   139 S. Ct. 1112 (2019) ........................................................................................... 8

*Charles v. Verhagen*,
   348 F.3d 601 (7th Cir. 2003) .................................................................. 10, 14, 15

*Children's Hosp. Ass'n of Tex. v. Azar*,
   933 F.3d 764 (D.C. Cir. 2019) ............................................................................. 11

*City of Los Angeles v. Barr,*
  929 F.3d 1163 (9th Cir. 2019) ........................................................................ 11, 19

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ................................................................................................ 6

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,*
  527 U.S. 666 (1999) .............................................................................................. 15

*Cutter v. Wilkinson,*
  423 F.3d 579 (6th Cir. 2005) ........................................................................ 10, 11

*DaimlerChrysler Corp. v. Cuno,*
  547 U.S. 332 (2006) ................................................................................................ 2

*Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.,*
  526 U.S. 629 (1999) ........................................................................................ 10, 14

*eBay Inc. v. MercExchange, L.L.C.,*
  547 U.S. 388 (2006) .............................................................................................. 21

*Foy v. Univ. of Tex.,*
  146 F.3d 867 (5th Cir. 1998) .............................................................................. 22

*Georgia v. City of Chattanooga,*
  264 U.S. 472 (1924) .............................................................................................. 22

*Gruver v. La. Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll.,*
  959 F.3d 178 (5th Cir. 2020) .............................................................................. 16

*Irving Indep. Sch. Dist. v. Tatro,*
  468 U.S. 883 (1984) .............................................................................................. 11

*Jackson v. Birmingham Bd. of Educ.,*
  544 U.S. 167 (2005) ........................................................................................ 10, 14

*Kansas v. United States,*
  214 F.3d 1196 (10th Cir. 2000) .......................................................................... 19

*Kentucky v. Yellen,*
  2021 WL 4394249 (E.D. Ky. Sept. 24, 2021) .................................................. 6, 16

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ........................................................................................... 3, 6

*Maryland v. King*,
    567 U.S. 1301 (2012) ............................................................................................. 22

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923) .................................................................................................. 7

*Mayweathers v. Newland*,
    314 F.3d 1062 (9th Cir. 2002) ................................................................... 10, 11, 14

*McKinley v. Abbott*,
    643 F.3d 403 (5th Cir. 2011) ................................................................................... 8

*Missouri v. Yellen*,
    2021 WL 1889867 (E.D. Mo. May 11, 2021) *appeal filed*,
    Civ. A, No. 21-2118 (8th Cir. May 18, 2021). .................................................. *passim*

*Munn v. Illinois*,
    94 U.S. 113 (1876) ................................................................................................. 15

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
    138 S. Ct. 1461 (2018) ........................................................................................... 18

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ......................................................................................... *passim*

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*,
    833 F.2d 583 (5th Cir. 1987) ................................................................................... 8

*New York v. United States*,
    505 U.S. 144 (1992) ..................................................................................... 6, 15, 19

*Nielsen v. Preap*,
    139 S. Ct. 954 (2019) ............................................................................................. 20

*Ohio v. Yellen*,
    2021 WL 1903908 (S.D. Ohio May 12, 2021) ................................................. 23, 24

*Ohio v. Yellen*,
    2021 WL 2712220 (S.D. Ohio July 1, 2021) ..................................................... 6, 14

*Oklahoma v. U.S. Civ. Serv. Comm'n,*
    330 U.S. 127 (1947) ........................................................................................ 4, 19

*Pennhurst State Sch. & Hosp. v. Halderman,*
    451 U.S. 1 (1981) ............................................................................................ 9, 12

*Petit v. U.S. Dep't of Educ.,*
    675 F.3d 769 (D.C. Cir. 2012) .............................................................................. 11

*Quill Corp. v. North Dakota By & Through Heitkamp,*
    504 U.S. 298 (1992) *overruled on other grounds by South Dakota v. Wayfair, Inc.*,
    138 S. Ct. 2080 (2018) ........................................................................................ 18

*R.J. Reynolds Tobacco Co. v. Durham Cnty.,*
    479 U.S. 130 (1986) ............................................................................................ 18

*Reno v. Condon,*
    528 U.S. 141 (2000) ............................................................................................ 15

*Rostker v. Goldberg,*
    453 U.S. 57 (1981) .............................................................................................. 15

*Rust v. Sullivan,*
    500 U.S. 173 (1991) ............................................................................................ 19

*Sabri v. United States,*
    541 U.S. 600 (2004) ........................................................................................ 4, 19

*Sampson v. Murray,*
    415 U.S. 61 (1974) .............................................................................................. 22

*Shelby Cnty. v. Holder,*
    570 U.S. 529 (2013) ............................................................................................ 21

*Sheline v. Dun & Bradstreet Corp.,*
    948 F.2d 174 (5th Cir. 1991) ................................................................................. 1

*Sherwin-Williams Co. v. Holmes Cnty.,*
    343 F.3d 383 (5th Cir. 2003) ................................................................................ 23

*Smith v. Berryhill,*
    139 S. Ct. 1765 (2019) ........................................................................................ 10

*South Dakota v. Dole,*
    483 U.S. 203 (1987) ................................................................................ 6, 15, 17, 19

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ................................................................................ 2, 3, 4, 6

*Texas Educaction Agency v. U.S. Department of Education,*
    992 F.3d 350 (5th Cir. 2021) ........................................................................... 11

*Travis v. Pennyrile Rural Elec. Coop.,*
    399 F.2d 726 (6th Cir. 1968) ........................................................................... 22

*United States v. Butler,*
    297 U.S. 1 (1936) ............................................................................................ 17

*United States v. Lipscomb,*
    299 F.3d 303 (5th Cir. 2002) ........................................................................... 19

*United States v. Miami Univ.,*
    294 F.3d 797 (6th Cir. 2002) ........................................................................... 11

*United States v. Morrison,*
    529 U.S. 598 (2000) ........................................................................................ 15

*United States v. Oakland Cannabis Buyers' Coop.,*
    532 U.S. 483 (2001) ........................................................................................ 22

*Va. Dep't of Educ. v. Riley,*
    106 F.3d 559 (4th Cir. 1997) ........................................................................... 12

*Van Wyhe v. Reisch,*
    581 F.3d 639 (8th Cir. 2009) ........................................................................... 10

*W. Va. Dep't of Health & Hum. Res. v. Sebelius,*
    649 F.3d 217 (4th Cir. 2011) ........................................................................... 14

*Walters v. Nat'l Ass'n of Radiation Survivors,*
    468 U.S. 1323 (1984) ...................................................................................... 22

*Wash. State Grange v. Wash. State Republican Party,*
    552 U.S. 442 (2008) .......................................................................................... 8

**Statutes**

4 U.S.C. § 114 ........................................................................................................ 18

28 U.S.C. §2201 .................................................................................................... 23

42 U.S.C. § 802 .............................................................................................. *passim*

Internet Tax Freedom Act,
    Pub. L. No. 105-227, 112 Stat. 2681 (1998) ......................................... 18

