IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

MAR − 4 2022

CLERK, U.S. DISTRICT COURT
By_____
Deputy

| | | |
|---|---|---|
| THE STATE OF TEXAS *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 2:21-CV-079-Z |
| | § | |
| JANET YELLEN *et al.*, | § | |
| | § | |
| Defendants. | § | |

**ORDER**

Before the Court is Defendants' Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) ("Motion") (ECF No. 19). Having reviewed the Motion, related pleadings, and applicable law, the Court finds Defendants' Motion should be and is hereby **DENIED**.

BACKGROUND

On March 11, 2021, Congress enacted the American Rescue Plan Act of 2021 ("ARPA"), Pub. L. No. 117-2, § 9901(a), 135 Stat. 4 (2021), codified as 42 U.S.C. §§ 801 *et seq.* ARPA establishes a "Coronavirus State Fiscal Recovery Fund," which allocates $220 billion to mitigate the fiscal effects of the COVID-19 pandemic on States, territories, and tribal governments through 2024. ECF No. 19 at 11. ARPA allocates nearly $200 billion to the States and District of Columbia. 42 U.S.C. § 802(b)(2)(A). ARPA allows States to use allocated funds in a wide range of areas to respond to the public health emergency caused by COVID-19.

For example, through 2024, a State may use ARPA funds to "cover costs incurred":

(A)     to respond to the public health emergency with respect to the Coronavirus Disease 2019 (COVID-19) or its negative economic impacts, including assistance to households, small businesses, and nonprofits, or aid to impacted industries such as tourism, travel, and hospitality;

(B)     to respond to workers performing essential work during the COVID-19 public health emergency by providing premium pay to eligible workers of the State, territory, or Tribal government that are performing such essential work, or by providing grants to eligible employers that have eligible workers who perform essential work;

(C)     for the provision of government services to the extent of the reduction in revenue of such State, territory, or Tribal government due to the COVID-19 public health emergency relative to revenues collected in the most recent full fiscal year of the State, territory, or Tribal government prior to the emergency; or

(D)     to make necessary investments in water, sewer, or broadband infrastructure.

*Id.* § 802(c)(1)(A)–(D).

Despite the considerable discretion ARPA affords States in using allocated funds, the statute imposes a limitation. Section 802(c)(2)(A) — referred to by Plaintiffs as the "Tax Mandate" and by Defendants as the "offset provision" — prohibits States from:

us[ing] the funds provided under [§ 802] . . . to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

*Id.* § 802(c)(2)(A). Defendants argue this funding condition only applies to reductions in *net* tax revenue. ECF No. 19 at 13. Defendants aver, if a State uses ARPA funds to reduce its net tax revenue, the State must repay the amount used to offset the lesser of "the reduction to net tax revenue" or "the amount of funds received." 42 U.S.C. § 802(e); ECF No. 19 at 13.

2

ARPA authorizes the Secretary of the Treasury "to issue such regulations as may be necessary or appropriate to carry out" the applicable statutory provisions. 42 U.S.C. § 802(f). On May 10, 2021, the Secretary of the Treasury posted an Interim Final Rule ("IFR") setting forth a framework to determine when a State has used ARPA funds to "directly or indirectly offset" net tax revenue. ECF No. 19 at 13. The IFR was published in the Federal Register the following week. *See Coronavirus State and Local Fiscal Recovery Funds*, 86 Fed. Reg. 26,786 (May 17, 2021).

On May 3, 2021, the States of Texas, Mississippi, and Louisiana ("Plaintiffs") filed a Complaint for Declaratory and Injunctive Relief (ECF No. 1) against Janet Yellen, in her official capacity as Secretary of the Treasury, Richard K. Delmar, in his official capacity as acting inspector general of the Department of Treasury, the Department of the Treasury, and the United States of America ("Defendants"). Plaintiffs allege the "Tax Mandate" is unconstitutional. ECF No. 1 at 2.