Internet Tax Freedom Act,
    Pub. L. No. 114-125, 130 Stat. 122 (2016) .......................................... 18

**Rules**

Interim Final Rule, Coronavirus State and Local Fiscal Recovery Funds,
    86 Fed. Reg. 26,786 (May 17, 2021).............................................. *passim*

**Other Authorities**

Directly, Oxford English Dictionary Online, available at
    https://www.oed.com/view/Entry/53307 (last visited October 22, 2021) 13

Indirectly, Oxford English Dictionary Online, available at
    https://www.oed.com/view/Entry/94534 (last visited October 22, 2021) 13

## SUMMARY

Through the American Rescue Plan Act, Congress has generously provided nearly $200 billion to mitigate the fiscal impacts of the pandemic on States and the District of Columbia. 42 U.S.C. § 802. Congress also gave States wide flexibility to use those funds while specifying that the federal money could not be used to directly or indirectly offset a reduction in net tax revenue resulting from certain changes in state law, *id.* § 802(c)(2)(A), and gave the Secretary of the Treasury the power to "issue such regulations as may be necessary or appropriate to carry out" Section 802, *id.* § 802(f). The Treasury Department exercised this authority by issuing a lengthy and detailed Interim Final Rule, Coronavirus State and Local Fiscal Recovery Funds, 86 Fed. Reg. 26,786 (May 17, 2021). In addition to implementing the permissible uses of Rescue Plan funds, the Rule outlines a step-by-step process that Treasury will follow to determine whether States are impermissibly using Rescue Plan funds to offset net-tax-revenue reductions. *Id.* at 26,807. Indeed, all three Plaintiff States have certified that they will comply with the Act and Treasury regulations and accepted billions of dollars in allotments. *See* Pls.' Combined Mot. & Response ["Pls.' Mot."] 6 n.3, ECF No. 28.

After Defendants filed their Motion to Dismiss ["Defs.' Mot."], ECF No. 19, the Plaintiff States moved for summary judgment on all claims except the Equal Sovereignty claim, ECF Nos. 27–28. Defendants now move for summary judgment in the alternative to their motion to dismiss. *See Sheline v. Dun & Bradstreet Corp.*, 948 F.2d 174, 176 (5th Cir. 1991) ("[S]ummary judgment is appropriate where the only issue before the court is a pure question of law.").

This lawsuit—seeking to prematurely enjoin the offset provision—is one of six around the country. In two of the cases already decided, district courts in Missouri and Arizona dismissed nearly identical complaints for lack of standing. *See Arizona v. Yellen*, 2021 WL 3089103, at *6 (D. Ariz. July 22, 2021), *appeal filed*, No. 21-16227 (9th Cir. July 26, 2021); *Missouri v. Yellen*, 2021 WL 1889867, at *5 (E.D. Mo. May 11, 2021), *appeal filed*, No.

21-2118 (8th Cir. May 18, 2021). This Court should do the same because Plaintiffs lack all three elements for pre-enforcement standing under *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). They have not plausibly pleaded, let alone proved, that the offset provision prohibits any conduct they intend to pursue, that there is a credible threat of enforcement from the offset provision, or that they have suffered any other cognizable injury. And the States certainly cannot manufacture standing by misreading the offset provision. Recoupment proceedings, should they ever occur, would be the proper context for addressing Plaintiffs' challenge to this grant condition.

In any event, Plaintiffs fail to state a claim on the merits. The offset provision is not ambiguous because "nobody questions the [offset provision] exists as a condition to [States] accepting the [Rescue Plan] funds," and "[i]n that regard, Congress fulfilled its duty under" the Spending Clause. *Arizona*, 2021 WL 3089103, at *3. Not to mention that the offset provision provides far more information than the Spending Clause requires, explaining the nature and scope of the funding condition. Plaintiffs' coercion and commandeering arguments fare no better and should be rejected because Plaintiffs were free to decline Rescue Plan funds if they dislike the offset provision. Nothing happens if States do so, a result that *all* Justices deemed acceptable in *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) [hereinafter "*NFIB*"]. And Plaintiffs' unprecedented Equal Sovereignty claim fails because the statute is facially neutral among the States.

Not only should Plaintiffs' summary-judgment motion be denied, but their case should be dismissed for lack of standing and failure to state a claim. In the alternative, summary judgment should be granted for Defendants.

## ARGUMENT

### I.   PLAINTIFFS HAVE FAILED TO ESTABLISH JURISDICTION.

The party that invokes federal jurisdiction must establish its standing at every stage of the litigation "for each claim [it] seeks to press," *DaimlerChrysler Corp. v. Cuno*,

547 U.S. 332, 352 (2006), with a burden of proof that increases "with the manner and de-gree of evidence required at the successive stages of litigation," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). So for final judgment, Plaintiffs must adduce actual evidence to prevail. *Id.* But Plaintiffs have not sufficiently pleaded, much less proved, that they can satisfy Article III's requirements.

The Court should dismiss this case for lack of subject matter jurisdiction, as two other district courts have now done in similar cases. *See Arizona*, 2021 WL 3089103, at *6; *Missouri*, 2021 WL 1889867, at *5.

### A.    Plaintiffs have neither pleaded nor proved the required elements for pre-enforcement standing.

As Defendants previously explained, when a plaintiff seeks to enjoin the future enforcement of a statute, "the injury-in-fact requirement" demands that the plaintiff "al-lege[] 'an intention to engage in a course of conduct arguably affected with a constitu-tional interest, but proscribed by a statute, and [that] there exists a credible threat of [en-forcement] thereunder.'" *Driehaus*, 573 U.S. at 159 (quoting *Babbitt v. United Farm Workers*, 442 U.S. 289, 298 (1979)); *see id.* at 161–67 (analyzing these three elements separately).

Here, Plaintiffs lack all three elements, relying on only mistaken interpretations of the offset provision or speculation about enforcement. First, the course of conduct that is proscribed by statute is *not* changing state taxes or reducing state tax revenues. Rather, the offset provision restricts a State only from using Rescue Plan funds to "offset a reduc-tion in the net tax revenue . . . resulting from a change in law." 42 U.S.C. § 802(c)(2)(A). As other courts have put it, "State tax cuts are not proscribed by the ARPA," and States are "free to propose and pass tax cuts as [they] see[] fit." *Missouri*, 2021 WL 1889867, at *4; *Arizona*, 2021 WL 3089103, at *5 (finding that Arizona lacked standing in this context because it did not "claim to have directly or indirectly used ARPA funds to supplement a reduction in its net income"). Plaintiffs point to a number of changes in state tax law

that they have either enacted or considered enacting. Pls.' Mot. 11–12. But Plaintiffs nei-
ther allege nor prove that these tax changes will result in a net-tax-revenue reduction, let
alone that they intend to "offset" any such reduction with Rescue Plan funds. Because
what matters is whether their "intended future conduct" is "'proscribed'" by the offset
provision, and because merely changing state taxes is not prohibited, Plaintiffs have not
demonstrated any intent to violate the offset provision and they cannot establish stand-
ing. *Driehaus*, 573 U.S. at 162–63.