Plaintiffs present several claims in support of their request for declaratory and injunctive relief. First, Plaintiffs argue the Tax Mandate violates the Spending Clause of the Constitution, U.S. CONST. art. I, § 8, cl. 1, because it "condition[s] billions of dollars of pandemic-recovery funding . . . on maintaining Congress's favored tax policies." ECF No. 1 at 11–12. Second, Plaintiffs allege the provision "is ambiguous as to its scope and not reasonably related to encouraging the States' economic recovery following the COVID-19 pandemic." *Id.* at 12. They also maintain the provision " is far too overinclusive *and* underinclusive to bear any reasonable relationship to any legitimate purpose underlying the Act's funding provisions." *Id.* Plaintiffs therefore conclude the "Tax Mandate" again violates the Spending Clause, U.S. CONST. art. I, § 8, cl. 1. ECF No. 1 12–13. Third, Plaintiffs aver the provision "commandeer[s] the States' sovereign authority over their own tax policy . . . in violation of the Tenth Amendment." ECF No. 1 at 14;

3

*see also* U.S. CONST. amend. X. Fourth, Plaintiffs contend the provision "violates [the Tenth Amendment and] the principle of equal sovereignty by targeting and invading the sovereignty only of those States that, as a matter of history and present fact, are likely to decrease taxes and other government revenues." *Id.* at 15. Plaintiffs have signed certifications and received ARPA funds — which they contend was the "inevitable result of Congress's coercive offer." ECF No. 28 at 15. Plaintiffs argue they continue to be harmed by Section 802(c)(2)(A), as it is an "unprecedented attempt to intrude upon their sovereign authority to set state tax policy." *Id.*

On July 12, 2021, Defendants filed a Motion to Dismiss Plaintiffs' Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). *See generally* ECF No. 27.

LEGAL STANDARD

A.  Dismissal Under Rule 12(b)(1)

Federal courts are courts of limited jurisdiction: they possess only power authorized by the U.S. Constitution and federal statutes. *Xitronix Corp. v. KLA-Tencor Corp.*, 916 F.3d 429, 435 (5th Cir. 2019). "The requirement that jurisdiction be established as a threshold matter spring[s] from the nature and limits of the judicial power of the United States and is inflexible and without exception." *Id.* (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998)).

When a motion to dismiss for lack of subject-matter jurisdiction "is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). Furthermore, where a complaint could be dismissed under Rule 12(b)(1) or 12(b)(6), "the court should dismiss only on the jurisdictional ground . . . without reaching the question of failure to state a claim." *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977). Doing so avoids the

issuance of an advisory opinion, *Steel Co.*, 523 U.S. at 101, and prevents courts without jurisdiction "from prematurely dismissing a case with prejudice," *Ramming*, 281 F.3d at 161.

A Rule 12(b)(1) motion can mount either a facial or factual challenge. *See, e.g.*, *Hunter v. Branch Banking & Tr. Co.*, No. 3:12-CV-2437-D, 2013 WL 607151, at \*2 (N.D. Tex. Feb. 19, 2013). When a party makes a Rule 12(b)(1) motion without evidence, the challenge to subject-matter jurisdiction is facial. *Id.* The court assesses a facial challenge like a Rule 12(b)(6) motion by "look[ing] only at the sufficiency of the allegations in the pleading and assumes them to be true. If the allegations are sufficient to allege jurisdiction, the court must deny the motion." *Id.*

### B. Dismissal Under Rule 12(b)(6)

"To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of the cause of action will not do." *Twombly*, 550 U.S. at 555 (internal marks and citation omitted).

"Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *In re Katrina*, 495 F.3d at 205 (quoting *Twombly*, 550 U.S. at 555) (internal marks and citation omitted)). "The court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *Id.* (quoting *Martin K. Eby Constr. Co., Inc. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)).

The Court must "begin by identifying the pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). After assuming the veracity of any well-pleaded allegations, the Court should then "determine whether they plausibly give rise to an entitlement to relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

This standard of "plausibility" is not necessarily a "probability requirement," but it requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

ANALYSIS

A. Rule 12(b)(1): Standing

The Court begins by determining whether this dispute can be "appropriately resolved through the judicial process." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quoting *Whitmore v. Arkansas*, 494 U.S. 149, 155 (1990)). The judicial power of federal courts is limited to certain "cases" and "controversies." U.S. CONST. art. III, § 2. Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan*, 504 U.S. at 560 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). To have standing, the party invoking federal jurisdiction must establish he suffered: (1) an "injury in fact" that is "concrete and particularized" and "actual or imminent"; (2) an injury that is "fairly . . . trace[able] to the challenged action of

the defendant"; and (3) an injury that is "likely" rather than "speculative[ly]" to be "redressed by a favorable decision." *Id.* at 560–61.