For similar reasons, Plaintiffs have not engaged in a "course of conduct" that is
"arguably affected with a constitutional interest." *Driehaus*, 573 U.S. at 159. Again, the
offset provision does not even arguably affect their "right under the federalism princi-
ples" to "set their own tax policies," Pls.' Mot. 14, because it merely restricts a State's
ability to use *federal funds* distributed under the Rescue Plan to offset a reduction in net
tax revenue. No State has a sovereign interest in using federal funds for that purpose, so
the States' "sovereign power to set [their] own tax policy is not implicated by the [Rescue
Plan]." *Missouri*, 2021 WL 1889867, at *4. On the contrary, the Supreme Court has repeat-
edly made clear that Congress has a sovereign interest in conditioning the receipt of fed-
eral funds "on the States' complying with restrictions on the use of those funds, because
that is the means by which Congress ensures that the funds are spent according to its
view of the 'general Welfare.'" *NFIB*, 567 U.S. at 580 (plurality opinion); *see Sabri v. United
States*, 541 U.S. 600, 608 (2004) ("The power to keep a watchful eye on expenditures . . . is
bound up with congressional authority to spend in the first place."); *Oklahoma v. U.S. Civ.
Serv. Comm'n*, 330 U.S. 127, 143 (1947) (explaining that Congress has the "power to fix the
terms upon which its money allotments to [S]tates shall be disbursed").

Finally, Plaintiffs have not come close to proving that there is a "credible threat of
[enforcement]" (*i.e.*, recoupment of misspent funds). *Driehaus*, 573 U.S. at 159. For recoup-
ment to occur, the Plaintiff States would have to make a change in state law that reduces

net tax revenue and then use Rescue Plan funds to offset that reduction in revenue. Plaintiffs have neither pleaded nor proved that those steps have occurred or will imminently occur. So there is no credible claim of an actual or imminent threat of enforcement. Two other courts have properly denied standing on this basis. *See Missouri*, 2021 WL 1889867, at *4 (denying standing because "recoupment is not triggered by a reduction in State tax revenue, it is triggered by a State's use of federal recovery fund to offset a reduction in its net tax revenue," which was not imminent); *Arizona*, 2021 WL 3089103, at *5 (denying standing because Arizona did not "claim to have directly or indirectly used ARPA funds to supplement a reduction in its net income" or "even claim the tax cut will result in a reduction in Arizona's net income").

The nature of the offset provision, already clear from the statutory text, is confirmed by the Rule, which outlines a comprehensive step-by-step process that Treasury will follow to determine whether States are impermissibly using Rescue Plan funds to offset net-tax-revenue reductions. *See* 86 Fed. Reg. at 26,807. So regardless of whether Plaintiffs misinterpret the offset provision as prohibiting *any* tax reductions, the Treasury Department—charged with enforcing the offset provision—has affirmatively rejected that reading. Under the Rule, "[a] recipient government would only be considered to have used [Rescue Plan] Funds to offset a reduction in net tax revenue . . . if, and to the extent that, the recipient government could not identify sufficient funds from sources other than the [Rescue Plan] Funds to offset the reduction in net tax revenue." *Id.* And reductions in tax revenue due to tax cuts can be permissibly offset by other changes in tax law that increase tax revenue, by spending cuts outside areas where a State is spending Rescue Plan funds, and by organic revenue growth—increased tax revenue from existing sources due to, for example, an improved economy. *Id.*; 86 Fed. Reg. at 26,809–10. Plaintiffs have said nothing concrete about any reduction in net tax revenue, how they intend to offset it, or whether any such offsets would contravene the Rule. Pls.' Mot. 11–

5

12. So Plaintiffs have not presented plausible allegations—let alone evidence—that there is any credible threat of enforcement. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

Plaintiffs' additional citations regarding pre-enforcement challenges are unavailing. Pls.' Mot. 14. Those cases involved conditions that affected more than just how a recipient could use new federal funds. *NFIB*, 567 U.S. at 540, 542 (States stood to lose existing funding); *South Dakota v. Dole*, 483 U.S. 203, 205–06 (1987) (same); *New York v. United States*, 505 U.S. 144, 154 (1992) (States required to take title to radioactive waste and stood to lose access to disposal sites). At bottom, Plaintiffs have developed no factual record demonstrating "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of [enforcement] thereunder." *Driehaus*, 573 U.S. at 159 (quoting *Babbitt*, 442 U.S. at 298). Because they have not, and because such a showing is required for pre-enforcement standing, the Court should deny Plaintiffs' motion and dismiss this action.

### B.   Plaintiffs' purported injury to their sovereignty is not cognizable.

As an alternative theory of injury, Plaintiffs claim that they are already suffering harm to their sovereignty from the passage of the Rescue Plan. Pls.' Mot. 7–13. But a pre-enforcement injury that does not meet the requirements of *Driehaus* is also not sufficiently "concrete and particularized" enough to satisfy Article III at this stage. *Lujan*, 504 U.S. at 560; *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (explaining that plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending"). In any event, this purported injury is not cognizable.

Plaintiffs' arguments are premised on their broad understanding of the offset provision as prohibiting *any* tax cut. *See* Pls.' Mot. 4. But, as explained above, that is simply not true. As Defendants, the Rule, and the *Missouri* and *Arizona* courts have all stated: merely enacting a tax cut does not implicate—or violate—the offset provision. Defs.' Mot. 5, ECF No. 19; 86 Fed. Reg. 26,786; *Missouri*, 2021 WL 1889867, at *3–4; *Arizona*, 2021 WL

3089103, at *5.[1] The offset provision is merely a limitation on how states can use federal funds—that is, the funds cannot be used to offset purposeful net-tax-revenue reductions. So the offset provision does not implicate any sovereign interest in setting tax policy or narrow any tax policy options. Nor do Plaintiffs argue they have a sovereign interest in spending conditioned federal dollars to offset reductions in net tax revenue. It therefore makes sense that Plaintiffs can identify no case outside the Rescue Plan context to support their novel harm-to-sovereignty theory based on federal funding (with attendant conditions) that they could simply turn down.

To the contrary, the Supreme Court has specifically rejected standing premised on "the imposition . . . of an [allegedly] unconstitutional option either to" sacrifice "a part of [the State's] reserved rights" or lose the conditioned funds. *Massachusetts v. Mellon*, 262 U.S. 447, 479–80, 485–86 (1923). Such "abstract questions . . . of sovereignty" do not create a cognizable injury. *Id. Mellon* forecloses Plaintiffs' sovereignty-as-injury argument, but they do not even address it. Plaintiffs' analogy to *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 576 U.S. 787 (2015), fares no better. *See* Pls.' Mot. 13. That case did not involve a condition on the use of federal funds, and unlike the offset provision, the statute at issue in that case completely eliminated the power of the State legislature to act. *Ariz. State Legislature*, 576 U.S. at 800. And Plaintiffs never demonstrate how the offset provision concretely harms their sovereignty.