    1. *Injury in Fact*

    The Court first determines whether Plaintiffs suffered an injury in fact. To establish injury in fact, Plaintiffs must show they endured "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). For an injury to be "particularized," it "must affect the plaintiff in a personal and individual way." *Id.* A "concrete" injury must be "de facto" — that is, it must "actually exist" and be "real" rather than "abstract." *Id.* at 340. Although tangible injuries may be easier to recognize, "concrete," is not necessarily synonymous with "tangible." *Id.* Intangible injuries can be "concrete." *Id.*

    The parties disagree as to when the alleged injuries occurred. The Court considers the nature of the right asserted by Plaintiffs to determine whether an injury in fact exists. *See Ohio v. Yellen*, 547 F. Supp. 713, 723–24 (S.D. Ohio 2021). The constitutional right at issue here is the States' power to tax. Earliest judicial decisions recognize "the power to tax involves the power to destroy." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 431 (1819); ECF No. 37 at 17. The Supreme Court recognizes the power to tax is "central to state sovereignty," *Dep't of Revenue v. ACF Indus., Inc.,* 510 U.S. 332, 345 (1994), as the "power of self-government . . . cannot exist distinct from the power of taxation," *Providence Bank v. Billings*, 29 U.S. (4 Pet.) 514, 546, 548 (1830). ECF No. 37 at 17. "The allocation of powers in our federal system preserves the integrity, dignity, and residual sovereignty of the States." *Bond v. United States*, 564 U.S. 211, 221 (2011). The States' "power of taxation is indispensable to [the States'] existence." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 199 (1824).

Defendants argue Plaintiffs lack an injury in fact because their asserted injuries are "hypothetical and speculative." ECF No. 19 at 16. Defendants aver Plaintiffs' fail to allege they will use Section 802(c)(2)(A) to enact tax cuts reducing net tax revenue. *Id.* Defendants also refer to a lack of imminent recoupment of ARPA funds by 42 U.S.C. § 802(e) enforcement as evidence of Plaintiffs' failure to demonstrate an injury in fact. *Id.* at 17. Defendants further suggest Plaintiffs' reliance on their sovereign taxation authority is a "naked contention" and "abstract question of sovereignty" insufficient to establish an Article III case or controversy. *Id.* at 17–18 (citing *Massachusetts v. Mellon*, 262 U.S. 447, 483, 485 (1923)).

In *Ohio v. Yellen*, the district court found Ohio, which challenged Section 802(c)(2)(A), had an injury in fact. The Court reasoned the limitation at issue was on Congress and *not* Ohio as federal courts require *Congress* to state conditions on federal funds unambiguously. *Ohio v. Yellen*, 539 F. Supp. 3d at 802, 809, 812 (S.D. Ohio 2021). Because "the constitutional violation occurs when the federal government offers money on ambiguous terms [,] [i]t is Congress *passing* the Act, not the State *accepting* the money" that creates the alleged injuries at issue. *Id.* The district court thus found the harm at issue as an "affront-to-sovereignty theory" because States as "co-sovereign[s] in our constitutional structure" have the right to "bargain" in accordance with constitutionally imposed strictures of "good faith" — one being the requirement of unambiguous terms in a "proposed Spending Clause 'deal.'" *Id.* at 813.

The Court agrees with the *Ohio* reasoning and finds Section 802(c)(2)(A) presents a mandate of such an ambiguous nature that may deprive Plaintiffs from receiving the information which it is entitled to under the Constitution. Such information would allow Plaintiffs to exercise their sovereign prerogative to determine whether the deal presented is in the best interests of their citizens.

8

But even if the Court were to find the Section 802(c)(2)(A) condition unambiguous, Plaintiffs still have an injury in fact. The unconstitutional conditions doctrine "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013). The Supreme Court's decisions in unconstitutional conditions cases "have long refused to attach significance to the distinction between conditions precedent and conditions subsequent." *Id.* at 596. Accordingly, an "unconstitutional condition" is a "constitutionally cognizable injury." *Id.* at 607.

Because the alleged constitutional violation here occurred when Congress passed ARPA, Plaintiffs' face an injury by being put in the position of having to choose between being injured by the loss of a substantial amount of federal funds or the invasion of their constitutional authority to tax. Plaintiffs face possible harm whichever choice they choose; "putting them to that choice is an injury itself." ECF No. 28 at 17. The Court thus finds an injury in fact exists.

2. *Traceability*

The Court next considers whether Plaintiffs' injuries are traceable to the challenged statute. To establish traceability, Plaintiffs must show a "fairly traceable" link between their alleged injuries and ARPA. *Lujan*, 504 U.S. at 560. This link in causation "requires no more than *de facto* causality," and Plaintiffs need not demonstrate Defendants' actions are "the very last step in the chain of causation." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2556 (2019); *see also Bennett v. Spear*, 520 U.S. 154, 169–70 (1997) (same).