Dismissing this case will not preclude a remedy for Plaintiffs because they can still pursue their constitutional arguments in enforcement proceedings, if they ever occur. That is how cases addressing new conditions on the use of federal funds are most commonly resolved. *See, e.g., Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291 (2006); *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985); *Bennett v. New Jersey*, 470 U.S.

---

[1] Even those courts that have found the offset provision unconstitutional have not adopted this broad misreading. *See generally Kentucky v. Yellen*, 2021 WL 4394249 (E.D. Ky. Sept. 24, 2021); *Ohio v. Yellen*, 2021 WL 2712220 (S.D. Ohio July 1, 2021).

632, 637 (1985). The limits on this Court's Article III jurisdiction do not give way to Plaintiffs' preference for a premature constitutional ruling.

### C.   PLAINTIFFS' CLAIMS ARE NOT RIPE.

For similar reasons this case is not ripe for review. *See* Defs.' Mot. 10–11; *Missouri*, 2021 WL 1889867, at *4–5. Plaintiffs argue that the case is ripe because the only remaining questions are purely legal. Pls.' Mot. 15–16 (citing *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 833 F.2d 583, 586–87 (5th Cir. 1987)). However, the legal issues here are not settled yet because there is no concrete controversy over a violation of the offset provision. As such, this case is "abstract or hypothetical." *New Orleans Pub. Serv.*, 833 F.2d at 586. Further factual development over how the States use the funds and whether such use violates the offset provision or implementing regulations is required. *Id.* at 587 ("[A] case is not ripe if further factual development is required."). Moreover, because this is a facial constitutional challenge, Plaintiffs must demonstrate that the provision is unconstitutional in all respects. *See Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019); *McKinley v. Abbott*, 643 F.3d 403, 408–09 (5th Cir. 2011) (citation omitted); *see also Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008). Further factual development is necessary because, even if the offset provision were unconstitutional as applied in certain circumstances, it may nevertheless be constitutional in other situations. The Court should therefore dismiss Plaintiffs' challenge as premature. *See Missouri*, 2021 WL 1889867, at *3–5.

## II.   PLAINTIFFS FAIL TO STATE A CLAIM ON THE MERITS.

On the merits, Plaintiffs have not demonstrated that the offset provision is unconstitutionally ambiguous, that it is coercive, or that it is unrelated to the purpose of ARPA; nor have they pleaded facts sufficient to state an Equal Sovereignty claim.

A.     **The offset provision is not unconstitutionally ambiguous.**

Plaintiffs contend that the offset provision is unconstitutionally ambiguous. Pls.' Mot. 22–29. But Plaintiffs' arguments misunderstand the nature of the constitutional inquiry. To comply with the unambiguity requirement of Spending Clause jurisprudence, Congress must simply make clear that acceptance of federal funds obligates States to comply with a condition. *Id.* That is exactly what the Rescue Plan does: "a state official who is engaged in the process of deciding whether the State should accept [Rescue Plan] funds and the obligations that go with those funds" would "clearly understand that one of the obligations of the Act is the obligation" not to use Rescue Plan funds to offset a net-tax-revenue reduction resulting from changes in state law. *Arlington Cent. Sch. Dist.*, 548 U.S. at 296. As one court recently held, "nobody questions the [offset provision] exists as a condition to [States] accepting the funds," and "[i]n that regard, Congress fulfilled its duty under [*Pennhurst*] and *Arlington Central*." *Arizona*, 2021 WL 3089103, at *3.

Precedent on Spending Clause unambiguity establishes that Congress must only make clear that acceptance of federal money obligates the States to comply with a condition. In *Pennhurst*—the origin of the Spending Clause unambiguity requirement—the Supreme Court held that "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). There, the statute provided money to States and contained a "bill of rights" provision specifying that mentally disabled citizens "have a right to appropriate treatment, services, and habilitation for such disabilities" to be provided "in the setting that is least restrictive of the person's personal liberty." *Id.* at 13. The Court held that these statements "represent general statements of federal policy, not newly created legal duties" and "in no way suggests that the grant of federal funds is 'conditioned' on a State's funding the rights described therein." *Id.* at 23. The *Pennhurst* Court then explicitly recognized that a State's obligations may be "largely indeterminate," so long as Congress

9

gives "clear notice to the States that they, by accepting funds under the Act, would indeed be obligated to comply with" the condition. *Id.* at 24–25.

Numerous Spending Clause cases all confirm that States make an "informed choice" when Congress simply makes clear that acceptance of federal money obligates the States to comply with a condition. *Id.* at 25. The Supreme Court itself has repeatedly affirmed that "there [i]s sufficient notice under *Pennhurst* where a statute ma[kes] clear that some conditions [a]re placed on the receipt of federal funds." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005); *Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999). And the Circuits have done the same, holding that the Spending Clause is satisfied where a "statute's *intention to impose a condition* is expressed clearly," even though the operation of a funding condition "is perhaps unpredictable." *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002); *Cutter v. Wilkinson*, 423 F.3d 579, 586 (6th Cir. 2005) ("Nothing more is required under *Pennhurst*, which held that Congress need provide no more than 'clear notice' to the states that funding is conditioned upon compliance with certain standards."); *Charles v. Verhagen*, 348 F.3d 601, 607–08 (7th Cir. 2003) ("[T]he exact nature of the conditions may be 'largely indeterminate,' provided that the existence of the conditions is clear . . . ."); *Benning v. Georgia*, 391 F.3d 1299, 1307 (11th Cir. 2004) ("The federal law in *Pennhurst* was unclear as to whether the [S]tates incurred any obligations at all by accepting federal funds, but [the statute at issue] is clear that [S]tates incur an obligation when they accept federal funds, even if the method for compliance is left to the [S]tates."); *Van Wyhe v. Reisch*, 581 F.3d 639, 650 (8th Cir. 2009) ("[S]etting forth every conceivable variation in the statute is neither feasible nor required."). Congress must only "make the existence of the condition itself—in exchange for the receipt of federal funds—explicitly obvious." *Mayweathers*, 314 F.3d at 1067.