Defendants focus on the injury-in-fact element of standing, thereby only indirectly addressing traceability by arguing Plaintiffs do not demonstrate how ARPA restricts any conduct they intend to undertake. ECF No. 19 at 17. Plaintiffs, however, aver their injuries are fairly

9

traceable to the "Tax Mandate" and redressable by a "court order declaring it unconstitutional and enjoining its enforcement." ECF No. 28 at 24.

Plaintiffs point to the recent decisions in *Ohio v. Yellen* ("*Ohio II*") and *West Virginia v. U.S. Dep't of Treasury. See* 547 F. Supp. 3d 713 (S.D. Ohio 2021); No. 7:21-CV-465, 2021 WL 2952863 (N.D. Ala. July 14, 2021). In *Ohio II*, the district court determined Ohio's "original and ongoing injuries ar[o]se directly from, and thus [were] traceable to, the prospect of future enforcement of the allegedly ambiguous—and therefore allegedly unconstitutional—Tax Mandate." 547 F. Supp. 3d at 727. And in *West Virginia*, the court simply stated, "there is no question that the injuries in fact as discussed [ ] are fairly traceable to the Federal Tax Mandate." 2021 WL 2952863, at *7.

The Court agrees with the *Ohio II* and *West Virginia* courts. The alleged injuries cited by Plaintiffs — specifically an unconstitutional condition forcing States to decide whether to choose "funding" or "state sovereignty" — began as soon as ARPA was enacted. ECF No. 28 at 16. *But for* the devastating economic conditions from the COVID-19 pandemic, the size of funding available from ARPA, the ambiguous Section 802(c)(2)(A) restriction on state taxing policies, and the Section 802(e) recoupment penalty, Plaintiffs would not be put in the position to either forgo their constitutional taxing authority or deny the alleged "unconstitutionally ambiguous deal." *Id.* at 16–17. Therefore, Plaintiffs' injuries are directly traceable to ARPA's enactment.

3. *Redressability*

Standing requires redressability, and redressability requires Plaintiffs demonstrate a "'substantial likelihood' that the requested relief will remedy the alleged injury." *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41 (1976)). Plaintiffs seek a declaration from this Court that Section

802(c)(2)(A) is unconstitutional and an injunction enjoining federal officials from enforcing Section 802(c)(2)(A) against them. ECF No. 1 at 4. A declaration of unconstitutionality and an injunction will halt the enforcement of Section 802(c)(2)(A) against Plaintiffs and thereby eliminate the alleged irreparable harm on state sovereignty present since the enactment of ARPA. *See Ohio II*, 547 F. Supp. at 727 ("Enjoining the Secretary from enforcing the Tax Mandate against Ohio, or declaring that the provision is unconstitutional as applied to the State, would remedy the uncertainty surrounding Ohio's legislative efforts relating to taxation, which is the harm that Ohio is currently suffering."); *West Virginia*, 2021 WL 2952863, at *7 ("[T]here is no question that the injuries in fact . . . can be redressed by a court order invalidating the mandate."). Therefore, Plaintiffs have established redressability.

    4. *Pre-Enforcement Standing*

Whereas the Court finds an injury in fact has existed since ARPA's enactment, the Court now considers Defendants' emphasis on pre-enforcement standing. When a party seeks to enjoin the future enforcement of a statute, standing exists when "the injury-in-fact requirement" demands the plaintiff assert "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of [enforcement] thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 298, 298 (1979)).

Defendants argue Plaintiffs lack pre-enforcement standing because their asserted injuries are "hypothetical and speculative." ECF No. 19 at 16. However, Plaintiffs state they will continue to exercise their right — under constitutionally-based principles of federalism — to enact tax laws during the covered period of the Section 802(c)(2)(A) enforcement. *See* ECF No. 28 at 23 (stating "Plaintiffs have . . . already considered and enacted changes to their tax laws during the covered

period of the Tax Mandate."). Further, the IFR — defining when a State has used ARPA funds to "directly or indirectly offset" net tax revenue — indicates the Secretary of the Treasury's intention "to seek recoupment when she deems a State to have violated her understanding of the Tax Mandate." *Id.* (citing 31 C.F.R. § 35.10). The ambiguity of Section 802(c)(2)(A)'s text and the Secretary of the Treasury's discretion to determine when a State's use of ARPA funds warrants recoupment will both arguably interfere with and proscribe the tax policies Plaintiffs intend to enact.