Indeed, the many cases applying *Chevron* deference to regulations implementing spending conditions demonstrate this point. *See* Defs.' Mot. 24. Agencies are routinely

empowered to operationalize statutory funding conditions, and courts have long deferred to agency interpretations of Spending Clause legislation, such as education statutes and Medicaid. "*Chevron* deference 'is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps.'" *Smith v. Berryhill*, 139 S. Ct. 1765, 1778 (2019) (some quotation marks omitted). In all of those cases, therefore, the details of the statutory spending condition *must* have been ambiguous because otherwise there would be nothing for the agency to interpret. But none of those cases then declared the spending conditions in question unconstitutional—as Plaintiffs now demand—because the Spending Clause inquiry is focused only on whether Congress made clear that acceptance of federal funds obligates States to comply with a condition. *See, e.g.*, *City of Los Angeles v. Barr*, 929 F.3d 1163 (9th Cir. 2019) (applying *Chevron* deference while simultaneously finding no Spending Clause violation). Here, Defendants are not asking the Court to defer to the Rule because Plaintiffs have not challenged it. But these cases illustrate that the unambiguity requirement of the Spending Clause is fulfilled when Congress clearly specifies the existence of a funding condition, even if Congress does not specify every detail of how the condition will be implemented.

If Plaintiffs were correct, then numerous statutes would be arguably unconstitutional. That includes the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), which the every circuit to address the issue upheld despite repeated acknowledgments that the funding condition in that statute is "unpredictable." *Cutter*, 423 F.3d at 586; *see also Mayweathers*, 314 F.3d at 1067. Other funding regimes, like Medicaid and education statutes, could also be called into question, even though courts have deferred to regulations implementing such statutes for decades. *See, e.g., Irving Indep. Sch. Dist. v. Tatro*, 468 U.S. 883, 891–92 (1984) (Education of the Handicapped Act); *Children's Hosp. Ass'n of Tex. v. Azar*, 933 F.3d 764, 770 (D.C. Cir. 2019) (Medicaid); *Petit v. U.S. Dep't of Educ.*, 675 F.3d 769, 778 (D.C. Cir. 2012) (IDEA); *United States v. Miami Univ.*, 294 F.3d 797, 811-15 (6th Cir. 2002) (Family Educational Rights and Privacy Act).

When *Pennhurst* (and the legion of other cases) are properly applied, agency regulations have no bearing on the Spending Clause analysis. For this reason, it is not necessary for the Court to consider *Texas Education Agency v. U.S. Department of Education*, 992 F.3d 350 (5th Cir. 2021); the fact that the statute clearly establishes that a condition exists satisfies the Spending Clause inquiry, and there is no need to look to the regulation to resolve the constitutional challenge. *See also* Defs.' Mot. 24 n.3 (noting that *Texas Education Agency* involved a condition that a State waive sovereign immunity, which is not present here). If a statutory funding condition exists, the implementing agency could regulate the details of the condition subject to the Administrative Procedure Act and the other typical constraints; if not, any agency regulation imposing funding conditions would be unauthorized by the statute. That is the upshot of the *Riley* case cited by Plaintiffs. Pls.' Mot. 28; *Va. Dep't of Educ. v. Riley*, 106 F.3d 559, 568 (4th Cir. 1997) (en banc) (reasoning that an agency could not, by regulation, act *ultra vires* by imposing spending conditions that did not exist as part of the statute). And that's exactly what *Pennhurst* requires: Congress must provide only "clear notice to the States that they, by accepting funds under the Act, would indeed be obligated to comply with" a condition. *Pennhurst*, 451 U.S. at 25. The idea is simply to keep Congress from "surprising participating States with post-acceptance or retroactive conditions." *NFIB*, 567 U.S. at 584 (quoting *Pennhurst*, 451 U.S. at 25).

Here, Congress made abundantly clear that the acceptance of Rescue Plan funds obligates the State to comply with the offset provision, easily passing muster under binding Supreme Court precedent. 42 U.S.C. § 802(c)(2) (delineating "[f]urther restriction[s] on the use of funds," including the offset provision, which governs a State's "use [of] the funds provided under this section"). As one court recently held in this context, "nobody questions the [offset provision] exists as a condition to [States] accepting the funds," and "[i]n that regard, Congress fulfilled its duty under" Spending Clause precedents. *Arizona*, 2021 WL 3089103, at *3.

But the Rescue Plan does not just provide the existence of a condition; it explains the nature and scope of the condition as well. By its plain terms, the offset provision only applies when a State uses Rescue Plan funds to "offset" a reduction in "net" tax revenue resulting from changes in state law. 42 U.S.C. § 802(c)(2)(A). The meaning of "offset" is undisputed, and a state official would clearly understand that one of the obligations of accepting Rescue Plan funds is not to use those funds as an offset for a reduction in net tax revenue caused by state tax cuts. Taken together, the statute's language simply ensures that States are not using federal funds to finance state tax cuts that decrease net tax revenue.

Plaintiffs chiefly take issue with the use of the word "indirectly." *See* Pls.' Mot. 23–27. But Defendants have already explained both direct and indirect offsets. *See* Defs.' Mot. 13–15. For example, assuming no other changes, a State could not receive $2 billion in Rescue Plan funds, cut its income tax by an amount equal to $2 billion, and use the Rescue Plan funds to offset the revenue loss. That would be using Rescue Plan funds to "directly" offset a net-tax-revenue reduction. 42 U.S.C. § 802(c)(2)(A); *see* Directly, Oxford English Dictionary Online, available at https://www.oed.com/view/Entry/53307 (last visited October 22, 2021) (defining "directly" as "[i]n a direct manner or way"). Similarly, again assuming no other changes, a State could not use Rescue Plan funds to replace $2 billion in planned state expenditures on COVID-19 testing and then use the $2 billion it had originally budgeted for that purpose to offset a $2 billion reduction in state income tax. That would be using Rescue Plan funds to "indirectly" offset a net-tax-revenue reduction. 42 U.S.C. § 802(c)(2)(A); *see* Indirectly, Oxford English Dictionary Online, available at https://www.oed.com/view/Entry/94534 (last visited October 22, 2021) (defining "indirectly" as "through some intervening person or thing"); *see also* 86 Fed. Reg. at 26,807, 26,810 (providing further details on how Treasury will implement the phrase "directly or indirectly offset").

Plaintiffs acknowledge that "an adverb" like "directly" or "indirectly" "may not give the word it modifies a completely different meaning." Pls.' Mot. 26. And Plaintiffs do not argue that the word "offset" alone is ambiguous. The phrase "directly or indirectly" in the offset provision merely underscores that a State cannot circumvent the offset provision by using grant funds not to pay directly for a tax cut but to pay for other expenditures, while using funds usually directed toward those other expenditures to cover the tax cut. Congress routinely uses the phrase "directly or indirectly" in that fashion to emphasize the breadth of a statutory dictate. *See, e.g., Ass'n of Priv. Sector Colleges & Univs. v. Duncan*, 681 F.3d 427, 444 (D.C. Cir. 2012) ("Congress phrased the relevant provision broadly—employing words and phrases like 'any' and 'directly or indirectly.'").