A violation of Section 802(c)(2)(A) is not a prerequisite to standing. The Supreme Court does not require plaintiffs challenging the constitutionality of a law to "confess that [they] will in fact violate the law." *Driehaus*, 573 U.S. at 163. Pre-enforcement standing in Spending Clause cases is common. *See NFIB v. Sebelius*, 567 U.S. 519, 542 (2012); *New York v. United States*, 505 U.S. 144, 171–72 (1992); *South Dakota v. Dole*, 483 U.S. 203, 205–06 (1987). If a plaintiff is subject to the threat of enforcement, "an actual . . . enforcement action is not a prerequisite to challenge the law." *Driehaus*, 573 U.S. at 158. An argument that Plaintiffs have not violated the Tax Mandate lacks force, as it does not mean Plaintiffs cannot and will not violate the Tax Mandate in the future. *See, e.g.*, ECF No. 28 at 23 ("Plaintiffs have, in fact, already considered and enacted changes to their tax laws during the covered period of the Tax Mandate."). The Court thus finds Plaintiffs have standing to raise each of their claims even if their alleged injuries are considered at a pre-enforcement stage.

### B.  Rule 12(b)(6): Failure to State a Claim

Defendants aver Plaintiffs challenge to the Section 802(c)(2)(A) condition fails as a facial matter because "Plaintiffs do not claim that any particular state enactment that will lead to recoupment." ECF No. 19 at 20–21. Defendants argue Plaintiffs must demonstrate Section

802(c)(2)(A) is "unconstitutional in all its applications" and "there is no set of circumstances under which the law would be valid." ECF No. 19 at 21 (quoting *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019)). Defendants further assert Plaintiffs fail to demonstrate a "plain showing" Congress exceeded its constitutional bounds in enacting Section 802(c)(2)(A). *Id.*

The question before the Court is whether Plaintiffs plead sufficient facts — when accepted as true and viewed in the light most favorable to Plaintiffs — to state a facially plausible claim for relief. *See Iqbal*, 556 U.S. at 678; *White v. U.S. Corr., L.L.C.*, 996 F.3d 302, 306–07 (5th Cir. 2021). The Court considers each of Plaintiffs' claims with the understanding that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "A complaint 'does not need detailed factual allegations,' but the facts alleged 'must be enough to raise a right to relief above the speculative level.'" *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 765–66 (5th Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

1. *The Spending Clause*

Plaintiffs assert Section 802(c)(2)(A) exceeds Congress's Spending Clause authority by its coercive effect and ambiguous conditions unrelated to ARPA's purpose of mitigating economic harms resulting from the COVID-19 pandemic. ECF No. 1 at 11–13. Defendants disagree. They argue Plaintiffs fail to state a claim on the merits because they "have not come close" to showing Congress exceeded its Spending Clause authority. ECF No. 19 at 20. Defendants claim Congress validly exercised its spending power through its "broad leeway in establishing permissible uses of federal funds" and "overriding interest in ensuring that the new [ARPA] funds will be used for the broad categories of state expenditures it identified." *Id.* at 23.

13

The Spending Clause confers Congress the authority to "lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. CONST. art. I, § 8, cl. 1. Congress may exercise its spending power to incentive States to follow federal policies. *See Coll. Savings Bank v. Fla. Prepaid Postsecondary Ed. Expense Bd.*, 527 U.S. 666, 686 (1999) (Congress can condition spending upon the States "taking certain actions that Congress could not require them to take."). Congress may not, however, use this authority to cross the line between persuasion and compulsion. *See NFIB*, 567 U.S. at 577–78 ("[W]hen 'pressure turns into compulsion,' . . . the legislation runs contrary to our system of federalism."). In short, Congress must use its spending power in pursuit of "the general Welfare" and may only place conditions on State receipt of federal funds that are unambiguous, do not violate other constitutional provisions, and are reasonably related to the purpose of the federal grant. *Dole*, 483 U.S. at 207–08; *see also New York*, 505 U.S. at 171–72.

    a.   Coercion

Congress may attach "appropriate conditions to federal taxing and spending programs to preserve its control over the use of federal funds." *NFIB*, 567 U.S. at 579. Congress, however, cannot order States to forgo a sovereign power through an explicit command or a conditional offer a State cannot refuse. *Id.* While the choice before Plaintiffs may be one in theory, the Court considers whether it is plausible Plaintiffs do not have a choice in fact. *See id.* at 581; *Dole*, 483 U.S. at 211–12.