Especially in the context of an emergency aid statute that Congress enacted quickly, "[t]here are far too many circumstances affecting the States in different ways for Congress to have envisioned all aspects of compliance and noncompliance." *Charles*, 348 F.3d at 608. Instead, "Congress permissibly conditioned the receipt of federal money in such a way that each State is made aware of the condition and is simultaneously given the freedom to tailor compliance according to its particular . . . circumstances." *Benning*, 391 F.3d at 1307 (quoting *Charles*, 348 F.3d at 608). That is straightforwardly allowed by the Spending Clause. *Id.* Plaintiffs' argument—that Congress itself must essentially specify minute details of a funding condition—is wrong. *See* Pls.' Mot. 27–28; *Ohio v. Yellen*, 2021 WL 2712220, at *12 (S.D. Ohio July 1, 2021) ("[O]ne thing is certain—exactitude is not necessary" for funding conditions.). "[I]t is simply impossible" for Congress to "delineate every instance in which a State may or may not comply with" the offset provision. *Charles*, 348 F.3d at 608; *Mayweathers*, 314 F.3d at 1067; *Arizona*, 2021 WL 3089103, at *3–4. As the Supreme Court has admonished, "every improper expenditure" need not be "specifically identified and proscribed" in the statute. *Bennett v. Ky. Dep't of Educ.*, 470 U.S. at 666; *Jackson*, 544 U.S. 167 at 183 (reiterating *Bennett*); *Davis*, 526 U.S. at 650 (same); *see W.*

*Va. Dep't of Health & Hum. Res. v. Sebelius*, 649 F.3d 217, 223 (4th Cir. 2011) ("Congress need not spell out every condition with flawless precision for a provision to be enforceable.").

The Court should find the offset provision plainly within Congress's Spending Clause authority because "[i]t made the existence of the condition upon which [States] could accept funds explicitly obvious." *Arizona*, 2021 WL 3089103, at *4 (citation omitted). And States are not without recourse if they dislike the offset provision or have concerns about its ambiguity: they may decline the Rescue Plan funds, seek a better bargain in the halls of Congress, or work cooperatively with the Treasury Department. *See Bennett*, 470 U.S. at 669 (describing a conditional grant program "an ongoing, cooperative program" in which "grant recipients ha[ve] an opportunity to seek clarification of the program requirements"); *Charles*, 348 F.3d at 608 (explaining that States who dislike the ambiguity of an imposed condition "certainly could have refused federal funding"). But because declaring an Act of Congress unconstitutional is "the gravest and most delicate duty that" federal courts are "called on to perform," *Rostker v. Goldberg*, 453 U.S. 57, 64 (1981) (quotation marks omitted), "[d]ue respect for the decisions of a coordinate branch of Government demands that [courts] invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds," *United States v. Morrison*, 529 U.S. 598, 607 (2000); *Reno v. Condon*, 528 U.S. 141, 148 (2000); *Munn v. Illinois*, 94 U.S. 113 (1876). Plaintiffs have not come close to making such a showing here.

**B.** **The offset provision is not coercive or commandeering.**

Plaintiffs fare no better in arguing that the offset provision violates the Tenth Amendment and unconstitutionally coerces States into accepting Rescue Plan funds with

the attendant conditions. Pls.' Mot. 19–22.[2] The offset provision is, by any measure, a modest restriction on an otherwise generous outlay of federal funds. It simply ensures that Congress's substantial monetary outlay will be used as intended for the public-health and economic-recovery purposes. And if Plaintiffs disliked the offset provision, they were free to simply decline the federal money.

In arguing otherwise, Plaintiffs misconstrue or ignore governing law. As Defendants previously explained, Congress has full "authority to condition the receipt of funds on the States' complying with restrictions on the use of those funds, because that is the means by which Congress ensures that the funds are spent according to its view of the 'general Welfare.'" *NFIB*, 567 U.S. at 580; Defs.' Mot. 19. That is exactly what Congress has done here: titled "[f]urther restriction on the *use of funds*," the offset provision only applies to a State's "*use [of] the funds* provided under this section." 42 U.S.C. § 802(c)(2) (emphases added). So a coercion analysis is inapplicable because Congress is not "pressuring the States to accept policy changes" independent of the new federal funds. *NFIB*, 567 U.S. at 580. As Defendants previously explained, binding Fifth Circuit precedent establishes that spending conditions on *new* funds, as opposed to preexisting funds, does not "trigger[] the coercion question" at all. *Gruver v. La. Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll.*, 959 F.3d 178, 183–84 (5th Cir. 2020); *see* Defs.' Mot. 19. Plaintiffs do

---

[2] The Supreme Court has repeatedly affirmed that "Congress can use [its Spending Clause] power to implement federal policy it could not impose directly under its enumerated powers." *NFIB*, 567 U.S. at 578; *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 686 (1999) (same); *Dole*, 483 U.S. at 207 (same). Thus, under both the Spending Clause and the Tenth Amendment, courts ask whether the challenged "provision is inconsistent with the federal structure of our Government established by the Constitution." *New York*, 505 U.S. at 177; *NFIB*, 567 U.S. at 578–79; *see also* Defs.' Mot. 21. So these two claims should be analyzed together.

16

not cite *Gruver*, much less grapple with it. *See generally* Pls.' Mot. Their failure to address this precedent is fatal.[3]

And even if a coercion analysis applied, Plaintiffs would still lose under *NFIB*. The key aspect of the Medicaid expansion that *NFIB* found to be coercive was that Congress "penalize[d] States that choose *not to participate* in that new program by taking away their *existing* Medicaid funding." *NFIB*, 567 U.S. at 585 (emphasis added); *see* Defs.' Mot. 19–20. As one court recently explained in rejecting this exact argument, the Rescue Plan "will not revoke any federal funding [States] enjoyed prior to accepting. The downside to de-clining the ARPA funds is just that—[States] would not have received ARPA funds." *Arizona*, 2021 WL 3089103, at *5.

Plaintiffs focus primarily on the size of the federal grant relative to the States' budgets. Pls.' Mot. 20–21. But the amount of funding at issue in *NFIB* was only relevant to the *preexisting* funding that would be withdrawn if States *declined* the Medicaid expansion. *See* Defs.' Mot. 20. *Compare NFIB*, 567 U.S. at 582 (finding that a threatened loss of *preexisting* Medicaid funds—ten percent of States' overall budgets—was coercive), *with South Dakota*, 483 U.S. at 211 (finding that a threatened five-percent loss of *preexisting* highway funds was not coercive). After all, "[t]hreat of loss, not hope of gain, is the es-sence of economic coercion." *United States v. Butler*, 297 U.S. 1, 81 (1936) (Stone, J., dis-senting). And *all* Justices in *NFIB* agreed that, despite the amount of funding at issue, "Congress could have made just the *new* funding provided under the ACA contingent on acceptance of the terms of the Medicaid Expansion." *NFIB*, 567 U.S. at 687–88 (joint dis-sent); *id.* at 576, 585 (plurality) (same); *id.* at 624–46 (Ginsburg, J., concurring in part) (find-ing no coercion). That holding defeats Plaintiffs' claim that the sheer *amount* of offered

---

[3] One district court recently held that the offset provision is unconstitutionally co-ercive. *See Kentucky v. Yellen*, 2021 WL 4394249, at *6 (E.D. Ky. Sept. 24, 2021). But the *Kentucky* court erred in its coercion analysis for reasons explained by Defendants here. In any event, that court, unlike this Court, was not bound by the Fifth Circuit's decision in *Gruver*.

funding is dispositive, regardless of whether it is being newly provided or eliminated. Notably, the offset provision is more modest than the prospective funding condition that all Justices in *NFIB* indicated was permissible: a State does not lose *all* of its Rescue Plan funding if it violates the offset provision, but only the amount it uses as an improper offset. *See* 42 U.S.C. § 802(e)(1).