Plaintiffs allege ARPA's billion-dollar proposal of pandemic recovery funds — totaling 22 percent of all States' annual general funds budgets in exchange for compliance with the "Tax Mandate" — is an offer akin to a "gun to the head." ECF No. 28 at 29–30; *see also* NATIONAL ASSOCIATION OF STATE BUDGET OFFICERS, THE FISCAL SURVEY OF STATES 13 (2020). The Court

recognizes Plaintiffs have not been notified of any recoupment of ARPA funds. The alleged coercion here — however — is judged at the time the States must choose whether to surrender their sovereignty or forgo billions of dollars in federal funds. *NFIB*, 567 U.S. at 582 & n.12. In *NFIB v. Sebelius*, the Supreme Court held Congress's financial inducement crossed the line between persuasion and coercion by conditioning Medicaid funding on a State's agreement to expand Medicaid coverage — resulting in a "threatened loss of over 10 percent of a State's overall budget." *Id*. at 581–82. Such a loss was an "economic dragooning that [left] the States with no real option but to acquiesce." *Id*. The Supreme Court contrasted the facts in *NFIB* with those in its *South Dakota v. Dole* decision. *Id*. at 580–81. In *Dole*, the *NFIB* Court explained, Congress only offered "relatively mild encouragement to the States" when South Dakota risked losing five percent of its highway funds — amounting to "less than half of one percent of South Dakota's budget at the time" — if the State chose to adhere to its own policy regulating minimum drinking age. *Id*.

Here, ARPA funds amount to around 22 percent of all States' annual general fund budgets and 9 percent of all States' total fund budgets. ECF No. 39 at 17 n.2. Specific to Plaintiffs, Texas is entitled to nearly $16 billion, which accounts for more than 13 percent of the State's 2021 budget; the amount available to Mississippi is nearly $2 billion, equivalent to 31 percent of the State's 2021 budget; and the amount available to Louisiana is over $3 billion, which equals 7 percent of the State's 2021 budget. *See* ECF No. 28 at 10. By contrast, in *NFIB* the Supreme Court determined "[t]he threatened loss of over 10 percent of a State's overall budget . . . is economic dragooning that leaves the States with no real option but to acquiesce in the Medicaid expansion." 567 U.S. at 582.

Although the 10-percent mark in *NFIB* is not a dogmatic, nominal amount that must be met for unconstitutional financial coercion to exist, the figure guides this Court when determining whether Congress has acted in a manner akin to "undue influence" over "relatively mild encouragement." 567 U.S. at 578, 579–80 (quoting *Steward Machine Co. v. Davis*, 301 U.S. 548, 590 (1937); *Dole*, 483 U.S. at 211). The threat to Plaintiffs' budgets is "economic dragooning" that exerts "undue influence" on the States rather than "relatively mild encouragement." *Id.* at 579–80, 582. Plaintiffs therefore assert a plausible coercion claim.

    b.  Ambiguous Conditions

When Congress imposes conditions on the receipt of federal funds, the conditions must be related "to the federal interest in particular national projects or programs" or "bear some relationship to the federal spending." *Dole*, 483 U.S. at 207 (quoting *Massachusetts v. United States*, 435 U.S. 444, 461 (1978) (plurality op.)); *New York*, 505 U.S. at 172. Plaintiffs aver Section 802(c)(2)(A) is too "overinclusive *and* underinclusive to bear reasonable relationship to any legitimate purpose underlying the Act's funding provisions" as it "arrogates to federal policy numerous fiscal decisions constitutionally left to the sovereign States, [yet] it imposes no similar restriction on cities, local governments, or tribal governments." *Id.* For example, Plaintiffs argue the "Tax Mandate" frustrates "Congress's endorsement of tax cuts as a tool for economic recovery" because nothing in Section 802(c)(2)(A) prevents them from spending freed-up State funds previously allocated towards an ARPA-approved category for non-COVID-19 recovery purposes. ECF No. 28 at 39; *see also* Pub. L. No. 117-2, §§ 9621, 9673. Therefore, Plaintiffs claim, the "Tax Mandate" is unrelated to ARPA's purpose of mitigating the fiscal effects stemming from the COVID-19 pandemic. ECF No. 28 at 38. Defendants argue the "offset provision" ensures ARPA funds are spent "according to [Congress's] view of the 'general Welfare'" by limiting their use to

16

four categories: "assistance to households and businesses, essential worker compensation, replacement of lost government revenues, and infrastructure investment." *See* 42 U.S.C. § 802(c)(1); ECF No. 19 at 24.