Like maintenance-of-effort requirements—a longstanding feature of Spending Clause legislation that ensures federal grants are used to supplement and not supplant state spending—the offset provision is plainly constitutional. Maintenance-of-effort requirements implicate a State's spending power, a core state function, yet such requirements are unquestionably permissible tools to ensure that the funds appropriated by Congress are used for their intended purposes. *See, e.g.*, *Bennett v. Ky. Dep't of Educ.*, 470 U.S. at 659 (Title I of the Elementary and Secondary Education Act "prohibited the use of federal grants merely to replace state and local expenditures"). Plaintiffs recognize that maintenance-of-effort provisions are generally constitutional. Pls.' Mot. 30–31. But they attempt to distinguish the offset provision on the grounds that "States do not have to use the [Rescue Plan] funds to supplement preexisting state spending" in specific areas and that "States are free to supplant planned funds state spending with ARPA funds and spend the resulting surplus as they see fit." *Id.* at 31. But that distinction means the offset provision is *less* intrusive on the States' budgets than a maintenance-of-effort provision. Plaintiffs' argument that the former is unconstitutionally coercive cannot be squared with their acceptance that the latter would be permissible.

Indeed, Congress routinely prohibits States from passing certain tax laws without violating the Tenth Amendment. *See, e.g.*, 4 U.S.C. § 114(a) (providing that States may not "impose an income tax on any retirement income of an individual who is not a resident or domiciliary of such State"); Pub. L. No. 105-227, 112 Stat. 2681, 2719 § 1101 (1998) ("Internet Tax Freedom Act," providing that no "State or political subdivision thereof shall impose . . . taxes on Internet access" or "multiple or discriminatory taxes on electronic

commerce" (made permanent by Pub. L. No. 114-125, 130 Stat. 122, 281 § 992 (2016))); *see, e.g., R.J. Reynolds Tobacco Co. v. Durham Cnty.*, 479 U.S. 130, 155 (1986); *Quill Corp. v. North Dakota By & Through Heitkamp*, 504 U.S. 298, 318 (1992) ("Congress is [] free to decide whether, when, and to what extent the States may burden interstate mail-order concerns with a duty to collect use taxes."), *overruled on other grounds by South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080 (2018); *see also Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1478–79 (2018).

Because Plaintiffs had "a legitimate choice whether to accept the federal conditions in exchange for federal funds," *NFIB*, 567 U.S. at 578, their coercion and Tenth Amendment arguments should be rejected. They were free to reject the federal money, and their voters know where to turn if they like, or dislike, the States' choice. *Id.* (explaining that "state officials can fairly be held politically accountable for choosing to accept or refuse the federal offer"); *New York*, 505 U.S. at 144.

### C. The offset provision is related to the purpose of ARPA.

Plaintiffs also incorrectly argue that the offset provision is not sufficiently related to the Rescue Plan's purposes. Pls.' Mot. 29–31. But the archetypal condition that is related to the purposes of federal spending is one that ensures "that public funds [are] spent for the purposes for which they were authorized." *Rust v. Sullivan*, 500 U.S. 173, 196 (1991). And that's exactly what the offset provision does: it merely specifies how States may use the newly appropriated federal funds to ensure that they are used for the public-health and economic-recovery purposes of the Act. *See Sabri*, 541 U.S. at 608; *Oklahoma*, 330 U.S. at 143; *see also* Section II, *supra*. Congress did not provide the Rescue Plan funds as a means to replace purposeful decreases in net tax revenue; it provided the money to help States economically recover from the pandemic in ways they otherwise could not.

This is more than sufficient to meet the "minimal standard of rationality" required of Spending Clause legislation. *Benning*, 391 F.3d at 1308; *see also New York*, 505 U.S. at 172

19

(finding funding conditions sufficiently related where "both the conditions and the payments embody Congress' efforts to address the pressing problem of radioactive waste disposal"); *Dole*, 483 U.S. at 208–09 (finding that the federal interest in a uniform drinking age was sufficiently related to States' receipt of highway funds); *United States v. Lipscomb*, 299 F.3d 303, 322 & n.97 (5th Cir. 2002) ("The required degree of this relationship is one of reasonableness or minimum rationality." (quoting *Kansas v. United States*, 214 F.3d 1196, 1199 (10th Cir. 2000))). In fact, Plaintiffs point to no case, and Defendants are aware of none, in which a court has struck down a funding condition on relatedness grounds. *See City of Los Angeles v. Barr*, 929 F.3d 1163, 1175 (9th Cir. 2019) (recognizing that the relatedness standard "is not demanding" and that "the Court has never struck down a condition on federal grants based on this relatedness prong").

Again, Plaintiffs' argument is premised on the erroneous understanding that the offset provision prohibits all "state tax cuts." Pls.' Mot. 30. But, as noted above, no party is advocating for this broad interpretation of the statute, and Treasury has affirmatively rejected that interpretation with the Rule. Section I.A., *supra*. And there is no reason why this Court should depart from the statute's text, the Rule's implementation of that text, or the principle that courts should *avoid* (rather than *create*) constitutional issues, *Nielsen v. Preap*, 139 S. Ct. 954 (2019), all to invalidate or enjoin a broad reading of the offset provision that Defendants have not adopted. Plaintiffs' relatedness argument should be rejected.

### D.   THE OFFSET PROVISION DOES NOT VIOLATE EQUAL SOVEREIGNTY PRINCIPLES.

Finally, the Court should dismiss Plaintiffs' Equal Sovereignty claim.[4] Plaintiffs do not attempt to seek summary judgment for this claim, and instead fall back on the stand-

---

[4] Notably, none of the amici in support of Plaintiffs have advocated for this novel theory of Equal Sovereignty, nor have any of the States in the other five challenges to the offset provision advanced this theory.

ard of review under Rule 12(b)(6). Pls.' Mot. 16–19 (arguing that Plaintiffs' claim is "plausible"); *Iqbal*, 556 U.S. at 678. But the question of whether the statute is unconstitutional on Equal Sovereignty grounds is a pure question of law. Plaintiffs have not pleaded or identified any factual dispute, and no factual development could assist the Court in ruling on this issue. Dismissal of this claim is thus appropriate.