Defendants fail to demonstrate how Section 802(c)(2)(A) satisfies the "minimum rationality" required of Spending Clause legislation. *United States v. Lipscomb*, 299 F.3d 303, 322 (5th Cir. 2002) (quoting *Kansas v. United States*, 214 F.3d 1196, 1199 (10th Cir. 2000)). Section 802(c)(2)(A)'s restrictions do not ensure ARPA funds are related to Congress's view of the "general Welfare." For example, limiting the use of ARPA funds while allowing States to use their freed-up funds towards non-COVID-19 recovery purposes undermines Defendants' alleged interest in ensuring the relief it provides is devoted towards ARPA-approved categories related to pandemic recovery. And Congress's acknowledgement in ARPA that tax cuts are a tool for economic recovery — such as tax relief for families and businesses — contradicts the purpose behind the "Tax Mandate" prohibition. *See* Pub. L. No. 117-2, § 9621, § 9673. The Court finds Plaintiffs plausibly assert Congress's conditions set forth in Section 802(c)(2)(A) are unrelated to ARPA's purpose.

The conditions Congress imposes "must [also] be set out 'unambiguously,'" because "States cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). Congress must clearly impose conditions on the grant of federal funds, especially when a State's potential obligations are "largely indeterminate" so that States may "knowingly decide whether or not to accept those funds." *Pennhurst*, 451 U.S. at 24. The Court must determine "whether Congress spoke so clearly that we can fairly say that the State could make an informed choice." *Id.* at 25.

17

The Court considers the statute "from the perspective of the state official who is engaged in the process of deciding whether the State should accept [the] funds and the obligations that go with those funds." *Murphy*, 548 U.S. at 296. The Court then "ask[s] whether such a state official would clearly understand" the statute's requirements. *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 908 F.3d 127, 136 (5th Cir. 2018) (quoting *Murphy*, 548 U.S. at 296). To make this determination, the Court begins with the statute's text. The Court presumes Congress "says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). A statute is ambiguous when "its text, literally read, admits of two plausible interpretations." *Graham Cnty. Soil & Water Conserv. Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 419 n.2 (2005).

Plaintiffs argue Section 802(c)(2)(A)'s broad prohibition on using funds to "directly or indirectly offset a reduction in the net tax revenue" collected by States provides no "clear limiting principle" to explain how attenuated an "indirect offset" must be to violate the "Tax Mandate." ECF No. 1 at 12. They argue "it is unclear what it means to 'indirectly offset a reduction in . . . net tax revenue,'" and "it is unclear how to determine if there has been 'a reduction in . . . net tax revenue.'" ECF No. 28 at 32. Plaintiffs cite the Secretary of the Treasury's failed attempts at clarifying the difference between direct and indirect offsets as evidence of Section 802(c)(2)(A)'s ambiguity. ECF No 28 at 32–36. Plaintiffs also refer to the absence of a baseline to determine a reduction in net tax revenue in the "Tax Mandate" — present in other ARPA provisions — as additional textual evidence of ambiguity. *Id.* at 36.

The Secretary of the Treasury attempted to clarify Section 802(c)(2)(A) through an IFR providing a framework to determine when a State has used its ARPA funds to "directly or indirectly offset" a reduction in the net tax revenue. ECF No. 19 at 13 (citing 86 Fed. Reg. 26,786

(May 17, 2021)). The Fifth Circuit has held "regulations cannot provide the clarity" required for a State's acceptance of a Spending Clause condition to be "knowing." *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 361–62 (5th Cir. 2021). "Relying on regulations to present the clear condition" — rather than the text of the statutory provision in question — "is an acknowledgment that Congress's condition was not unambiguous." *Id.* at 361. The Secretary of the Treasury's attempts to clarify the conditions in Section 802(c)(2)(A) arguably allows the Executive — rather than Congress which is empowered through the Spending Clause — to place conditions on federal grants. *See id.* at 362. Such an attempt by the Executive serves as an acknowledgement of the statute's ambiguity as the "needed clarity" must come "directly from the statute." *Id.* Therefore, the Court finds Plaintiffs plausibly assert Congress's conditions set forth in Section 802(c)(2)(A) are ambiguous.

2. *The Tenth Amendment*

The Constitution establishes a system of "dual sovereignty." *Printz v. United States*, 521 U.S. 898, 918 (1997) (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991)). "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. amend. X. The Tenth Amendment confirms legislative power granted to Congress is not unlimited as "[t]he Constitution confers on Congress . . . only certain enumerated powers," leaving "all other power [reserved] for the States." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1476 (2018).

a. The Anti-Commandeering Principle

The Anti-Commandeering Principle affirms the Tenth Amendment's restriction on Congress's ability to "issue direct orders to the governments of the States." *Id.* Defendants argue nothing in ARPA "force[s] the States to implement a federal program," so States have a "legitimate

choice whether to accept the federal conditions in exchange for federal funds." ECF No. 19 at 29. The Court, however, finds although ARPA does not "directly command the Plaintiff States to implement Congress's preferred tax policy," Congress may commandeer States in practice by threatening to deny them billions of dollars in "badly needed funding" should they not comply with the "Tax Mandate." ECF No. 1 at 14.