Plaintiffs admit that the offset provision is facially neutral among the States, but say that this facial neutrality is a "ruse." Pls.' Mot. 18. However, the cited portions of the Complaint contend only that some States are more "likely" to decrease taxes. Compl. ¶¶ 75–79, ECF No. 1. Nowhere do Plaintiffs explain how Congress's passage of a facially neutral statute is a secret scheme to target certain States and not others, let alone plead facts to that effect. The Court should reject Plaintiffs' "unadorned . . . accusation[]." *Iqbal*, 556 U.S. at 678.

As Defendants have pointed out, were Plaintiffs' theory of Equal Sovereignty correct, it would almost eliminate Congress's power to preempt state law under Article VI of the Constitution because States will likely have differing policy preferences on many issues. *See* Defs.' Mot. 25. Plaintiffs do not confront this problem and instead point out that Defendants' cited example comes from a Commerce Clause case, rather than a Spending Clause case. Pls.' Mot. 18–19. But even assuming the Equal Sovereignty principle allows federal courts to second guess congressional enactments, it is not specific to Spending Clause statutes. *See Shelby Cnty. v. Holder*, 570 U.S. 529, 553 (2013) (applying Equal Sovereignty analysis to a statute passed pursuant to the Section 2 of the Fifteenth Amendment). If Plaintiffs' theory were to prevail, any number of statutes previously upheld as valid exercises of Congress's powers (under the Commerce Clause, for example) would be subject to a renewed challenge on Equal Sovereignty grounds, so long as at least one State dislikes the policies contained therein. The Court should reject such a sweeping theory.

## III.   The Court should not enjoin the offset provision or declare it unconstitutional.

Even if the Court finds a constitutional defect in the offset provision, neither a permanent injunction nor a declaratory judgment is appropriate.

### A.   PLAINTIFFS ARE NOT ENTITLED TO A PERMANENT INJUNCTION.

A court, in its "equitable discretion," may enter a permanent injunction if a plaintiff can demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (citations omitted).

Plaintiffs fail each of these requirements. "An injunction against [even] threatened legal action will not issue if the party will have an adequate opportunity to fully present his defenses and objections in the legal action he seeks to enjoin." *Travis v. Pennyrile Rural Elec. Coop.*, 399 F.2d 726, 729 (6th Cir. 1968) (citing *Georgia v. City of Chattanooga*, 264 U.S. 472 (1924)). Even if the Plaintiff States were to use Rescue Plan Funds to offset a reduction in net tax revenue and face potential recoupment by the Secretary, any such recoupment proceedings would present "an adequate opportunity" to present their defenses. *Id.*; *see* 86 Fed. Reg. at 26,811–12 (detailing the recoupment process, including a "reconsideration process [that] provides a recipient the opportunity to submit additional information it believes supports its request" for reconsideration). Because the Plaintiff States may assert their constitutional argument as a "legal defense" to a recoupment action, they "therefore [have] an adequate remedy." *Travis*, 399 F.2d at 729. And if the States were unable to succeed in such hypothetical future proceedings, the result would simply be that they have to repay money—the quintessential example of harm that is *not* irreparable. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974); *Foy v. Univ. of Tex.*, 146 F.3d 867 (5th Cir. 1998)

(per curiam). With potential recoupment nowhere in sight, Plaintiffs' challenge is "premature" and no injunction should issue. *Travis*, 399 F.2d at 729.

By contrast, enjoining the enforcement of an Act of Congress would unquestionably impose irreparable harm on the federal government and contravene the public interest. *See United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001) (emphasizing that "a court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation" (quotation marks omitted)); *see also Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (citation omitted)). "The presumption of constitutionality which attaches to every Act of Congress is not merely a factor to be considered in evaluating success on the merits, but an equity to be considered in favor of [the government] in balancing hardships." *Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324 (1984) (Rehnquist, J., in chambers). An injunction would thus irreparably harm the United States and undermine the public interest. That is only more evident here, where the legislation at issue is a direct response to a national health and economic emergency of historic proportions.

**B.   THE COURT SHOULD NOT ISSUE A DECLARATORY JUDGMENT.**

A court may issue a declaratory judgment "[i]n a case of actual controversy within its jurisdiction." 28 U.S.C. §2201(a). Assuming the threshold requirements of standing and ripeness are met, the Court may consider various factors in determining whether to issue a declaratory judgment, including whether the declaratory judgment would serve

a useful purpose in clarifying the legal relations and whether there is an alternative remedy that is better or more effective. *Sherwin-Williams Co. v. Holmes Cnty.*, 343 F.3d 383, 389–90 & n.2 (5th Cir. 2003).[5]

Here, a declaratory judgment is not necessary to clarify any legal relations. As discussed above, the Rescue Plan—especially in combination with the unchallenged Rule—provides more than sufficient clarity. And if the Plaintiff States have any lingering questions, "Treasury encourages State, local, and Tribal governments in particular to provide feedback and to engage with Treasury regarding issues that may arise regarding all aspects of th[e] [Rule] and Treasury's work in administering the Fiscal Recovery Funds." 86 Fed. Reg. at 26,788.

A declaratory judgment also should not issue because there is an alternative remedy available: the States may assert their constitutional arguments as a defense to a recoupment action. This alternative is superior to a declaratory judgment because a recoupment action may never come to pass at all, either because the States do not use Rescue Plan funds to offset a reduction in net tax revenue or because the Secretary may exercise her enforcement discretion not to seek recoupment. *See Ohio v. Yellen,* 2021 WL 1903908, at *14 (S.D. Ohio May 12, 2021) ("[T]here is no reason to believe that the Secretary will exercise [her recoupment] powers any time soon."). The Plaintiffs are therefore not entitled to a declaratory judgment.

## CONCLUSION

For the reasons explained above, the Court should deny Plaintiffs' motion for summary judgment and dismiss the Complaint or grant summary judgment in favor of Defendants.

---

[5] Notably, Plaintiffs do *not* argue that the Court should enter a declaratory judgment on their Motion for Summary Judgment. *See generally* Pls.' Mot.; *but see* Compl. ¶¶ 10, 17, 20 (seeking declaratory relief).

DATED: October 25, 2021                    Respectfully submitted,

                                           BRIAN M. BOYNTON
                                           Acting Assistant Attorney General

                                           BRIAN D. NETTER
                                           Deputy Assistant Attorney General

                                           ALEXANDER K. HAAS
                                           Director, Federal Programs Branch

                                           BRIGHAM J. BOWEN
                                           Assistant Director, Federal Programs Branch

                                           */s/ Michael P. Clendenen*
                                           MICHAEL P. CLENDENEN
                                           STEPHEN EHRLICH
                                           CHARLES E.T. ROBERTS
                                           Trial Attorneys
                                           Civil Division, Federal Programs Branch
                                           U.S. Department of Justice
                                           1100 L Street, NW
                                           Washington, DC 20005
                                           Phone: (202) 305-9803
                                           Email: stephen.ehrlich@usdoj.gov

                                           *Counsel for Defendants*

**<u>Certificate of Service</u>**

On October 25, 2021, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ *Michael P. Clendenen*