For example, Plaintiff the State of Texas avers it expects to receive $16.45 billion under ARPA, which accounts for more than 13 percent of its 2021 budget *Id*. at 2–3. The refusal of such a significant amount — especially during a once-in-a-century pandemic when funds for economic recovery are in greater need — plausibly puts Texas officials in an unfair position of political accountability that should rest with federal officials. *NFIB*, 567 U.S. at 578. This danger is heightened when Congress acts under the Spending Clause "because Congress can use that power to implement federal policy it could not impose directly under its enumerated powers." *Id*. Accordingly, the Courts finds Plaintiffs assert a plausible Anti-Commandeering claim under the Tenth Amendment.

b.   Equal Sovereignty Principle

The Equal Sovereignty Principle recognizes the "historic tradition" in the United States "that all States enjoy 'equal sovereignty.'" *Nw. Austin Mun. Util. Dist. v. Holder*, 557 U.S. 193, 203 (2009) (quoting *United States v. Louisiana*, 363 U.S. 1, 16 (1960)). A statute that "differentiates between the States" may only be upheld upon a "showing that [the] statute's disparate geographic coverage is sufficiently related to the problems that it targets." *Id*.

Plaintiffs argue Section 802(c)(2)(A) intrudes "upon a sensitive area of state policymaking" in a subset of states which historically are more likely to exercise their sovereign right to decrease taxes and other government revenues. ECF No. 1 at 15. Plaintiffs further assert

Section 802(c)(2)(A) does not directly serve a legitimate purpose "sufficiently related to the problem that it targets" because it imposes no similar restrictions on cities, local governments, or tribal governments — and, therefore, the "Tax Mandate" does not promote pandemic recovery. *Id.*; ECF No. 28 at 26–27. Defendants cite *Mayhew v. Burwell,* to support their claim that Section 802(c)(2)(A) does not implicate the Equal Sovereignty principle. ECF No. 19 at 33; 772 F.3d 80 (1st Cir. 2014). Defendants argue because the "offset provision" does not differentiate between states on its face, Plaintiffs fail to assert an Equal Sovereignty claim. *See Mayhew*, 772 F.3d at 82 (finding the Affordable Care Act's requirement that States accepting Medicaid funds maintain their state-level Medicaid eligibility standards for children for a specified period "is constitutional, fitting easily within congressional spending power to condition federal Medicaid grants."). Plaintiffs rebut: Defendants fail to consider the *Mayhew* court's distinction between the federal provision in question before the First Circuit and Section 802(c)(2)(A) before this Court. ECF No. 28 at 27. They argue the *Mayhew* court determined the "provision at issue . . . does not intrude on an area of traditional state concern." 772 F.3d at 94–96.

The U.S. Supreme Court recognizes the taxation authority of state governments as a traditional power central to state sovereignty. *ACF Indus., Inc.,* 510 U.S. at 345. Section 802(c)(2)(A) may appear neutral on its face, but in practice the provision runs the risk of intruding into a sensitive area of state policymaking by conditioning a federal benefit on States forgoing their sovereign power to tax. Such an intrusion into a realm that is traditionally in the exclusive province of States is an "'extraordinary' departure from basic principles of federalism." *Id.*; *see also Mayhew*, 772 F.3d at 94–95. Section 802(c)(2)(A)'s prohibition on using ARPA funds to reduce net tax revenue may plausibly result in the disparate treatment of Plaintiffs because they historically use their taxation authority to decrease government revenue. ECF No. 28 at 26. Any

disparate treatment between States must be "sufficiently related to the problems that it targets." *Louisiana*, 363 U.S. at 16. ARPA is intended to "mitigate the fiscal impacts of the pandemic on States." ECF No. 44 at 9. The "Tax Mandate," however, is arguably unrelated to the problem Congress targets because cutting taxes is a legitimate fiscal policy used to spur economic recovery consistent with ARPA's purpose. ECF No. 28 at 26. The Court thus finds Plaintiffs' pleadings assert a facially plausible Equal Sovereignty claim under the Tenth Amendment.

CONCLUSION

For the reasons set forth above, the Court **DENIES** Defendants' Motion to Dismiss.

**SO ORDERED**.

March 4, 2022

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE